## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW A. RAGAN, individually and on behalf of all others similarly situated, ) ) | **CIVIL ACTION NO.**: |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CLASS ACTION COMPLAINT** |
| ) | |
| ADVANTA CORP., DENNIS ALTER, ) MAX BOTEL, DANA BECKER DUNN, ) RONALD LUBNER, WILLIAM A. ) ROSOFF, PHILLIP M. BROWNE, PAUL ) JEFFERS and DOES 1-10, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Matthew A. Ragan ("Plaintiff"), on behalf of the Advanta Corp. Employee Stock Ownership Plan and the Advanta Corp. Employee Savings Plan (each a "Plan" and collectively, the "Plans"), himself and a class of all others similarly situated, alleges as follows:

### INTRODUCTION

1.  This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against Advanta Corp. ("Advanta" or the "Company") and other fiduciaries of the Plans.

2.  Plaintiff was a Plan participant during the Class Period, during which time the Plans held interests in the Company's common stock. Plaintiff's investment portfolio in the Plans during the Class Period included Advanta stock.

3.  401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plans may have the option of purchasing the common stock of his or her

employer, often the sponsor of the plans, for part of his or her retirement investment portfolio. Common stock of Advanta was held by each of the Plans throughout the Class Period.

4.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to her and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plans' vast holdings of Advanta stock.

5.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plans assets, breached their fiduciary duties to Plaintiff, the Plans and proposed Class by failing to prudently and loyally manage the Plans' investment in Company securities by (1) continuing to offer Advanta common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plans' pre-existing heavy investment in Advanta equity when Company stock was no longer a prudent investment for the Plans. These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.      Plaintiff's Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as

independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

7.  Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Advanta stock as an investment option and continuing to invest Plan assets in Advanta stock when it was no longer prudent to do so.

8.  Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plans' assets in Advanta equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company's assets contained large amounts of impaired credit card receivables for which Advanta had not accrued losses; (b) Advanta's customer default rate would be substantially higher than the industry average by 2009 due to the Company's failure to verify its customers' ability to pay; (c) due to Advanta's practice of issuing credit cards to small business owners without verifying income, the Company's credit receivables were excessively risky; (d) customers were leaving and would continue to leave the Company due to, among other things, Advanta's drastic increase of interest rates and its manipulation of the cash reward program; and (e) the Company's portfolio would have large charges to reflect impairments, due to Advanta's failure to correctly account for its delinquent customers and credit trends.

9.     This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plans, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

12.     Plaintiff Michael A. Ragan is a "participant," within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), of the Employee Savings Plan and held Advanta shares in his account during the Class Period.

**Defendants**

**Advanta**

13.     Advanta is a Delaware corporation headquartered in Spring House, Pennsylvania.

14.     Advanta is both the sponsor and administrator of the Plans.

15.     The Company acted through the Board of Directors (the "Board"), the Board's Compensation Committee (the "Compensation Committee"), as well as its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), the Company's Plan Administrative Committee for each of the Plans (the "Administrative Committee") and other Company officers and employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

**Chairman/CEO**

16.     Defendant Dennis Alter ("Alter") served as the Company's Chairman of the Board and CEO during the Class Period.  Defendant Alter was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**Other Director Defendants**

17.     Defendant Max Botel ("Botel") served as a member of the Board during the Class Period.  Further, Defendant Botel served as a member of the Compensation Committee.  Defendant Botel was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

18.     Defendant Dana Becker Dunn ("Dunn") served as a member of the Board during the Class Period.  Further, Defendant Dunn served as a member of the Compensation Committee.  Defendant Dunn was a fiduciary of the Plans, within the

meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

19.     Defendant Ronald Lubner ("Lubner") served as a member of the Board during the Class Period.   Further, Defendant Lubner served as a member of the Compensation Committee.   Defendant Lubner was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

20.     Defendant William A. Rosoff ("Rosoff") served as a member of the Board during the Class Period.  In October 1999, Defendant Rosoff became President as well as Vice Chairman of the Board of the Company.   Defendant Rosoff was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

21.     Defendants Alter, Botel, Dunn, Lubner and Rosoff are hereinafter collectively referred to as the "Director Defendants."

**Administrative Committee Defendants**

22.     Each Plan is administered by a Plan Administrative Committee.   The Administrative Committee is comprised of certain Company employees/officers appointed by the Board.  The Administrative Committee is charged with the day-to-day management and administration of the Plans and/or management and disposition of the Plans' assets.

23.     Defendant Philip M. Browne ("Browne") served as Senior Vice President and CFO of Advanta during the Class Period.   During the Class Period, Defendant Browne signed the 2006, 2007 and 2008 Form 11-K submissions for the Plans on behalf of the Company, as a "Member of the Committee Administering the Plan."   Defendant Browne was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

24.     Defendant Paul Jeffers ("Jeffers") served as Vice President, Human Resources, of Advanta during the Class Period.   During the Class Period, Defendant Jeffers signed each of the Plans' Form 5500 submissions to the IRS and Dept. of Labor on behalf of the Company, as Plan Administrator.   Defendant Jeffers was likely a member of the Administrative Committee.   Defendant Jeffers was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**Additional Plan Fiduciaries**

25.     Without limitation, unknown "Doe" Defendants 1-10 include other individuals, including members of the Plans' Administrative Committee, as well as other Company officers, directors and employees who are or were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.   The identities of the Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

**THE PLANS**

26.     The Plans are "employee pension benefit plans," as defined by ERISA §

3(2)(A).  Specifically, each Plan is a "defined contribution plan" within the meaning of

ERISA § 3(34).  Each Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1).

However, in a breach of fiduciary duty action such as this, the Plans are neither

defendants nor plaintiffs.  Rather, pursuant to ERISA § 409, and the law interpreting it,

the relief requested in this action is for the benefit of the Plans and their participants and

beneficiaries.

Employee Stock Ownership Plan

27.     The Plan is purportedly an employee stock ownership plan (an "ESOP")

and is generally available to employees of the Company and its subsidiaries who have

reached 21 years of age with one year of service.

28.     The Plan is administered by the Plan Administrative Committee, which is

comprised of persons appointed by the Board.

29.     The Plan invests in Advanta Class A common stock.

30.     At December 31, 2006, the ESOP held $37,073,699 in Advanta Class A

stock.  By December 31, 2007, the ESOP held only $10,113,880 in Advanta Class A

stock.  *See* 2007 Form 5500.

31.     Fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties,

including the duties to act loyally, prudently, and for the exclusive purpose of providing

benefits to plan participants.

32.     Accordingly, if the fiduciaries know or if an adequate investigation would

reveal that company stock no longer is a prudent investment for the ESOP, the fiduciaries

must disregard plans direction to maintain investments in such stock and protect the plans by investing the plans assets in other suitable investments.

Employee Savings Plan

33.   The Plan invests in Advanta stock along with other mutual funds and other investment vehicles.

34.   The Plan is administered by the Administrative Committee, which is comprised of persons appointed by the Board.

35.   Employees are eligible to participate in the Plan when they have reached 21 years of age and have had six months of service with the Company.

36.   In 2008, participants could elect to contribute to the Plan up to 75% of their eligible compensation.   Advanta's contributions were equal to 50% of each employee's contributions to the Plan up to 5% of each employee's eligible compensation (so that the initial maximum contribution by Advanta would be 2.5% of an employee's eligible contribution).  *See* 2008 Form 11-K.

37.   The Plan was restated effective January 1, 2009 to provide for matching contributions equal to 100% of employee contributions up to 4% of an employee's eligible compensation. *See* 2008 Form 11-K.

38.   On October 1, 2008, Schwab Retirement Plans Services, Inc. replaced Wilmington Trust Company as the Trustee of the Plan. *See* 2008 Form 11-K.

39.   The Plan has been heavily invested in Advanta stock.  At December 31, 2006, the Plan held approximately $7,654,030 in Advanta Class B common stock and $315,304 in Advanta Class A common stock.   At December 31, 2007, the Plan held approximately $2,678,692 in Advanta Class B common stock and $91,834 in Advanta

Class A common stock.  At December 31, 2008, the Plan held approximately $932,309 in

Advanta Class B common stock and $14,745 in Advanta Class A common stock.

## CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1),

and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans,

himself/herself and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> Advanta Corp. Employee Stock Ownership Plan and/or the
> Advanta Corp. Employee Saving Plan at any time between
> October 31, 2006 and the present (the "Class Period") and
> whose Plan accounts included investments in Advanta
> common stock.

41.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this

time, and can only be ascertained through appropriate discovery, Plaintiff believes there

are hundreds of members of the Class who participated in, or were beneficiaries of, the

Plans during the Class Period and whose Plan accounts included investment in Advanta

stock.  According to the 2007 Form 5500 submissions for the Plans, as of December 31,

2006, the ESOP had approximately 700 participants and the Employee Savings Plan had

approximately 1,100 participants.

42.    Common questions of law and fact exist as to all members of the Class

and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

- whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

- whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

- whether Defendants violated ERISA; and

- whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plans and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

45.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

46.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would

create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

47.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plans, either as a named fiduciary or as a de facto fiduciary with discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

48.     ERISA requires every plans to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plans." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

49.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

50.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to one or both of the Plans and owed fiduciary duties to

one or both of the Plans and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

51.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

52.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

53.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the Administrative Committee members, to itself.

54.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

55.     During the Class Period, all of Defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company's Fiduciary Status**

56.     Instead of delegating fiduciary responsibility for the Plans to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

57.     The Company acted through the Board, the Compensation Committee, the Administrative Committee and certain other officers and employees.  The Company had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan-related activities.  The Board had the authority and discretion to hire, appoint, monitor, and remove the members of the Administrative Committee, as well as other officers and employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

58.     By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Administrative Committee Defendants, breached fiduciary duties they owed to the Plans, their participants and their beneficiaries.  Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

**Director Defendants' Fiduciary Status**

59.     The Board has primary oversight of the Plan.  Indicative of the Board's authority, The Board was responsible for selecting, monitoring and removing members of the Plans' Administrative Committee.  *See* 2007 Form 5500 for the ESOP.

60.     The Board's Compensation Committee was charged with reviewing and approving company-wide benefit programs. *See* Compensation Committee Charter, available at: https://www.advanta.com/ADV/Corporate/Investing.page? ("Compensation Committee Charter").

61.     The Compensation Committee Charter provides that, as part of this responsibility, "the Committee will review major changes to the Company's Benefit Programs including fiduciary issues, major plan revisions."

62.     The Company's Senior Vice President of Human Resources, or his or her designee, served as the Secretary of the Compensation Committee.

63.     Ultimately, the Board collectively retained responsibility for the Compensation Committee's actions.   Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plans and their participants in that regard.

**Administrative Committee's Fiduciary Status**

64.     The Administrative Committee is comprised of persons appointed by the Board and delegated the day-to-day responsibility for the administration of the Plans. The Administrative Committee and its members were fiduciaries of the Plans, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were, upon information and belief, named fiduciaries of the Plans and exercised discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

65.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plans and its participants when communicating with them.   A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.   "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d  1255, 1261 (3d Cir. 1995); *Fisher v. Philadelphia Elec. Co.,* 994 F.2d 130, 133 (3d Cir. 1993).

66.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g.*, *In re Unisys Corp., supra,* 994 F.2d at 133 ("a plan administrator has an affirmative duty to speak when it knows that silence might be harmful."); *see also Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004)..

67.     During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company stock.   These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plans documents (including Summary Plans Descriptions ("SPDs") and/or prospectuses regarding Plans/participant holdings of Company stock), which included and/or reiterated these statements.   Upon information and belief, at all times during the

Class Period, Advanta's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

68.     Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[1] concerning investment in company stock, including that:

> Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

- Out of loyalty, employees tend to invest in company stock;

- Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- Employees tend not to change their investment option allocations in the plans once made;

- No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals

---

[1]   Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plans design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

would advise employees to avoid investment in company stock entirely;

- Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

- Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

69.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plans' funds in Company stock, they still took no action to protect the Plans' assets from their imprudent investment in Company stock.

## DEFENDANTS' CONDUCT

70.     Advanta is an issuer of credit cards, particularly MasterCard and Visa, to professionals and small businesses in the United States.  The Company issued cards through its subsidiary, Advanta Banks Corp. ("Advanta Bank").  In addition to the credit cards, Advanta offers credit protection and insurance products that provide coverage for disability, involuntary unemployment and loss of life, among other things.  Moreover, the Company provides deposit products, including retail and large denomination certificates of deposit and money accounts.  The Company was founded in 1951 and was formerly known as TSO Financial Corp., changing its name to Advanta Corp. in 1988.

71.     Throughout the Class Period, Defendants knew or should have known that Advanta common stock was an imprudent Plans investment, because: (a) the Company's assets contained large amounts of impaired credit card receivables for which Advanta had not accrued losses; (b) Advanta's customer default rate would be nearly six times that of

the industry average by 2009 due to the Company's failure to verify its customers' ability to pay; (c) due to Advanta's practice of issuing credit cards to small business owners without verifying income, the Company's credit receivables were excessively risky; (d) customers were and would continue to leave the Company due to, among other things, Advanta's drastic increase of interest rates and its manipulation of the cash reward program; and (e) the Company's portfolio would have large charges to reflect impairments, due to Advanta's failure to correctly account for its delinquent customers and credit trends.

72.     Nevertheless, Defendants failed to protect the Plans' assets—which were imprudently invested in Advanta stock.

**Advanta Was Exposed to Substantial Problems, Yet Concealed the Truth Regarding its Financial Condition and Business Operations**

73.     On October 31, 2006, the Company announced its financial results for the third quarter of 2006.  Advanta reported quarterly net income of $21.1 million, or $0.73 per diluted share for Class A and Class B shares combined, and announced that Advanta Business Cards earned net income of $20.7 million for the quarter, as compared to $16.2 million for the third quarter of 2005.  The Company also stated that:

> "I am happy to report strong profits again this quarter and to share with you that our portfolio is performing well and growing. Not only are we continuing to attract a large number of new high credit quality, profitable customers through our focused marketing efforts, but we are able to leverage our infrastructure costs through this growth," said Dennis Alter, Chairman and CEO. "During the quarter, new bankruptcy filings remained lower than we anticipated, and we are increasing our guidance for 2006 full year earnings from continuing operations to a range of $2.78 to $2.83 per combined diluted share primarily due
> 
> *       *       *
> 
> During the third quarter of 2006, Advanta Business Cards

customers exceeded the 1 million mark while ending managed receivables of $4.6 billion grew 29% over the same quarter last year. Owned Business Cards receivables were $1.2 billion at quarter end, reflecting growth of 46% over those reported at the same quarter end last year. Transaction volume for the quarter was $3.1 billion, exceeding third quarter 2005 volume by 23%.

74.    In a conference call with investors later that day, Defendant Rosoff spoke of the Company's "solid foundation for originated high credit quality customers," and Defendant Alter maintained that the high earnings for the quarter were due to "lower credit losses."

75.    On this day, Advanta Class B stock closed at $26.16 per share and Advanta Class A stock closed at $29.93 per share.

76.    On January 25, 2007, Advanta announced its financial result for the fourth quarter 2006 and fiscal year 2006.  Advanta reported full year 2006 net income from continuing operations to be $84.2 million, or $2.86 per diluted share for Class A and Class B shares combined.  The Company also stated that:

"Our 2006 full year Business Cards earnings increased by over 50%, and our managed receivables grew by almost 39%; we added 56% more new customers, and our managed net credit loss rate dropped by 230 basis points to 3.41%. We had a great year! Most importantly we continued to strengthen and build on the foundation for the burgeoning results we expect to see going forward," said Dennis Alter, Chairman and CEO.

Ending managed receivables grew to $5.2 billion at December 31, 2006, with full year new customers totaling approximately 371,000. Ending owned receivables grew 29% during the year to $1.1 billion, and the full year net credit loss rate on owned receivables decreased 218 basis points to 3.19%. 2006 customer transaction volume totaled $12.3 billion, a 26% increase over 2005.

For the fourth quarter, Advanta reported net income of

$18.2 million or $0.62 per combined diluted share, including a $0.01 per share asset valuation gain associated with the Company's venture capital portfolio.

77.    Later that day, during a conference call with investors, Defendant Alter spoke of his confidence for 2007, 2008 "and beyond," and Defendant Rosoff stated that profits from new customers "are expected to make our 2008 income shoot up by more than 40% . . ."

78.    On that day, Advanta's Class B common stock closed at $31.11 per share and Advanta Class A stock closed at $28.96 per share.

79.    On April 24, 2007, Advanta reported its financial results for the first quarter of 2007.  The Company reported quarterly net income of $21.4 million, or $0.72 per diluted share for Class A and Class B combined.  Additionally, according to a Company press release:

> "We had a very good start to 2007," said Dennis Alter, Chairman and CEO. "Strong earnings, low credit losses and delinquencies, and the addition of new high credit quality customers continued to mark our performance."
>
> Ending managed receivables grew to $5.6 billion at March 31, 2007 with ending owned receivables totaling $1.1 billion. During the quarter, approximately 97,000 new customers were added and transaction volume of $3.4 billion reflected growth of 24% over the comparable quarter of 2006. The managed net credit loss rate decreased 32 basis points to 3.3% and the owned net credit loss rate decreased by 43 basis points to 3.1%.

80.    On this day, Advanta's Class B common stock closed at $31.36 per share and Advanta Class A stock closed at $28.84 per share.

81.     On July 31, 2007, Advanta reported its financial results for the second quarter of 2007.  The Company reported net income from continuing operations of $0.51 per diluted share for Class A and Class B shares combined, $0.03 higher than the first quarter.  Additionally, the Company stated:

> "The powerful dynamics we have described in the business are once again demonstrated by the performance in the quarter," said Dennis Alter, Chairman and CEO.
>
> Ending managed receivables grew to $6.0 billion at quarter end with ending owned receivables totaling $1.1 billion. During the quarter, 103,000 new customers were added and transaction volume increased to $3.7 billion. The managed net credit loss rate was 3.48% and the owned net credit loss rate was 3.06%.

82.     Later that day, during a conference call with investors, Defendant Rosoff assured participants that Advanta was reviewing and "completely complying" with all new credit card regulations.

83.     On this day, Advanta Class B common stock closed at $25.66 per share and Advanta Class A stock closed at $23.49 per share.

84.     On October 25, 2007, Advanta announced its financial results for the third quarter of 2007.  The Company reported third quarter 2007 net income of $22.1 million, or $0.50 per diluted share for Class A and Class B shares combined.  Additionally, the Company announced:

> Ending managed receivables grew to $6.2 billion at quarter end with ending owned receivables totaling $1.2 billion. During the quarter, over 74,000 new customers were added and transaction volume totaled $3.6 billion. The managed net credit loss rate was 3.87% and the owned net credit loss rate was 3.52%.
>
> "Over the past years, we've been plansning for a potentially

more difficult environment by focusing on high credit
quality customers," said Dennis Alter Chairman and CEO.
"This strategy continues to look good to us now."

85.     On this day, Advanta's Class B common stock closed at $17.69 per share

and Advanta Class A stock closed at $15.67 per share.

86.     On November 27, 2007, the Company held a conference call with analysts

and investors.  Two days later, on November 29, 2007, the Company filed a Form 8-K

with the SEC detailing the call.  In particular, the Company referenced the economic

climate and its expected effect on Advanta.  However, the created the impression that all

current and future hardship was due to external circumstances, and not due to specific

actions and policies that Company had undertaken.  The Company's Form 8-K stated:

> With respect to fiscal year 2007, management addressed
> the impact of the current economic environment on
> business performance. Specifically, management
> addressed, among other things, the following items during
> the conference call:
>
> • Since the Company announced third quarter 2007
> earnings results, delinquency buckets have been
> negatively impacted as a higher percentage of
> customers than anticipated have rolled into
> delinquency and a lower percentage of delinquent
> customers have made payments. Management
> indicated that, consistent with what other credit card
> issuers are anticipating, the Company now believes
> that these higher delinquency rates, and therefore
> charge-off trends, will continue for some time
> before they improve.
>
> • The Company indicated that if current entry rates
> and collections rates for delinquent customers
> continue for the rest of this year, or get modestly
> worse, it expects 2007 earnings per share from
> continuing operations to be between $1.90 and
> $2.00 per combined diluted share. This is lower
> than the Company's previous guidance range of

$2.10 and $2.17 per combined diluted share. Management further noted that if there were more than modest worsening in delinquency entry rates and/or collections rates, then earnings per share would be less.

• The Company indicated that, based on current collection rates and recovery expectations, the managed net charge-off rate is expected to be about 3.75% for the 2007 fiscal year, as compared to its most recent estimate of 3.6% to 3.7% for the year. Based on the same assumptions, the owned net charge-off rate is expected to be about 3.4% for the 2007 fiscal year, as compared to the Company's most recent estimate of 3.25% to 3.35% for the year.

• The Company confirmed that it is on track with its previously announced guidance for receivable and transaction volume growth for 2007.

• The Company expects to acquire approximately 330,000 new customers in fiscal year 2007. The Company indicated that its marketing campaigns continue to do well and that management is pleased with the results of its marketing investments.

The Company noted that it has not factored anything into its 2007 earnings guidance range related to the Visa/American Express litigation settlement since it is still being evaluated. The Company discussed this litigation settlement and its potential impact on the Company's financial results in a Current Report on Form 8-K filed with the SEC on November 16, 2007.

With respect to expectations for 2008, the Company stated that it would not be providing guidance for earnings or other 2008 financial measures at this time. Management commented that it believes it is prudent not to give guidance for 2008 at this time given the degree of volatility and uncertainty in the current economic environment. Management stated that the Company expects to be profitable and to continue to pay its quarterly dividend at its present level.

Following the Company's prepared remarks, there was a

question and answer session with institutional investors and analysts. Management responded to questions about various items, including the following:

> • With respect to credit trends in the current portfolio, management indicated that the deteriorating credit trends were not limited to any specific segments of the portfolio and that the trends are being experienced throughout the portfolio.

> • There were questions about various aspects of the Company's business, plans and expectations, including, among others, questions about plans for managing growth, marketing campaigns, expectations for credit quality and the possibility of authorizing a stock buyback. The Company reiterated that it would not give guidance for 2008 and, consistent with that, management declined to speculate or offer predictions in any of these areas.

> However, management indicated that it plans to continue to monitor all aspects of the business, including these areas, and to evaluate opportunities and make prudent decisions that are focused on the long-term health of the business.

87. The Company's Class B common stock closed at $11.06 per share and Advanta Class A stock closed at $10.08 per share on November 27, 2007, $9.52 per share and $8.86 per share, respectively, on November 28, 2007 and $9.51 and $8.74 per share, respectively, on November 29, 2007.

88. On January 30, 2008, Advanta reported its financial results for the fourth quarter and full year 2007. The Company reported full year 2007 net income from continuing operations of $71 million, or $1.61 per diluted share for Class A and Class B share combined, and fourth quarter earnings of $0.17 per share. The Company highlighted its disappointment with the economic climate, yet gave no indication that it had acted improperly. The Company stated:

During the year, the Company acquired approximately 335,000 new customers. Managed receivables grew approximately 22% to $6.3 billion in 2007. Owned receivables were $1.0 billion at year end, approximately 9% lower than December 31, 2006. Transaction volume of $14.4 billion for 2007 increased 17% from the prior year. For the full year, the managed net credit loss rate was 3.71% and the owned net credit loss rate was 3.39%. These net credit loss rates compare to the 2006 rates of 3.41% and 3.19%, respectively.

"Our decision to focus exclusively on the small business market almost 7 years ago has enabled us to build a profitable, sustainable business over the long haul. Although we're disappointed with the impact of the current economy on our recent results, we believe the small business market will continue to provide opportunities for us going forward," said Dennis Alter, Chairman and CEO.

89.     That day, the Company's Class B common stock closed at $9.18 per share and Advanta Class A stock closed at $8.00 per share.

90.     On April 30, 2008, the Company reported its financial results for the first quarter of 2008.  Advanta reported first quarter net income $18.4 million, or $0.44 per diluted share for Class A and Class B shares combined.  Additionally, the Company stated:

Managed and owned net credit losses for the quarter were 6.43% and 6.53%, respectively. Managed receivables ended the quarter at $6.3 billion while owned receivables totaled almost $1.0 billion. New customers added were just over 67,000, and transaction volume was $3.4 billion.

"We are managing the business diligently through this down cycle, with the goal of minimizing risk and improving our results," said Dennis Alter, Chairman and CEO. "We have strong liquidity, flexible funding options, and the same determination that has moved us through down cycles over the past six decades."

91.     That day, Advanta's Class B common stock closed at $8.78 per share and Advanta Class A stock closed at $7.58 per share.

92.     On or about July 29, 2008, Advanta reported its financial results for the second quarter of 2008.  The Company reported second quarter net income of $4.0 million, or $0.10 per diluted share for Class A and Class B shares combined. Additionally, the Company stated:

> At the end of the quarter, managed and owned receivables totaled $6.1 billion and $851 million, respectively. Consistent with the Company's prior comments about new customer expectations, the Company added about 26,000 new customers in the quarter. Customer transaction volume totaled $3.5 billion of which almost 90% related to merchandise sales activity.
>
> Managed and owned net credit loss rates for the quarter were 8.38% and 8.87%, respectively.
> "The quarter's results are obviously not what we would like to see. All of us at the company are focused on returning to robust earnings and returns for our shareholders," said Dennis Alter, Chairman and CEO.

93.     That day, the Company's Class B common stock closed at $7.14 per share and Advanta Class A stock closed at $6.21 per share.

94.     On or about October 30. 2008, the Company reported its financial results for the third quarter of 2008.  For the third quarter, the Company reported a net loss of $17.6 million, or $0.43 per diluted share for Class A and Class B shares combined. Despite the quarterly loss, Advanta continued to blame the economy, and touted its supposedly strong balance sheet.  The Company stated:

- Cash and liquid investments totaling $1.8 billion at quarter end or 32% of aggregate owned and securitized receivables.

- Advanta Bank Corp. total risk-based and Tier 1 capital ratios of 24.5% and 22.3%, respectively.
- Advanta Corp. equity together with subordinated debt for trust preferred securities to managed receivables of 12.0% and to owned receivables of 92.3%.
- Business Cards ending managed receivables of $5.6 billion and owned receivables of $0.7 billion.
- Business Cards managed net interest yield of 11.46% and owned net interest yield of 8.24%.
- Customer transaction volume of $3.3 billion, 89% of which was merchandise sales volume.
- Business Cards managed net credit loss rate of 10.0% and owned net credit loss rate of 10.6%.
- The reported results do not include an estimated $1.6 million pretax charge for its portion of the recent settlement between Visa and Discover.

"This economy has dealt small business owners a tough hand," said Dennis Alter, Chairman and CEO. "Not only are consumers spending less money with them, but their options for funding business inventories and obligations have shrunk. Although this has flowed through to us in the form of rising credit losses, our balance sheet is strong and we continue to manage through this uncertain economy."

95.     On this day, the Company's Class B common stock closed at $3.74 per share.

96.     On or about January 29, 2009, Advanta announced its financial results for the fourth quarter and full year 2008. For the full year, the Company reported a net loss of $43.8 million, or $1.08 per diluted share for Class A and Class B shares combined. For the fourth quarter, the Company reported a net loss of $46.9 million, or $1.16 per combined diluted share. Additionally, the Company stated:

- Cash and liquid investments increased by $0.8 billion while deposits grew by $0.5 billion. At year end, cash and liquid investments were 53% of aggregate owned and securitized receivables.

- Advanta Bank Corp. total risk-based and Tier 1 capital ratios increased to 38.4% and 35.4%, respectively.

- Advanta Corp. equity together with subordinated debt for trust preferred securities to managed receivables increased slightly to 12.2% and to owned receivables increased to 120.7%.

- The fair value estimates of the Company's retained interests in securitizations decreased by $36.4 million with about two-thirds of the adjustment related to increased market credit spreads that resulted in higher discounts on these assets.

- The allowance for receivable losses increased to 20.3% of Business Cards owned receivables at quarter end, after building reserves for credit losses on principal receivables by $11.4 million.

- Business Cards ending managed receivables decreased to $5.0 billion with owned receivables decreasing to $0.5 billion.

- Business Cards managed net interest yield expanded to 12.45% and owned net interest yield declined to 7.04%.

- Customer transaction volume declined to $2.9 billion.
- Business Cards managed net credit loss rate rose to 12.0% and owned net credit loss rate rose to 14.1%.

- Business Card operating expenses include a $3.3 million asset impairment charge related to certain acquisition-related software and other assets based on the Company's expectations for future account originations.

- The consolidated results include the impact of a $2.2 million reserve reduction for the Company's proportionate share of the amounts funded by Visa in Visa's litigation escrow.

The Company also announced that it is taking actions in response to the continued economic downturn.

The Board of Directors has approved a reduction in the Company's regular quarterly cash dividends. The new rates

will apply to its next dividend declaration. As a result of this action, future quarterly dividends declared for its Class A Common Stock will decrease from 17.71 cents to 2 cents per share and future quarterly dividends declared for its Class B Common Stock will decrease from 21.25 cents to 2.5 cents per share.

In addition, the Company is taking steps to significantly reduce operating expenses to a level that is more commensurate with its anticipated portfolio size and scale of business activities in 2009. Cost reductions will result from actions such as slowing marketing activities, structuring the organization to be more efficient and reducing staffing levels beyond those previously announced related to its offshoring initiative. Flowing from this, the Company will have approximately 300 fewer employees and operating expenses for 2009 are expected to be between 20% and 25% lower than those reported for 2008.

97.     On this day, the Company's Class B common stock closed at $0.70 per share and Advanta Class A stock closed at $1.96 per share.

98.     On or about April 30, 2009, the Company reported its first quarter 2009 financial results.  For the quarter, the Company reported a net loss of $75.9 million, or $1.87 per diluted Class B share.  Additionally, the Company stated:

Noteworthy activity and details for the first quarter, compared to the fourth quarter of 2008, include:

- Cash and liquid investments totaled $2.2 billion at the end of the quarter or 47% of owned and securitized receivables.
- 
- Advanta Bank Corp. total risk-based and Tier 1 capital ratios of 21.8% and 19.7%, respectively, continue to be significantly above required ratios to be considered well capitalized.

- Advanta Corp. equity together with subordinated debt for trust preferred securities to managed receivables decreased slightly to 11.3% and to owned receivables decreased to 96.6%.

- A retained interests in securitizations valuation charge of $17.6 million was recorded to increase the discount rates on these assets associated with recent trust performance trends and downgrades.

- The allowance for receivable losses increased to 21.6% of Business Cards owned receivables at quarter end, after building reserves for credit losses on principal receivables by $14.6 million.

- Business Cards ending managed receivables decreased to $4.7 billion with owned receivables increasing to $549 million.

- Business Cards managed net interest yield declined to 11.19% and owned net interest yield declined to 1.62%.

- Customer transaction volume declined to $2.5 billion.

- Business Cards managed net credit loss rate rose to 15.9% and the owned net credit loss rate rose to 20.1%. The managed and owned 12 month lagged net credit loss rates were 12.2% and 10.7%, respectively.

Also, Advanta Capital Trust I has $100 million of trust preferred securities which are backed by the Company's junior subordinated long term debt. The Company expects to make a tender offer for all of the trust preferred securities. The securities have recently traded at under 10% of face value and the tender price will be related to those trades. The Company's purchase and retirement of these securities would increase the Company's stockholders' equity and reduce future expenses. The terms of the trust preferred securities provide that semi-annual payments on the securities can be deferred at the Company's election and that no payments of dividends can be made on the Company's common or preferred stocks during the deferral period. The Company has elected to defer payments on the trust preferred securities and to suspend payment of common and preferred dividends, which were largely curtailed earlier in the year.

99.     On this day, the Company's Class B common stock closed at $1.17 per share and Advanta Class A stock closed at $0.78 per share.

100.    On May 11, 2009, Advanta issued a press release entitled "Advanta Announces Plans to Maximize Capital and Dramatically Reduce Risk." The press release stated:

> Advanta Corp. (NASDAQ: ADVNB; ADVNA) today announced its Board of Directors has approved a plans designed to dramatically limit the Company's credit loss exposure and maximize its capital and its liquidity measures.
>
> As a result of the deteriorating economic environment, the Company would expect the negative performance trends, if not abated with this plans, to result in losses that would erode its capital. Therefore, the Company envisions the following.
>
> • The Company's securitization trust will go into early amortization based on May's performance. Early amortization will officially be determined on June 10.
>
> • Since the securitizations will not be permitted to fund new receivables after June 10, the Company will shut down all credit card accounts to future use at that time. Neither Advanta Bank Corp. nor any other Advanta-related entity will fund activity on its balance sheet from the accounts. Therefore, the Company will not take any off-balance sheet receivables onto its balance sheet. Shutting down the accounts will not accelerate payments required from cardholders on existing balances.
>
> • In early amortization almost all of the receipts from cardholders are required to be paid to the securitization trust's noteholders and to the Company's seller's interest (its on-balance sheet share of the receivables). The securitization trust's notes are obligations of the trust and not of any Advanta entity. The Company is only at risk with respect to the off-balance sheet obligations to the

extent of its residual interests.

- Advanta Bank Corp. will use up to $1.4 billion to make a cash tender offer for Advanta Business Card Master Trust Class A senior notes at a price between 65% and 75% of their face value in a modified Dutch Auction.

- Advanta Corp. will make a cash tender offer for any or all of the $100 million of 8.99% Capital Securities issued by Advanta Capital Trust I at 20% of their face value.

- The Company will continue to service and collect the securitization trust's credit card receivables and its own receivables. This, along with taking appropriate actions to adjust expenses to be consistent with these activities, will be the Company's first priority. The Company will be free to do new business in the future to the extent it chooses, but it does not expect to do so in a significant way until implementation of the plans is well under way.

- Advanta Corp.'s senior retail investment notes are unlimited obligations of Advanta Corp. and will remain outstanding and continue to be issued in the ordinary course. The benefits of the plans to the Company are designed to benefit the senior retail note program holders as well as the Company's shareholders.

The Company previously disclosed that it expected to use tools at its disposal to avoid early amortization of the securitization trust unless it concluded there was a better plans to maximize its capital and liquidity. The Company has now concluded that the plans outlined here is that better plans.

101.    On this day, the Company's Class B common stock closed at $1.55 per share and Advanta Class A stock closed at $1.13 per share.

102.    The next day, on May 12, 2009, *Bloomberg.com* published an article entitled "Advanta's Card-Lending Shutdown May Imperil Customers."   The article stated:

> Advanta Corp., the credit-card issuer for small businesses, may leave 1 million customers scrounging to find new lenders and debt holders facing losses of 35 percent after the company shut down accounts to preserve capital.
>
> Advanta will cease lending June 10 after uncollectible debt reached 20 percent as of March 31, according to a statement and filings yesterday by the Spring House, Pennsylvania-based firm. The lender earmarked $1.4 billion to buy back securitized card loans with offers of 65 cents to 75 cents on the dollar.
>
> Credit-card company profits suffered as the recession pushed U.S. unemployment to 8.9 percent in April. Defaults on cards historically track the jobless rate, and analysts have been concerned that the industry's average for bad loans would breach 10 percent and set a record. Advanta decided to cut off customers after "charge-offs" rose to twice that threshold, from 9.6 percent at year-end.
>
> "The question is how many business owners depend solely on their Advanta credit card," said William Dunkelberg, chief economist at the National Federation of Independent Business. While most probably have other sources of credit, self-employed entrepreneurs may have trouble getting a new card, he said. "Credit is harder to find than it's ever been in this expansion," said Dunkelberg, whose biography lists him as a former Advanta director.
>
> **Stock Declines**
> The company's A-shares dropped 28 cents, or 25 percent, to 85 cents at 4 p.m. in Nasdaq Stock Market trading. Advanta, which had $2.4 billion in deposits as of March 31, reported three consecutive quarterly losses and its shares have plunged from about $30 in June 2007. The recession affected Advanta's customers across the country, Chief Financial Officer Philip Browne has said.
>
> "We'll be shutting down accounts for future transaction activities, but many of the customers will maintain balances

and pay us off over time," Browne said yesterday in a telephone interview. "We'll have to service and collect on that, and that will be the first order of business for the company."

More than 90 percent of Advanta's small business customers will have "adequate" access to alternative credit after the company halts lending, Browne said.

Citing the recession, Advanta said it's plansning to "maximize capital and dramatically reduce risk." While the company has "no indication" if debt investors will accept the buyback offer, the price is "relatively consistent with recent trading levels of the bonds," Browne said.

**No Public Actions**

Advanta's credit-card unit is chartered and regulated in Utah and has "no corrective actions that are public," said G. Edward Leary, the state commissioner of financial institutions. He declined to say whether any non-public actions were taken against the company.

This would be the first so-called early amortization of a trust since 2003, according to JPMorgan Chase & Co. analyst Christopher Flanagan.

"Early amortization has been viewed as a catastrophic event for issuers," Scott Valentin, an analyst at Friedman Billings Ramsey & Co., said today in a research note. Advanta's filing said that the charge-off rate for uncollectible loans may increase after accounts are closed. Valentin said that's likely because "the cards have substantially less utility to cardholders," cutting the incentive to keep up with payments.

"They're hoping they can stay alive barely until the environment changes," said David Robertson, president of the Nilson Report, the Carpinteria, California-based industry newsletter. This is "a big sign that the credit-card industry has problems that are going to be around for several years."

**Workforce Slashed**

Advanta was the 11th-biggest U.S. credit-card issuer at the end of 2008 with about $5 billion in outstanding balances, and the only major lender focused on small business borrowers, Robertson said. In the first quarter the company slashed the workforce by about 300 employees, or 36

percent, from 841 as of Dec. 31, 2008. Calls inquiring about the future of current employees weren't returned.

The company's woes aren't likely to spread to other asset-backed issuers, said JPMorgan's Flanagan. Advanta's "precarious liquidity and capital position" make the lender more vulnerable to deteriorating credit than its stronger counterparts, Flanagan said in a May 8 report.

Credit-card companies can take steps to protect investors and avoid having to wind down trusts, including removing overdue accounts from the pool and increasing the cash cushion that comes with the securities to shield bondholders from losses. Bank of America Corp., Citigroup Inc., General Electric Co. and JPMorgan have already taken steps to protect their securitized assets as delinquencies surge, according to JPMorgan data.

**Needs Capital**
Advanta relied on the asset-backed securities market for funding, and has been unable to raise cash through securitization since June 2008, according to Bloomberg data. It is shut out of the Federal Reserve's Term Asset-Backed Securities Loan Facility, or TALF, because of ratings cuts on its bonds.

Credit card-backed debt eligible for purchase with TALF loans must be rated AAA. Moody's Investors Service has assigned "junk" ratings to Advanta's senior unsecured and subordinated debt. The trust preferred securities rating of Advanta Capital Trust I was cut to C from Caa3 in April by Moody's, citing a "high degree of uncertainty" that investors will get repaid because of Advanta's "weak financial condition."

Today, Standard & Poor's cut its rating on Advanta to CC from CCC and assigned a negative outlook to the company.

103.    That day, Advanta's Class B common stock closed at $1.09 per share and

Advanta Class A stock closed at $0.85 per share.

**The Truth Emerges About Advanta's Business Practices**

104.    On June 8, 2009, Advanta issued a press release entitled "Advanta Announces Termination of Its Cash Tender Offer for Class A Senior Notes."  The press release stated:

> Advanta Corp. (NASDAQ: ADVNB; ADVNA) today announced that Advanta Bank Corp. (the "Bank') has terminated its previously announced cash tender offer for up to $1.4 billion of Advanta Business Card Master Trust's Class A senior notes (the "ABS Notes Tender Offer") which was made on May 11, 2009. The Bank is terminating the ABS Notes Tender Offer because it recently has been determined that a regulatory condition to the tender offer will not be satisfied. The tender offer consideration will not be paid or become payable to senior note asset-backed holders who validly tendered their notes in connection with this offer. As promptly as practical, all tendered notes will be returned to the holders thereof. This termination has no impact on the Company's ability to proceed with its previously announced cash tender offer for any and all of the $100 million of outstanding Advanta Capital Trust I 8.99% Capital Securities.
>
> As a result of the termination of the ABS Notes Tender Offer, the Company will not be able to complete all of the components of the plans it previously announced which together were intended to limit the Company's credit loss exposure and maximize its capital and its liquidity measures. Although the Company does not expect to fully realize its objectives of maximizing its capital and its liquidity measures, it still expects to realize the limitation of its credit loss exposure. This is expected to be achieved as a result of early amortization of the Company's securitization trust, which is anticipated to begin this month, and the closing of all customer accounts to future use that was effective May 30, 2009.
>
> **In addition, the Company expects the Bank to enter into an agreement with its regulators in the near term about its operations.** [Emphasis added.]

105.    On this day, Advanta's Class B common stock closed at $0.81 per share and Advanta Class A stock closed at $0.82 per share.  The next day, June 9, 2009,

Advanta's Class B common stock closed at $0.7184 per share and Advanta Class A stock closed at $0.64 per share.

106.    On or about June 24, 2009, Advanta entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist with counsel for the Federal Deposit Insurance Corporation ("FDIC").  The FDIC had served on Advanta a Notice of Charges and of Hearing that detailed unsafe or unsound banking practices.  The FDIC filed its Order to Cease and Desist on June 30, 2009.

107.    On July 1, 2009, *Bloomberg.com* published an articled entitled "Advanta Faces Deposit Halt, $35 Million Restitution."  This article provided detail on the Cease and Desist Order issued by the FDIC.  The article stated:

> Advanta Corp., the credit-card lender that shut down its small-business accounts, was ordered by regulators to plans on halting bank operations and pay customers $35 million because of allegedly "unsound" practices.
>
> Advanta must give the Federal Deposit Insurance Corp. a plans that "provides for the termination of the bank's deposit- taking operations and deposit insurance after the bank's deposits are repaid in full" within 30 days of yesterday, according to a federal filing today by the Spring House, Pennsylvania-based company.
>
> The lender cut off almost 1 million customer credit-card accounts in May after defaults surged to 20 percent at the end of the first quarter. Advanta's bank unit held $2.39 billion in deposits as of March 31. Repaying depositors could take several years and Advanta is allowed to submit a plans to continue handling deposits during that period, the filing said.
>
> Customer accounts remain fully insured and the company's ability to service its managed credit-card accounts and receivables isn't affected, the filing said. A call to Advanta spokeswoman Amy Holderer wasn't immediately returned. The FDIC ordered Advanta to cease "unsafe or unsound banking practices" tied to marketing of cash-back reward

programs and pricing strategies on business cards. Restitution may cost $14 million for customers affected by the cash-back program and $21 million for the pricing strategy dispute, the filing said. The order included a $150,000 penalty.

**Advanta Agrees**

The company said it consented to the order and didn't admit wrongdoing. Advanta accounted for the cash-back restitution in last year's third quarter and expects another charge in this year's second quarter to cover the pricing strategy compensation. The bank must begin making restitution payments within 60 days of June 30.

Regulators restricted Advanta's use of cash assets, payment of dividends and transactions that would "materially alter the bank's balance sheet composition and taking of brokered deposits," the company said. The cease and desist order, effective June 30, gives Advanta 30 days to submit a plans to "achieve and maintain sufficient capital."

The company has posted three consecutive quarterly losses totaling $142 million, more money than it made in the preceding eight quarters combined. Advanta in January cut its dividend to 2 cents and fired 300 employees, and in April reported that 12 percent of its owned credit-card receivables were 30 or more days delinquent.

Advanta fell by less than a cent to 42 cents at 4:15 p.m. New York time in Nasdaq Stock Market trading. The stock has plunged more than 90 percent in the past 12 months.

108.   On this day, the Company's Class B common stock closed at $0.39 per share and Advanta Class A stock closed at $0.422 per share.

109.   The next day, July 2, 2009, the FDIC announced that it had reached a settlement with Advanta for deceptive and unfair business practices.  The related press release stated:

Today the Federal Deposit Insurance Corporation (FDIC) announced a settlement with Advanta Bank Corporation, Draper, Utah (Advanta), for deceptive and unfair practices

in violation of section 5 of the Federal Trade Commission (FTC) Act.

Under the settlement, Advanta has agreed to an order to cease and desist, to pay restitution, and to pay a civil money penalty in the amount of $150,000. In addition, restitution of approximately $14 million will be paid to businesses that used Advanta's Cash Back Reward program and $21 million to accountholders whose accounts were repriced. In agreeing to the issuance of the order, Advanta did not admit or deny any liability.

Advanta's "Cash Back Reward" program advertised a percentage of cash back on certain purchases by business credit card accountholders. Due to the tiered structure of the cash back payments, however, the advertised percentage was not available for all purchases. As a result, it was effectively impossible to earn the stated percentage of cash back reward payments. The FDIC concluded that the Bank's solicitations were likely to mislead a reasonable customer and that the representations were material and that therefore, the Bank engaged in a pattern of deceptive acts or practices in violation of Section 5.

In addition, numerous complaints were filed regarding Advanta's substantial annual percentage rate (APR) increases on the accounts of small business owners and professionals, who had neither exceeded their credit limits nor were delinquent in making payments on their accounts. The FDIC determined that Advanta's rate increases had been implemented in an unfair manner, that Advanta failed to adequately notify accountholders that their APR had increased, the amount of the increase, the reason for the increase, the procedures to opt-out and the consequences of an opt-out. The repricing caused substantial injury to customers, withheld and/or provided inadequate information that could have enabled the customer to reasonably avoid the injury, and provided no benefit to the customer or competition.

"The Advanta settlement demonstrates the FDIC's commitment to having banks take responsibility for ensuring that they do not engage in unfair or deceptive acts or practices in connection with the banking products and services they offer," said FDIC Board member Thomas J. Curry. "Any person doing business with an insured

depository institution can expect to be treated fairly, and any such entity that engages in unfair or deceptive acts or practices should be aware that the FDIC will pursue such practices with all of the legal authority at our disposal."

110.    On this day, Advanta's Class B common stock closed at $0.39 per share and Advanta Class A stock closed at $0.42 per share.

111.    As described further herein, Defendants, as fiduciaries of the Plans were obligated to continuously ensure that the Plans' investment alternatives—including Advanta common stock—were prudent investments of the Plans' assets.   However, Defendants failed to do so—to the substantial detriment of the Plans and its participants.

112.    Since the beginning of the Class Period through the present, the Plans' imprudent investments in Lincoln National common stock have been decimated, as indicated below:



*Source:* http://www.bigcharts.com.

**Defendants Knew or Should Have Known That Advanta Stock Was an Imprudent Investment for the Plans, Yet Misled Plan participants**

113.    During the Class Period, although they knew or should have known that the Company's stock was an imprudent Plans investment, Defendants did nothing to protect the heavy investment of Plan participants in Advanta stock.

114.    As a result of the enormous erosion of the value of Company stock, the Plans' participants suffered unnecessary and unacceptable losses.

115.    Because of their high ranking positions within the Company and/or their status as Plans fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

116.    Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and devastate participants' investments once the truth became known. Yet, Defendants failed to protect the Plans and their participants from foreseeable losses.

117.    Rather, during the Class Period, despite its obligation to prudently manage the Plans' assets—including the Plans' heavy investment in Advanta stock—the Company and Company insiders misrepresented the Company's true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

118.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Advanta

stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

119.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Advanta stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Advanta's problems so that participants—to the extent that they were permitted—could make informed decisions regarding whether to include Advanta stock in their Plan accounts.

120.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Advanta stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

121.    Because Defendants knew or should have known that Advanta was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Advanta stock.

122.    Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plans of Advanta stock; discontinuing further contributions to and/or investment in Advanta stock under the Plans; consulting independent fiduciaries

regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Advanta they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Advanta stock.

123.   Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plans' investment in Advanta stock.   In fact, Defendants continued to invest and to allow investment of the Plans' assets in Company stock even as Advanta's problems came to light.

**At Least Certain of the Defendants Suffered From Conflicts of Interest**

124.   Advanta's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a portion of certain officers' compensation, including defendants Alter, Rosoff and Browne was in the form of stock awards and option awards.   This was the case for the fiscal years ended December 31, 2006, 2007 and 2008.   In 2008, Defendant Alter's total compensation exceeded $5.5 million; Defendant Rosoff's total compensation exceeded $2.4 million; and Defendant Browne's total compensation exceeded $1.1 million.   *See* Advanta Definitive Proxy Statement filed with the SEC on or about April 28, 2009.

125.   Because the compensation of at least some of the defendants was significantly tied to the price of Advanta stock, at least certain of the Defendants had incentive to keep the Plans' assets heavily invested in Advanta stock on a regular, ongoing basis.   Elimination of Company stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Advanta stock and sent a

negative signal to Wall Street analysts; both results would have adversely affected the price of Advanta stock, resulting in reduced compensation for at least certain of the defendants.

126.    Some Defendants may have had no choice in tying their compensation to Advanta stock (because compensation decisions were out of their hands), but defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Advanta stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

127.    These conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plans participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plans.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

128.    During the Class Period, certain of defendants chose to protect their own interests by selling millions of dollars of their personal holdings of Company stock. Throughout the Class Period, Company insiders sold 598,890 shares of their Advanta stock for proceeds of over $26.6 million.

129.    Defendant Rosoff reaped over $11.5 million from selling his personal holdings in Company stock, as follows:

| Date | Shares Traded | Trade Price | Proceeds |
|------|---------------|-------------|----------|
| 4/26/2007 | 250,000 | 46.230 | 11,557,500.00 |

130.    During the Class Period, Defendant Browne reaped over $2.7 million from selling his personal holdings in Company stock, as follows:

| Date | Shares Traded | Trade Price | Proceeds |
|---|---|---|---|
| 11/1/2006 | 200 | 39.360 | 7,872.00 |
| 11/1/2006 | 1,050 | 39.350 | 41,317.50 |
| 11/1/2006 | 350 | 39.240 | 13,734.00 |
| 11/1/2006 | 400 | 39.330 | 15,732.00 |
| 11/15/2006 | 300 | 42.950 | 12,885.00 |
| 11/15/2006 | 200 | 42.760 | 8,552.00 |
| 11/15/2006 | 400 | 42.750 | 17,100.00 |
| 11/15/2006 | 150 | 42.720 | 6,408.00 |
| 11/15/2006 | 350 | 42.700 | 14,945.00 |
| 11/15/2006 | 300 | 42.650 | 12,795.00 |
| 11/15/2006 | 300 | 42.640 | 12,792.00 |
| 12/1/2006 | 2,190 | 45.170 | 98,922.30 |
| 12/1/2006 | 200 | 45.140 | 9,028.00 |
| 12/1/2006 | 100 | 45.130 | 4,513.00 |
| 12/1/2006 | 100 | 45.110 | 4,511.00 |
| 12/1/2006 | 2,519 | 45.050 | 113,480.95 |
| 12/1/2006 | 100 | 45.040 | 4,504.00 |
| 12/1/2006 | 100 | 45.030 | 4,503.00 |
| 12/1/2006 | 400 | 45.020 | 18,008.00 |
| 12/1/2006 | 200 | 45.010 | 9,002.00 |
| 12/1/2006 | 1,277 | 45.000 | 57,465.00 |
| 12/6/2006 | 600 | 44.600 | 26,760.00 |
| 12/6/2006 | 1,400 | 44.490 | 62,286.00 |
| 12/20/2007 | 13 | 43.390 | 564.07 |
| 12/20/2007 | 100 | 43.380 | 4,338.00 |
| 12/20/2007 | 100 | 43.360 | 4,336.00 |
| 12/20/2007 | 187 | 43.300 | 8,097.10 |
| 12/20/2007 | 100 | 43.290 | 4,329.00 |
| 12/20/2007 | 150 | 43.280 | 6,492.00 |
| 12/20/2007 | 100 | 43.270 | 4,327.00 |
| 12/20/2007 | 650 | 43.250 | 28,112.50 |
| 12/20/2007 | 600 | 43.140 | 25,884.00 |
| 1/3/2007 | 2,000 | 43.490 | 86,980.00 |
| 1/10/2007 | 3,125 | 46.000 | 143,750.00 |
| 1/17/2007 | 2,000 | 46.000 | 92,000.00 |
| 1/17/2007 | 100 | 46.700 | 4,670.00 |
| 1/17/2007 | 300 | 46.620 | 13,986.00 |
| 1/17/2007 | 1,600 | 46.600 | 74,560.00 |
| 2/7/2007 | 400 | 46.490 | 18,596.00 |
| 2/7/2007 | 346 | 46.450 | 16,071.70 |
| 2/7/2007 | 1,254 | 46.350 | 58,122.90 |
| 2/21/2007 | 96 | 45.450 | 4,363.20 |
| 2/21/2007 | 100 | 45.430 | 4,543.00 |

| | | | |
|---|---|---|---|
| 2/21/2007 | 100 | 45.420 | 4,542.00 |
| 2/21/2007 | 550 | 45.400 | 24,970.00 |
| 2/21/2007 | 1,154 | 45.350 | 52,333.90 |
| 3/7/2007 | 600 | 40.450 | 24,270.00 |
| 3/7/2007 | 350 | 40.380 | 14,133.00 |
| 3/7/2007 | 850 | 40.360 | 34,306.00 |
| 3/7/2007 | 200 | 40.320 | 8,064.00 |
| 3/21/2007 | 250 | 43.000 | 10,750.00 |
| 3/21/2007 | 500 | 42.950 | 21,475.00 |
| 3/21/2007 | 100 | 42.930 | 4,293.00 |
| 3/21/2007 | 1,150 | 42.920 | 49,358.00 |
| 4/4/2007 | 568 | 45.150 | 25,645.20 |
| 4/4/2007 | 1,432 | 45.000 | 64,440.00 |
| 4/18/2007 | 94 | 46.880 | 4,406.72 |
| 4/18/2007 | 256 | 46.870 | 11,998.72 |
| 4/18/2007 | 1,350 | 46.850 | 63,247.50 |
| 4/18/2007 | 300 | 46.700 | 14,010.00 |
| 5/2/2007 | 500 | 45.230 | 22,615.00 |
| 5/2/2007 | 450 | 45.190 | 20,335.50 |
| 5/2/2007 | 1,050 | 45.050 | 47,302.50 |
| 5/4/2007 | 640 | 44.780 | 28,659.20 |
| 5/16/2007 | 203 | 46.130 | 9,364.39 |
| 5/16/2007 | 295 | 46.110 | 13,602.45 |
| 5/16/2007 | 1,502 | 46.100 | 69,242.20 |
| 5/23/2007 | 9 | 49.060 | 441.54 |
| 5/23/2007 | 100 | 49.050 | 4,905.00 |
| 5/23/2007 | 1,455 | 49.040 | 71,353.20 |
| 6/6/2007 | 750 | 50.070 | 37,552.50 |
| 6/6/2007 | 50 | 50.050 | 2,502.50 |
| 6/6/2007 | 400 | 50.040 | 20,016.00 |
| 6/6/2007 | 50 | 50.030 | 2,501.50 |
| 6/6/2007 | 250 | 49.980 | 12,495.00 |
| 6/6/2007 | 500 | 49.850 | 24,925.00 |
| 6/20/2007 | 400 | 34.080 | 13,632.00 |
| 6/20/2007 | 200 | 34.070 | 6,814.00 |
| 6/20/2007 | 500 | 34.050 | 17,025.00 |
| 6/20/2007 | 500 | 34.040 | 17,020.00 |
| 6/20/2007 | 1,400 | 33.970 | 47,558.00 |
| 7/5/2007 | 300 | 32.550 | 9,765.00 |
| 7/5/2007 | 200 | 32.650 | 6,530.00 |
| 7/5/2007 | 100 | 32.640 | 3,264.00 |
| 7/5/2007 | 400 | 32.570 | 13,028.00 |
| 7/5/2007 | 200 | 32.560 | 6,512.00 |
| 7/5/2007 | 400 | 32.500 | 13,000.00 |
| 7/5/2007 | 400 | 32.630 | 13,052.00 |
| 7/5/2007 | 300 | 32.620 | 9,786.00 |
| 7/5/2007 | 100 | 32.610 | 3,261.00 |
| 7/5/2007 | 300 | 32.600 | 9,780.00 |

| | | | |
|---|---|---|---|
| 7/5/2007 | 300 | 32.580 | 9,774.00 |
| 7/18/2007 | 31 | 32.150 | 996.65 |
| 7/19/2007 | 100 | 31.030 | 3,103.00 |
| 7/19/2007 | 500 | 30.990 | 15,495.00 |
| 7/19/2007 | 200 | 30.980 | 6,196.00 |
| 7/19/2007 | 169 | 30.970 | 5,233.93 |
| 7/19/2007 | 100 | 30.570 | 3,057.00 |
| 7/19/2007 | 1,900 | 30.540 | 58,026.00 |
| 8/1/2007 | 900 | 26.800 | 24,120.00 |
| 8/1/2007 | 300 | 26.380 | 7,914.00 |
| 8/1/2007 | 100 | 26.370 | 2,637.00 |
| 8/1/2007 | 100 | 26.360 | 2,636.00 |
| 8/1/2007 | 400 | 26.350 | 10,540.00 |
| 8/1/2007 | 100 | 26.330 | 2,633.00 |
| 8/1/2007 | 100 | 26.320 | 2,632.00 |
| 8/1/2007 | 400 | 26.300 | 10,520.00 |
| 8/1/2007 | 600 | 26.200 | 15,720.00 |
| 8/1/2007 | 100 | 26.470 | 2,647.00 |
| 8/1/2007 | 500 | 26.450 | 13,225.00 |
| 8/1/2007 | 525 | 26.400 | 13,860.00 |
| 8/15/2007 | 1,875 | 25.330 | 47,493.75 |
| 8/15/2007 | 1,125 | 24.200 | 27,225.00 |
| 9/5/2007 | 200 | 26.040 | 5,208.00 |
| 9/5/2007 | 175 | 25.980 | 4,546.50 |
| 9/5/2007 | 256 | 25.850 | 6,617.60 |
| 9/5/2007 | 1,169 | 25.800 | 30,160.20 |
| 9/5/2007 | 38 | 25.770 | 979.26 |
| 9/5/2007 | 121 | 25.760 | 3,116.96 |
| 9/5/2007 | 541 | 25.750 | 13,930.75 |
| 9/6/2007 | 200 | 25.900 | 5,180.00 |
| 9/6/2007 | 93 | 25.800 | 2,399.40 |
| 9/6/2007 | 207 | 25.750 | 5,330.25 |
| 9/19/2007 | 400 | 28.600 | 11,440.00 |
| 9/19/2007 | 148 | 28.410 | 4,204.68 |
| 9/19/2007 | 2,452 | 28.400 | 69,636.80 |
| 10/3/2007 | 800 | 29.000 | 23,200.00 |
| 10/3/2007 | 400 | 28.750 | 11,500.00 |
| 10/3/2007 | 100 | 28.740 | 2,874.00 |
| 10/3/2007 | 200 | 28.710 | 5,742.00 |
| 10/3/2007 | 600 | 28.650 | 17,190.00 |
| 10/3/2007 | 19 | 28.630 | 543.97 |
| 10/3/2007 | 419 | 28.610 | 11,987.59 |
| 10/3/2007 | 462 | 28.600 | 13,213.20 |
| **Total** | **69,940** | | **$2,726,007.23** |

131.    Thus, certain of the Defendants' interests were not aligned with those of the Plaintiff and the Class, whose assets were decimated by continued investments in Company stock, as Advanta's share price plummeted.

## CLAIMS FOR RELIEF UNDER ERISA

132.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

133.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

134.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

135.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

136.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982).  They entail, among other things:

a.     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.     A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c.     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

137.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section

404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

138.   Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plans-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure To Prudently and Loyally Manage the Plans' Assets
### (Breaches of Fiduciary Duties in Violation Of ERISA § 404 and § 405 by all Defendants)

139.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

140.   At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

141.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plans or disposition of a Plans' assets are responsible for ensuring that investment options made available to participants under a Plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the Plans are prudently invested.  Defendants were responsible for ensuring that all investments in the Company's stock in the Plans were prudent and that such investment was consistent with

the purpose of the Plans.  Defendants are liable for losses incurred as a result of such investments being imprudent.

142.    A fiduciary's duty of loyalty and prudence requires it to disregard plans documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plans documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plans trustees, to do so.

143.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plans or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plans investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.

144.    Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period these Defendants knew or should have known that, as described herein, the Advanta common stock was not a suitable and appropriate investment for the Plans.  Investment in Company stock during the Class Period clearly did not serve the Plans' stated purpose.  Yet, during the Class Period, despite their

knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

145.   Defendants further breached their duties of loyalty and prudence by failing to divest the Plans of Advanta stock when they knew or should have known that it was not a suitable and appropriate Plans investment.

146.   Defendants breached their duties of loyalty and prudence by failing to ensure that participants liquidated their Advanta common stock investments in each of the Plans and transferred the sale proceeds to the other investment options available in the 401(k)/profit sharing component of the Plans.   With actual or constructive knowledge that Plan participants did not have full and complete information about the Company's problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interests or, if necessary, to liquidate ESOP's holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

147.   Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.   During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plans to follow their natural bias

towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

148.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had or should have had knowledge of such breaches by other Plans fiduciaries, yet made no effort to remedy them.

149.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment. Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plans.

150.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

151.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

152.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plans within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

153.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plans fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

154.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

155.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

156.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Advanta and the Director Defendants)**

157.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.   At all relevant times, as alleged above, Advanta and the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

159.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of Advanta and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Administrative Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

160.   The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.   In this case, that means that the monitoring fiduciaries, Advanta and the Director Defendants, had the duty to:

(1)   Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.   They must be knowledgeable about the operations of

56

the Plans, the goals of the Plans, and the behavior of the Plans'
participants;

(2)     Ensure that the monitored fiduciaries are provided with adequate
financial resources to do their job;

(3)     Ensure that the monitored fiduciaries have adequate information to
do their job of overseeing the Plans' investments;

(4)     Ensure that the monitored fiduciaries have ready access to outside,
impartial advisors when needed;

(5)     Ensure that the monitored fiduciaries maintain adequate records of
the information on which they base their decisions and analysis with
respect to the Plans' investments; and

(6)     Ensure that the monitored fiduciaries report regularly to the
monitoring fiduciaries.  The monitoring fiduciaries must then review,
understand, and approve the conduct of the hands-on fiduciaries.

161.    Under ERISA, a monitoring fiduciary must ensure that the monitored
fiduciaries are performing their fiduciary obligations, including those with respect to the
investment of a Plans' assets, and must take prompt and effective action to protect a plan
and its participants when they are not.  In addition, a monitoring fiduciary must provide
the monitored fiduciaries with complete and accurate information in their possession that
they know or reasonably should know that the monitored fiduciaries must have in order
to prudently manage a plan and its assets.

162.    Advanta and the Director Defendants breached their fiduciary monitoring
duties by, among other things, (a) failing to ensure that the monitored fiduciaries had

access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Advanta and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plans in Advanta common stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plans to continue offering Advanta stock as an investment alternative.  Despite this knowledge, Advanta and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

163.    In addition, Advanta and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Advanta that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

164.    Advanta and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

165.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

166.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

167.     The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, reflected in the diminished account balances of the Plans' participants.

168.     Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and its participants would have avoided a substantial portion of the losses that they suffered through the Plans' continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

169.     As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

170.     ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plans any losses to the plans . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

171.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

173.    Plaintiff, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

174.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Advanta maintained by the Plans in proportion to the accounts' losses attributable to the decline in Advanta's stock price;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: October 29, 2009                     Respectfully submitted,

                                            **JHM6596**
                                            **BARROWAY TOPAZ KESSLER
                                             MELTZER & CHECK, LLP**
                                            Joseph H. Meltzer
                                            Edward W. Ciolko
                                            Joseph A. Weeden
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            Telephone:  (610) 667-7706
                                            Facsimile: (610) 667-7056

                                            **BRODSKY & SMITH, LLC**
                                            Evan J. Smith, Esquire
                                            Two Bala Plaza, Suite 602
                                            Bala Cynwyd, PA 19004
                                            Telephone:  (610) 667-6200
                                            Facsimile:  (610) 667-9029

                                            *Attorneys for Plaintiff and the Proposed
                                            Class*