# Exhibit A

# ADVANTA CORP.
# EMPLOYEE STOCK OWNERSHIP PLAN

(Amended and Restated Effective September 10, 1998)

## TABLE OF CONTENTS

Page

ARTICLE I       STATEMENT OF PURPOSE ....................................................................1

ARTICLE II      DEFINITIONS .......................................................................................3

ARTICLE III     PARTICIPATION ELIGIBILITY ............................................................17

ARTICLE IV      EMPLOYER CONTRIBUTIONS ............................................................18

ARTICLE V       PARTICIPANT CONTRIBUTIONS .......................................................21

ARTICLE VI      ALLOCATION OF CONTRIBUTIONS ..................................................22

ARTICLE VII     ADMINISTRATIVE PROVISIONS........................................................27

ARTICLE VIII    RETIREMENT AND TERMINATION OF EMPLOYMENT BENEFITS ...35

ARTICLE IX      DEATH BENEFITS AND SURVIVING SPOUSE'S BENEFITS .............36

ARTICLE X       NONFORFEITURE PROVISIONS (VESTING) ....................................39

ARTICLE XI      METHODS AND TIMING OF BENEFIT DISTRIBUTIONS ...................41

ARTICLE XII     PROVISIONS RELATING TO TOP-HEAVY PLANS ...............................43

ARTICLE XIII    PLAN ADMINISTRATOR ....................................................................45

ARTICLE XIV     ALLOCATION AND DELEGATION OF AUTHORITY ...........................49

ARTICLE XV      CLAIMS PROCEDURES .....................................................................50

ARTICLE XVI     AMENDMENT AND TERMINATION - ADOPTION BY AFFILIATES ...52

ARTICLE XVII    MISCELLANEOUS PROVISIONS .......................................................55

ARTICLE I

STATEMENT OF PURPOSE

1.1.   General Purpose.  Advanta Corp., a Delaware corporation, ("Advanta" or the "Employer") established the Advanta Corp. Employee Stock Ownership Plan (the "Plan") effective September 10, 1998 to enable each eligible person employed by the Employer to benefit, in accordance with the terms of the Plan, from an accumulation of stock of the Employer and to provide for substantial employee participation in the ownership of the Employer, and hereby restates the Plan in its entirety, effective as of September 10, 1998.  It is a primary purpose of the Plan to establish for each Participant an ownership interest in the Employer. Accordingly, it is anticipated that the trustees under the Plan will arrange from time to time for loans meeting the requirements of "Exempt Loans" under ERISA and the Code (as those terms are hereinafter defined), that the proceeds of these loans will be used as soon as practicable after receiving such loans to purchase Employer Securities (as defined in this Plan), that such Employer Securities will be held in a suspense account pending payments on such loans, that Employer contributions will be used to pay principal and interest on such loans, that at the end of each Plan Year, Employer Securities will be released from the Suspense Account to reflect the payments on such loans and will be allocated to the accounts of Participants, and that Participants will enjoy all the rights of an owner with respect to the Employer Securities allocated to their accounts but subject to the Plan's vesting rules, all as more particularly provided later in this Plan.  The Trustee shall only acquire Employer Securities for the Plan which have voting rights, but shall not acquire such voting Employer Securities if the acquisition would result in the Plan holding more than 9.9% of the voting power of all outstanding shares of the Company's stock.  The Trustee will also take all appropriate steps, subject to the terms of the Plan, to dispose of any voting Employer Securities to the extent needed in order to ensure that the Plan does not hold more than 9.9% of the voting power of all outstanding shares of the Company's stock.  If any Employer Securities are purchased at a time when the Plan already has 9.9% or more of the voting power of all outstanding shares of the Company's stock, the Trustee will only acquire Employer Securities that have no voting rights.

1.2.   Qualification Under the Internal Revenue Code.  It is intended that the Plan be a qualified employee stock ownership plan within the meaning of sections 401(a) and 4975 of the Code and that the funding vehicle(s) associated with the Plan be exempt from federal income taxation pursuant to the provisions of section 501(a) of the Code.  Subject to the provisions of Article IV of the Plan (identifying certain circumstances authorized by statute or regulation, the occurrence of which may result in refunds to the Employer of amounts contributed under the Plan), the assets of the Plan shall be applied exclusively for the purposes of providing benefits to Participants and Beneficiaries under the Plan and for defraying expenses incurred in the administration of the Plan and its corresponding funding vehicle(s).

1.3.   Plan Documents.  The Plan shall consist of this instrument together with its corresponding Trust Agreement, all amendments to either of the foregoing, and all documents



specifically incorporated in either of the foregoing by reference.  Descriptive materials published in connection with the Plan, such as plan descriptions, summaries of plan provisions, and notices relating to modification of the Plan, do not constitute part of the Plan and shall not give rise to rights or benefits not provided under the Plan.

      1.4    <u>Restatement</u>.  The Plan is hereby amended and restated effective September 10, 1998 (the "Restatement Effective Date") or any such other effective dates indicated herein as applicable to incorporate all such amendments required by the Uruguay Round Agreements Act ("GATT"), Pub. L. 103-465, the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), Pub.L. 103-353; the Small Business Job Protection Act of 1996, ("SBJPA"), Pub. L. 104-188, the Taxpayer Relief Act of 1997 ("TRA '97"), Pub. L. 105-34 and the Internal Revenue Service Restructuring and Reform Act of 1998 ("RRA '98"), Pub. Law. 105-206, (such acts collectively called the "GUST Amendments") and any other amendments deemed necessary or appropriate by the Board.



## ARTICLE II

### DEFINITIONS

2.1.    "Account" shall mean the entire interest of a Participant in the Plan.  Unless otherwise specified, the value of a Participant's Account and the quantity of Employer Securities allocable to a Participant's Account shall be determined as of the Valuation Date of the Plan coincident with or next following the occurrence of the event to which reference is made.  While a Participant will have but one Account, a Participant's Account may consist of several "Subaccounts" in order to differentiate, as needed, among the categories of investments allocated to his Account (for example, the portion of an Account attributable to Employer Securities purchased with the proceeds of Exempt Loans versus the portion attributable to other Employer Securities or the respective portions of his Account attributable to Employer Securities purchased with the proceeds of different Exempt Loans) or for such other purposes as the Plan Administrator may consider advisable (for example, to facilitate compliance with changes in applicable law or regulations).

2.2.    "Adoption Agreement" means the document by which an entity not theretofore constituting "Employer" adopts the Plan, joins in the corresponding Trust Agreement(s) and other funding vehicle(s), consents to the administration of the Plan, and becomes an entity constituting "Employer" hereunder.  Each executed Adoption Agreement is an integral part of the Plan.  No entity shall be permitted to become an Employer other than pursuant to the provisions of Section 16.6.

2.3.    "Advanta" shall mean Advanta Corp., a Delaware corporation.

2.4.    "Affiliated Company" shall mean any entity which, with any entity constituting Employer, constitutes (a) a "controlled group of corporations" within the meaning of section 414(b) of the Code, (b) a "group of trades or businesses under common control" within the meaning of section 414(c) of the Code, or (c) an "affiliated service group" within the meaning of section 414(m) of the Code.  An entity shall be considered an Affiliated Company only with respect to such period as the relationship described in the preceding sentence exists.  When the term "Affiliated Company" is used in Sections 2.9, 2.16, 2.17, 6.4 and 12.3 of the Plan (and only when the term is so used), sections 414(b) and(c) of the Code shall be deemed modified by application of the provisions of section 415(h) of the Code (which substitutes the phrase "more than 50 percent" for the phrase "at least 80 percent" in section 1563(a)(1) of the Code, which is then incorporated by reference in section 414(b) of the Code).

2.5.    "Age" shall mean the chronological age attained by the Participant at his most recent birthday.

2.6.    "Aggregation Group" shall mean the permissive Aggregation Group if there be one in existence, and shall otherwise mean the Mandatory Aggregation Group.

DSC:517535.10/TEA002-143126                         -3-

2.7.    "Alternate Payee" shall mean any person entitled to current or future payment of benefits under the Plan pursuant to a QDRO.

2.8.    "Anniversary Date" shall mean the last day of the Plan Year.

2.9.    "Annual Addition" shall mean, as to any Participant for any Limitation Year, the sum of:

        (a)    Employer contributions allocated to his Account;

        (b)    the amount of the Participant's contribution to his Account(s) for such year;

        (c)    Forfeitures reallocable to the Participant's Account; and

        (d)    As to any Key Employee, any amount credited to an account established under section 419A(d)(1) of the Code for the provision of post-retirement medical benefits.

For the purposes of this Section, contributions to any qualified defined contribution plan sponsored by the Employer or by an Affiliated Company and forfeitures reallocable under any such plan shall be considered contributions or forfeitures, as the case may be, to the Participant's Account under the Plan. Notwithstanding anything to the contrary set forth in this Section 2.9, Annual Additions shall not include forfeitures or Employer contributions to the extent forfeitures and Employer contributions are excluded from the limitations of Code Section 415 pursuant to the provisions of Code Section 415(c)(6).

2.10.    "Beneficiary" shall mean:

        (a)    Any Alternate Payee named in a QDRO to receive benefits in the event of the death of the Participant, to the extent of the rights granted in such QDRO;

        (b)    As to any Participant who is married at the time of his death, the Participant's Spouse, except as provided in subsections (c) and (d) hereof;

        (c)    As to any Participant who (1) is not married at the time of his death, or (2) is married, but whose Spouse has consented to the designation of a Beneficiary other than himself or herself (to the extent of such consent), the persons or entities designated by the Participant in writing to be his Beneficiaries hereunder; and

        (d)    As to any Participant who dies not survived by a Spouse, whose death benefit is not subject to a QDRO, and who has not designated a Beneficiary (or who is not survived by any such designated Beneficiary), the Participant's estate.

2.11.   "Benefit Commencement Date" shall mean the date on which there is distributed to the Participant (or to the Beneficiary of a deceased Participant) the entire amount standing to his credit under the Plan, or, if distribution is to be made as an annuity or otherwise in more than one payment, the date on which the first such benefit payment is made to the Participant or to the Beneficiary of a deceased Participant.

2.12.   "Board of Directors" shall mean the board of directors of Advanta Corp.  The Board of Directors shall have the authority to delegate to any committee, person or persons, any of its duties and obligations under the Plan.

2.13.   "Code" shall mean the Internal Revenue Code of 1986, as the same may be amended from time to time, and any successor statute of similar purpose.

2.14.   "Common Stock" shall mean either Class A or Class B Common Stock of Advanta Corp.

2.15.   "Compensation" shall mean the base salary including any shift differential and overtime paid for up to forty (40) hours per week (and also including commissions paid to certain classifications of employees as have been or may be designated by the Advanta Plan Administrative Committee from time to time), but excluding adjustments to salary and allowances paid due to international service, overtime paid for work in excess of forty (40) hours per week, bonuses, and expense reimbursements of any kind, paid to an Employee by the Employer and in a Plan Year, the same being "Participant's compensation" as that term is defined at section 415(c)(3) of the Code, to include all such direct monetary remuneration paid to the payee during the computation period of reference as is included under Treas. Reg. §1.415-2(d)(1), but to exclude all other remuneration, regardless of form.  Compensation of any Employee or Participant in excess of one hundred sixty thousand dollars ($170,000), as such limitation may be adjusted by the Secretary of the Treasury under section 401(a)(17) of the Code, shall be disregarded for all purposes under the Plan.

2.16.   "Defined Benefit Fraction" shall be a fraction,

(a)   the numerator of which is the sum of the projected annual benefits of the Participant under all defined benefit pension plans sponsored by the Employer and all Affiliated Companies (as of the close of the Limitation Year), and

(b)   the denominator of which is the lesser of (1) 1.25 multiplied by the dollar limitation in effect under section 415(b)(1)(A) of the Code as to such Limitation Year, or (2) the product of (i) 1.4, multiplied by (ii) the amount which may be taken into account under section 415(b)(1)(B) of the Code with respect to such individual under the Plan for such Limitation Year.

(c)   If the Plan is a Super Top-Heavy Plan, or if the Plan is a Top-Heavy Plan which fails to satisfy the minimum allocation requirements of Section 6.4 hereof, "1.0" shall be substituted for "1.25" in subsection (b) of this Section.

2.17.    "Defined Contribution Fraction" shall be a fraction,

(a)    the numerator of which is the sum of the Annual Additions to the Participant's Account as of the close of the Limitation Year of reference, treating as an Annual Addition under the Plan all amounts which satisfy the definition of Annual Addition hereunder but which were accumulated under any other qualified defined contribution plan sponsored by the Employer or any Affiliated Company, and

(b)    the denominator of which is the sum of the denominator increments (as of the close of the Limitation Year) for all of the Participant's years of Service with the Employer or any Affiliated Company, where the denominator increment for each such year of Service is the lesser of (1) the product determined by multiplying 1.25 by the dollar limitation in effect under section 415(c)(1)(A) of the Code for such year of Service (determined without regard to section 415(c)(6) of the Code), or (2) the product determined by multiplying 1.4 by the amount which may be taken into account under section 415(c)(1)(B) of the Code (or sections 415(c)(7) or 415(c)(8), if applicable) with respect to such individual for such year.

(c)    If the Plan is a Super Top-Heavy Plan, or if the Plan is a Top-Heavy Plan which fails to satisfy the minimum allocation requirements of Section 6.4 hereof, "1.0" shall be substituted for "1.25" in subsection (b) of this Section.

2.18.    "Determination Date" shall mean, as to any Plan Year other than the Plan Year which commenced with the Restatement Effective Date, the last day of the preceding Plan Year. As to the Plan Year which commenced with the Restatement Effective Date, the term "Determination Date" shall be a reference to the last day of such Plan Year.

2.19.    "Disregarded Prior Service" shall mean a Participant's Period of Service completed prior to any Period of Severance, where

(a)    the Participant had either

(1)    no vested interest in that portion of his Account under the Plan attributable to Employer contributions prior to such Period of Severance, or

(2)    a vested interest in that portion of his Account under the Plan attributable to Employer contributions prior to such Period of Severance, received a distribution of the full value of such vested interest, and failed to make a restoration contribution of the value of such vested interest (with interest) prior to experiencing a Period of Severance of at least sixty (60) months' duration; and

(3)    the length of the Participant's Period of Severance (with respect to which a determination is being made) equals or exceeds the greater of:

(A)    sixty (60) months, and

(B)    the length of his Period of Service (but not counting any previously Disregarded Prior Service) as determined at the beginning of such Period of Severance.

2.20.   "Employee" shall mean each person in the employ of the Employer, including each person who is required under any applicable provision of the Code to be treated as employed by the Employer; provided, however, that (a) the term "Employee" shall not include any person whose terms and conditions of employment are determined through collective bargaining with a third party if the issue of retirement benefits has been a bona fide subject of collective bargaining, unless the collective bargaining agreement provides for the inclusion of such person as a Participant in the Plan, (b) no Leased Employee shall be treated as an "Employee" for purposes of eligibility to become a Participant in the Plan, except to the extent and for the periods during which the Employer elects to admit such Leased Employee to Active Participant status under the Plan; and (c) no individual who is, in the opinion of the Plan Administrator, an independent contractor, or an employee of an independent contractor, or who is treated or designated as such by the Employer, shall be treated as an "Employee" for purposes of eligibility to become a Participant in the Plan.  The exclusion of such individuals from eligibility to become a Participant in the Plan shall be effective without regard to any determination by any governmental agency or any court that any such individual is required to be treated as an employee of the Employer for any purpose.

2.21.   "Employee Retirement Income Security Act of 1974" or "ERISA" shall mean the Act known by that name (and any successor Act), including all amendments thereto.

2.22.   "Employer" shall mean Advanta Corp., a Delaware corporation and any successor thereto.  The term "Employer" shall also include any other related entity which adopts this Plan and joins in the corresponding Trust Agreement, pursuant to the provisions of Section 16.6.

2.23.   "Employer Securities" shall have the following meanings when used herein:

(a)    Other than as to Plan assets acquired with the proceeds of an Exempt Loan, Employer Securities shall mean capital stock of any class issued by the Employer (or by a corporation which is a member of the same controlled group of corporations as the Employer with the term "controlled group of corporations" having the same meaning herein as in section 409(l)(4) of the Code), or a "marketable obligation" within the meaning of section 407(a) of ERISA.

(b)    As to Plan assets acquired with the proceeds of such an Exempt Loan, Employer Securities shall mean Common Stock of the Employer which constitutes "employer securities" as that term is defined in Section 409(l) of the Code.

2.24.   "Employment Commencement Date" shall mean, with respect to any individual, the first date on which that individual performs an Hour of Service in the employ of the Employer whether or not such Service was performed as an Employee.

DSC:517535.10/TEA002-143126                      - 7 -

2.25    "Entry Date" shall mean each January 1 and July 1 of each Plan Year.

2.26.   "Excused Absence" means any of the following:

(a)     Absence on leave granted by the Employer for any cause for the period stated in such leave or, if no period is stated, then for six (6) months and any extensions that the Employer may grant in writing.  For the purposes of this provision, the Employer will give similar treatment to all Employees in similar circumstances.

(b)     Absence in any circumstance so long as the Employee continues to receive his regular compensation from the Employer.

(c)     Absence in the armed forces of the United States or government service in time of war or national emergency.

(d)     Absence by reason of illness or disability until such time as the employment relationship between Employer and Employee is severed.

An "Excused Absence" shall cease to be an "Excused Absence" and shall be deemed a Period of Severance commencing as of the Employee's Severance from Service Date if the Employee fails to return to the Service of the Employer (A) within five (5) days of the expiration of any leave of absence referred to in subsection (a) of this Section; (B) at such time as the payment of regular compensation referred to in subsection (b) of this Section is discontinued; (C) within six (6) months after his discharge or release from active duty in the armed services, or, if the Employee does not return to the service of the Employer within the said six (6) month period by reason of a disability incurred while in the armed forces, if he returns to service with the Employer upon the termination of such disability as evidenced by release from confinement in a military or veterans health care facility; or (D) upon recovery from illness or disability.  The Employer shall be the sole judge of whether or not recovery from illness or disability has occurred for this purpose.

Notwithstanding any provision of this Section 2.28 or any other provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with section 414(u) of the Code.

2.27.   "Exempt Loan" or "Loan" shall mean any loan which would otherwise be a prohibited transaction subject to excise tax under section 4975 of the Code (by reason of such loan being taken from a "disqualified person" (within the meaning of section 4975(e)(2) of the Code or by reason of such loan being guaranteed by such a "disqualified person"), but which is exempt from the said prohibited transaction excise tax by operation of section 4975(d)(3) of the Code.  The proceeds of any Exempt Loan must be used within a reasonable time after their receipt by the Plan only for one or more of the following purposes: (1) to acquire Employer Securities, (2) to repay the loan, or (3) to repay a prior Exempt Loan.

2.28.   "Five-percent Owner" shall mean, as to any entity, any person who owns (or is considered as owning within the meaning of section 318 of the Code) more than five percent (5%) of the outstanding stock of the Employer (or any entity constituting Employer) or stock possessing more than five percent (5%) of the total combined voting power of all of the stock of such entity.  Where an entity is not a corporation, a person shall be considered a "Five percent Owner" if he owns more than five percent (5%) of either the capital or the profits interest in the entity.

2.29.   "Fund" shall mean all of the assets of the Plan held by the Trustee (or any nominee thereof) at any time under the Trust Agreement.  The Fund may consist of various "Subfunds" to the extent the Plan Administrator or Trustee may consider it advisable to keep separate account of various categories of investments which may be held under the Plan and Trust.

2.30.   "Hour of Service" shall be defined in a manner consistent with regulations published by the secretary of Labor at Title 29, Code of Federal Regulations, §2530.200b-2, and shall mean (a) each hour for which an employee is paid or entitled to payment for the performance of duties for the Employer or an Affiliated Company during the applicable computation period, (b) each hour for which an employee is paid or entitled to payment by the Employer or an Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether or not the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury or military duty, or leave of absence, and (c) each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer or an Affiliated Company.  Hours of Service shall be credited to the computation period in which earned, regardless of when determined or awarded.  Notwithstanding the foregoing, except as provided in the following sentence, (i) not more than five hundred and one (501) Hours of Service shall be credited to an employee on account of any single continuous period during which the employee performs no duties for the Employer or an Affiliated Company; (ii) no credit shall be granted for any period with respect to which an employee receives payment or is entitled to payment under a plan maintained solely for the purpose of complying with applicable workmens' compensation or disability insurance laws; and (iii) no credit shall be granted for a payment which solely reimburses an employee for medical or medically related expenses incurred by the employee.  Each week of absence for military service in the armed forces of the United States from which service the Employee returns to the Employer or an Affiliated Company within the period during which he or she has legally protected reemployment rights shall count as a number of Hours of Service equal to the number of Hours of Service that would have been credited to the employee with respect to the employee's customary week of employment during the month immediately preceding the date on which absence for military service commenced.  Service rendered at overtime or other premium rates shall be credited at the rate of one (1) Hour of Service for each hour for which pay is earned, regardless of the rate of compensation in effect with respect to such hour.

For the purposes of this Section, the term "employee" means any person with whom the Employer or an Affiliated Company maintains an employer-employee relationship under general

principles of law, or under the provisions of section 414(n) of the Code if section 414(n)(5) does not apply to negate the applicability of section 414(n).

If an employee's payroll records are normally kept on other than an hourly basis, Hours of Service shall be credited on the basis of the manner in which the employee's payroll records are maintained, utilizing such of the following equivalencies as may be appropriate:

| Basis Upon Which the Participant's Payroll Records are Maintained | Credit Granted if Participant Earns One (1) or More Hours of Service During Period |
|---|---|
| Shift | Actual hours for full shift |
| Day | 10 Hours of Service |
| Week | 45 Hours of Service |
| Semi-monthly Payroll Period | 95 Hours of Service |
| Months of Employment | 190 Hours of Service |

2.31.   "Key Employee" shall mean a person described in section 416(i)(1)(A) of the Code as interpreted by the regulations thereunder, and shall not include any other person. In general, a Key Employee is a person who is or was employed by the Employer or an Affiliated Company who, during the Plan Year or during any of the preceding four (4) Plan Years, was any of the following:

(a)    An officer of the Employer or of an Affiliated Company having an annual compensation of more than fifty percent (50%) of the amount in effect under section 415(b)(1)(A) of the Code for the Plan Year. An individual shall be considered an officer only if he or she (A) is in the regular and continuous employ of the Employer or Affiliated Company, (B) has been designated as an officer pursuant to election or appointment by the board of directors or other person or governing body having authority to elect or appoint officers of the Employer or Affiliated Company, and (C) is an administrative executive.  The number of persons to be considered officers in any Plan Year and the identity of the persons to be so considered shall be determined pursuant to the provisions of section 416(i) of the Code and the regulations published thereunder.

(b)    One (1) of the ten (10) employees of the Employer or of an Affiliated Company who owns (or is considered as owning under the attribution rules set forth at Section 318 of the Code and the regulations thereunder) the largest interest in the Employer or such Affiliated Company, provided that no person shall be considered a Key Employee under this subsection (b) if his annual Statutory Compensation is not greater than the limitation in effect for such Plan Year under section 415(c)(1)(A) of the Code, nor shall any person be considered a Key Employee under this subsection (b) if his ownership interest in the Plan Year being tested and the preceding four Plan Years was at all times less than one-half of one percent (½%) in value of any of the entities forming the Employer and the Affiliated Companies. Also for the purposes of this subsection (b), if two or more employees have the same interest in the

Employer or an Affiliated Company, the employee having the greatest annual compensation shall be deemed to have the greatest such interest, with the interests of the other such similar interest holders being deemed to be descending in size in accordance with the descending order of their respective compensations.

(c)     A Five-percent Owner of the Employer.

(d)     A person who is both an Employee whose annual Statutory Compensation from the Employer and all Affiliated Companies exceeds $150,000 and who is a One-percent Owner.  The Beneficiary of any deceased Participant who was a Key Employee shall be considered a Key Employee for the same period as the deceased Participant would have been so considered.

2.32.   "Key Employee Ratio" shall mean the ratio for any Plan Year, calculated as of the Determination Date with respect to such Plan Year, determined by comparing the amount described in subsection (a) of this Section with the amount described in subsection (b) hereof, after deduction from both such amounts of the amount described in subsection (c) hereof.

(a)     The amount described in this subsection (a) is the sum of (1) the aggregate of the present value of all accrued benefits of Key Employees under all qualified defined benefit plans included in any Aggregation Group including the Plan, (2) the aggregate of the balances in all of the accounts standing to the credit of Key Employees under the Plan and, if the Plan is part of an Aggregation Group, all other qualified defined contribution plans included in the Aggregation Group, and (3) the aggregate amount distributed from the plan and all other plans in such Aggregation Group to or on behalf of any Key Employee during the period of five (5) Plan Years ending on the Determination Date.

(b)     The amount described in this subsection (b) is the sum of (1) the aggregate of the present value of all accrued benefits of all Participants under all qualified defined benefit plans included in any Aggregation Group of which the Plan is a part, (2) the aggregate of the balances in all of the accounts standing to the credit of all Participants under the Plan and, if the Plan is part of an Aggregation Group, all other qualified defined contribution plans included in the Aggregation Group, and (3) the aggregate amount distributed from the Plan and all other plans in such Aggregation Group to or on behalf of any Participant during the period of five (5) Plan Years ending on the Determination Date.

(c)     The amount described in this subsection (c) is the sum of (1) all rollover contributions (or similar transfers) to the Plan, (2) any amount that would have been included under subsection (a) or subsection (b) hereof with respect to any individual who has not received compensation from any entity constituting Employer (other than benefits under the Plan) at any time during the five-year period ending on the Determination Date, and (3) any amount that is included in subsection (b) hereof for, on behalf of, or on account of, a person who is a Non-key Employee as to the Plan Year of reference but who was a Key Employee as to any earlier Plan Year.

2.33. "Leased Employee" shall mean a person who is not an employee of the Employer or Affiliated Company, but who provides services to the Employer or Affiliated Company where (a) such services are performed pursuant to an agreement between the recipient of those services and any other person or entity, (b) the person performing the services has done so on a substantially full-time basis for at least one year, and (c) the services so performed are performed under the primary direction and control of the recipient of those services, except that even if an individual would otherwise be considered a Leased Employee hereunder, that person shall not be considered a Leased Employee if (1) he is covered by a money purchase pension plan which (i) covers all employees of the leasing organization (other than those rendering service directly to the leasing organization), (ii) provides a nonintegrated employer contribution rate of at least ten percent (10%) of compensation (as defined for the purposes of Section 415 of the Code), and (iii) allows immediate participation and full and immediate vesting, and (2) Leased Employees (including, for this purpose, those who would be Leased Employees but for the operation of this sentence) do not constitute more than twenty percent (20%) of that part of the recipient's workforce consisting of non-highly compensated employees.

2.34. "Limitation Year" shall mean the Plan Year unless a different "Limitation Year" is designated by the Board of Directors by resolution.

2.35. "Mandatory Aggregation Group" shall mean the group of qualified plans sponsored by the Employer or by an Affiliated Company formed by including in such group (1) all such plans in which a Key Employee is a Participant, and (2) all such plans which enable any plan described in clause (1) to meet the requirements of either section 401(a)(4) of the Code or section 410 of the Code.

2.36. "Named Fiduciary" shall mean the Employer, the Plan Administrator (if other than the Employer) and the Named Appeals Fiduciary. Each Named Fiduciary shall have only those particular powers, duties, responsibilities and obligations as are specifically delegated to him under this Plan and/or the Trust Agreement. Any fiduciary, if so appointed, may serve in more than one fiduciary capacity. Notwithstanding anything to the contrary contained herein, with respect to Employer Securities allocated to the Account of a Participant or Beneficiary, the Participant or Beneficiary, as the case may be, shall be the Named Fiduciary.

2.37. "Non-key Employee" shall mean any person who is employed by the Employer in any Plan Year, but who is not a Key Employee as to that Plan Year.

2.38. "Normal Retirement Age" shall mean the later of the date a Participant attains Age 65 or the fifth anniversary of the time the Participant commenced participation in the Plan.

2.39. "Normal Retirement Date" shall mean the last day of the month in which the Participant attains Normal Retirement Age.

2.40. "One-percent Owner" shall mean, as to any entity, any person who owns (or is considered as owning within the meaning of section 318 of the Code) more than one percent



(1%) of the outstanding stock of the Employer (or any entity constituting Employer) or stock possessing more than one percent (1%) of the total combined voting power of all of the stock of such entity. Where an entity is not a corporation, a person shall be considered a "One percent Owner" if he owns more than one-percent (1%) of either the capital or the profits interest in the entity.

2.41.   "Parenthood Absence" shall mean an absence from work (a) due to the pregnancy of the individual, (b) due to the birth of a child to the individual, (c) due to the placement of a child in connection with the adoption of that child by the individual, or (d) for the purposes of caring for a child during the period immediately following the birth or placement for adoption of such child.

2.42.   "Participant" shall mean any person who has been or who is an Employee and who has been admitted to participation in this Plan pursuant to the provisions of Article III hereof. The term "Participant" shall include Active Participants (those who are currently eligible to share in Employer contributions to the Plan), Retired Participants (those former Employees presently receiving benefits under the Plan or entitled to receive such benefits), and Vested Participants (employees who are no longer Active Participants, former Employees who are undergoing a Period of Severance, and, if the Plan is terminated, former Active Participants who remain employees of Employer, any of whom are or may become entitled at some future date to the distribution of benefits from the Plan by reason of their having been Active Participants herein).

2.43.   "Period of Service" or "Service" shall mean, in general, the aggregate of the periods of an Employee's employment by the Employer or any Affiliated Company commencing on his or her Employment Commencement Date or Reemployment Commencement Date, whichever is applicable, and ending on his or her Severance from Service Date, but subject to the following rules with respect to how Service and Periods of Service are determined for various purposes under this Plan:

(a)   All Service or Periods of Service which become Disregarded Prior Service shall cease to be Service for all purposes under the Plan. Otherwise, all of an Employee's separate Periods of Service shall be aggregated for purposes of the Plan in accordance with this Section.

(b)   In determining the aggregate of a Participant's periods of continuous employment for purposes of this Section, there shall be included:

(1)   periods of Total Disability and periods of Excused Absence in such periods of continuous employment, and

(2)   unless already credited in accordance with this subsection, any period of time beginning on an Employee's Severance from Service Date and ending on whichever of the following dates is applicable:

(A)     in the case of an Employee whose Severance from Service Date occurred immediately upon his termination of active employment, the date on which he or she next performs an Hour of Service, but only if such Hour of Service is performed within the twelve (12) consecutive month period following such Severance from Service Date; or

(B)     in the case of an Employee whose Severance from Service Date occurred while he or she was absent from work, with or without pay, the date on which he or she next performs an Hour of Service after such Severance from Service Date, but only if such Hour of Service is performed within the twelve (12) consecutive month period following the date he or she was first absent from work, provided that

Service to be credited pursuant to this paragraph shall not be credited as Service until the Employee performs an Hour of Service in whichever of the periods specified in subparagraphs (A) and (B) is applicable.

(c)     No Service shall be credited for any purpose under this Plan for employment with an entity prior to the time such entity became an Employer or an Affiliated Company.

(d)     For the purposes of this Section, a person shall be designated a Leased Employee and shall be treated as an employee of an Affiliated Company (or, if the Employer elects to admit such person to participation under the Plan, then as an employee of Employer for the period during which such participation is as an Active Participant) if the person is, as to the Employer or Affiliated Company for whom he or she performs services, a Leased Employee within the meaning of Section 414(n)(2) or under Treasury Regulations promulgated pursuant to Section 414(o)(2) of the Code with respect to whom the safe harbor exception of Section 414(n)(5) is not applicable.

2.44.   "Period of Severance" shall mean the period beginning on an individual's Severance from Service Date and ending on the first date thereafter on which the individual performs service for the Employer or an Affiliated Company entitling such individual to credit for an Hour of Service. Notwithstanding the foregoing, the first year of any Parenthood Absence shall not be included in a Period of Severance. A "One Year Period of Severance" shall mean a twelve (12) consecutive month Period of Severance.

2.45.   "Permissive Aggregation Group" shall mean the group of qualified plans sponsored by the Employer or by an Affiliated Company formed by including in such group (a) all plans in the Mandatory Aggregation Group, and (b) such other qualified plans sponsored by the Employer or an Affiliated Company as the Employer elects to include in such group, as long as the group, including those plans electively included, continues to meet the requirements of sections 401(a)(4) and 410 of the Code.

2.46.   "Plan" shall mean the Advanta Corp. Employee Stock Ownership Plan as set forth herein, and as the same may from time to time hereafter be amended. The plan is intended to

constitute an "employee stock ownership plan" within the meaning of section 407(d)(6) of ERISA and section 4975(e)(7) of the Code.

2.47.   "Plan Administrator" shall mean Company's Plan Administrative Committee or the person or committee named as such pursuant to the provisions of Article XIII hereof, or, in the absence of any such appointment, the Employer.

2.48.   "Plan Year" shall mean the twelve-month period commencing each January 1 and ending on the following December 31; provided, however, that the first Plan Year shall be the period commencing on the Restatement Effective Date and ending December 31, 1998.

2.49.   "QDRO" shall mean a "qualified domestic relations order" within the meaning of section 206(d)(3)(B) of ERISA.

2.50.   "Reemployment Commencement Date" shall mean the first date after an individual's Severance from Service Date on which the individual performs service for the Employer or an Affiliated Company entitling such individual to credit for at least one (1) Hour of Service.

2.51.   "Required Beginning Date" shall mean the April 1 of the calendar year following the later of (a) the calendar year in which the Participant attains age 70½, or, (b) with respect to a Participant who is not a Five-percent Owner, the calendar year in which the Participant retires.

2.52   "Restatement Effective Date" shall mean September 10, 1998.

2.53.   "Severance from Service Date" shall mean the earliest of:

        (a)   the date on which the individual retires, quits, is discharged from employment or dies or is absent from the employ of the Employer and all Affiliated Companies; or

        (b)   the first anniversary of the first date of a period in which the individual remains absent from service (with or without pay) from the Employer and all Affiliated Companies for any reason other than retirement, quit, death, or discharge from employment, such as vacation, holiday, sickness, disability, leave of absence or layoff; or

        (c)   the date on which the individual retires, quits, is discharged from employment or dies while on a period of absence described in subsection (b).

2.54.   "Spouse" shall mean (a) the person to whom the Participant was married on his Benefit Commencement Date, or (b) if the Participant's Benefit Commencement Date had not occurred at the time of his death, the person to whom the Participant was married at the time of his death.  When the word "spouse" is used without an initial capital letter in the Plan, the term means the person to whom the Participant was married or is married as of the date of reference.

2.55.   "Statutory Compensation" shall mean the Participant's wages, salaries, fees for professional service and other amounts received for personal services actually rendered in the course of employment with an Employer (including, but not limited to, commissions paid to salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips and bonuses), the same being "Participant's compensation" as that term is defined at section 415(c)(3) of the Code, to include all such direct monetary remuneration paid to the payee during the computation period of reference as is included under Treas. Reg. § 1.415-2(d)(1), but to exclude all other remuneration, regardless of form.

2.56.   "Suspense Account" shall mean the account created by the Trustee pursuant to Section 7.7 hereof to hold Employer Securities acquired with the proceeds of an Exempt Loan.

2.57.   "Total Disability" shall mean an injury or illness which renders the Participant completely unable to perform the material duties of his regular occupation or employment and which is expected to continue for at least one year. The Plan Administrator shall determine whether a Member qualifies for a distribution under this subsection based on such medical evidence as the Plan Administrator shall deem appropriate.

2.58.   "Trust Agreement" shall mean the Advanta Corp. Employee Stock Ownership Plan Trust Agreement as the same is presently constituted, as it may hereafter be amended, and such additional and successor trust agreements as may be executed for the purpose of providing for the management of the assets of the Plan.

2.59.   "Trustee" shall mean the party or parties so designated pursuant to the Trust Agreement and each of their respective successors.

2.60.   "Valuation Date" shall mean the last day of the Plan Year (the "Annual Valuation Date"), the last business day of each month, and each other interim date during the Plan Year on which a valuation of the Fund is made.

2.61.   "Year of Participation" shall mean any Plan Year in which the Participant completes one thousand (1,000) or more Hours of Service, provided, however, that a Participant shall not be credited with a Year of Participation for any Plan Year in which he resigns or is discharged (with or without cause) if he is not an employee of the Employer on the last day of such Plan Year. In any Plan Year in which the plan is a Top-Heavy Plan, the term "Year of Participation" shall mean any Plan Year in which the Participant is engaged in employment entitling him to be an Active Participant for at least one (1) day, provided, however, that a Participant shall not be credited with a Year of Participation for any Plan Year in which he resigns or is discharged (with or without cause) if he is not an employee of the Employer on the last day of such Plan Year.

# ARTICLE III

## PARTICIPATION ELIGIBILITY

3.1.   <u>Minimum Service Requirement</u>.  Every Employee who was eligible to participate in the Advanta Corp. Employee Savings Plan as of the Restatement Effective Date commenced participation in the Plan as of such date.  Every other Employee becomes a Participant as of the Entry Date (as hereinafter defined) that occurs on or immediately following the date on which such Employee has both attained at least age 21 and is credited with one year of Service.

3.2.   <u>Procedure for and Effect of Admission</u>.  Each Employee who becomes eligible for admission to participation in the Plan shall complete such forms and provide such data as are reasonably required by the Plan Administrator as a precondition of such admission.  By becoming a Participant, each Employee shall for all purposes be deemed conclusively to have assented to the terms and provisions of the Plan, the corresponding Trust Agreement, and to all amendments to such instruments.

3.3   <u>Termination and Readmission</u>.  An Employee who has satisfied the service requirements of Section 3.1 and who subsequently terminates employment with the Employer shall requalify for participation on the date on which he next becomes an Employee of an Employer, or the Entry Date on which he satisfies the age requirements of Section 3.1, if later.

## ARTICLE IV

### EMPLOYER CONTRIBUTIONS

4.1.   Contributions to Pay Principal and Interest on Exempt Loans. For each Plan Year during which an Exempt Loan is outstanding, the Employer shall make contributions under the Plan with respect to such Plan Year as follows:

(a)   Contributions to Pay Principal. On or before the date on which any principal payment is due under the terms of any Exempt Loan then outstanding (to the extent that such payment due exceeds the income generated by the Employer Securities held in the Suspense Account with respect to the Loan on which principal payments are being made), the Employer shall make such contributions as shall be necessary so that the Trustee can timely make the principal payments on that Loan, provided that such contribution is currently deductible with respect to the Plan Year within which or for which made, unless the Employer determines, in its absolute discretion, to make such contribution whether or not it is currently deductible.

(b)   Contributions to Pay Interest. For each Plan Year during which a payment of interest is due under the terms of any Exempt Loan then outstanding, the Employer shall make such contribution, if any, to the Trust as the Chief Financial Officer of Advanta or the Board of Directors, or its delegatee, in his or its absolute discretion, determines in order to enable the Trustee to make any such interest payments (to the extent that such interest payments exceed the income generated by the Employer Securities held in the Suspense Account with respect to the Loan on which interest payments are being made). Contributions which the Employer determines to make pursuant to this subsection, shall be paid to the Trustee on or before the due date for the interest payment with respect to which the contribution is being made.

4.2.   Additional Employer Contributions. In addition to the contributions which it makes pursuant to Section 4.1, the Employer may make such contributions to the Trust in respect of the fiscal year of the Employer during which this Plan is first adopted and in respect of each fiscal year thereafter during which the Plan is in effect, in such amounts as the Board of Directors, in its absolute discretion, shall timely determine, provided that any such additional contribution may not be made if it would exceed the amount which is deductible by the Employer for that fiscal year after giving effect to the contributions it has made for that fiscal year pursuant to Section 4.1. In allocating any such additional contribution among the Accounts of Active Participants eligible to share in such allocation, the contribution shall be allocated separately from the contribution made pursuant to Section 4.1, shall be allocated to a separate Subaccount of the Accounts of such Active Participants, and shall otherwise be allocated as provided in Section 6.1. Additional Employer contributions may be made in cash, in stock or marketable obligations of the Employer (as defined in section 407(e) of ERISA), or in any combination of cash and/or stock and/or marketable obligations of the Employer (or any parent or wholly-owned subsidiary thereof). This Section shall not be construed as requiring the Employer to make contributions in any specific fiscal year, provided, however, that

notwithstanding any other provision of the Plan to the contrary, the Employer shall make such contributions as may be required to meet the minimum accrual requirements under the Code relating to Top-Heavy Plans for any period during which the Plan is Top-Heavy, to the extent such minimum accrual requirements are not satisfied by the allocation of the Employer's contributions, if any, made pursuant to Section 4.1. If the Employer makes a contribution under this Section 4.2 when there are outstanding contributions due under Section 4.1(a) and (b), such contributions shall be deemed as a contribution under Section 4.1 (a) or (b) in an amount necessary to fully pay the contributions due under those Sections.

4.3.   Contingent Nature of Contributions.  To the extent that an Exempt Loan is no longer outstanding, each contribution made by Employer pursuant to the provisions of Sections 4.1 and 4.2 hereof is hereby made expressly contingent on the deductibility thereof for federal income tax purposes for the year with respect to which such contribution is made, except as otherwise specifically provided in such Sections. Each such contribution is further similarly contingent upon the maintenance of qualified status by the Plan for the year with respect to which such contribution is made, to the extent that the loss of qualified status would deprive the Employer of the deduction taken for such contribution.

4.4.   Exclusive Benefit, Refund of Contributions.  Except as provided below, all contributions made by the Employer are made for the exclusive benefit of the Participants and their Beneficiaries, and such contributions shall not be used for nor diverted to purposes other than for the exclusive benefit of the Participants, their Beneficiaries and, where applicable, their respective Alternate Payees (including the costs of maintaining and administering the Plan and Trust). Notwithstanding the foregoing, to the extent that such refunds do not, in themselves, deprive the Plan of its qualified status, refunds of contributions shall be made to the Employer under the following circumstances and subject to the following limitations:

(a)   Disallowance of Deduction.  To the extent that an Exempt Loan is no longer outstanding and a federal income tax deduction is disallowed for any contribution to the Plan made by the Employer, other than a contribution which, pursuant to Sections 4.1 and 4.2, the Employer has committed itself to make notwithstanding failure of deductibility, the Trustee shall refund to the Employer the amount so disallowed within one (1) year of the date of such disallowance.

(b)   Mistake of Fact.  In the case of a contribution which is made in whole or in part by reason of a mistake of fact (for example, incorrect information as to the eligibility or compensation of an Employee, or a mathematical error), so much of the Employer contribution as is attributable to the mistake of fact shall be returnable to the Employer upon demand, upon presentation of evidence of the mistake of fact to the Trustee and of calculations as to the impact of such mistake. Demand and repayment must be effectuated within one (1) year after the payment of the contribution to which the mistake applies.

In the event that any refund is paid to the Employer hereunder, such refund shall be made without interest, and adjusted for any losses, and shall be deducted from among the Accounts of



the Participants only to the extent that the amounts to be refunded were credited to such Accounts.

Notwithstanding any other provision of this Section, no refund shall be made to the Employer which is specifically chargeable to the Account(s) of any Participant(s) in excess of one hundred percent (100%) of the amount in such Account(s) nor shall a refund be made by the Trustee of any funds, otherwise subject to refund hereunder, which have been distributed to Participants, Beneficiaries and Alternate Payees. In the case that such distributions become refundable, Employer shall have a claim directly against the distributees to the extent of the refund to which it is entitled.

All refunds pursuant to this Section shall be limited in amount, circumstance and timing to the provisions of section 403(c) of ERISA, and no such refund shall be made if, solely on account of such refund, the Plan would cease to be a qualified plan pursuant to Section 401(a) of the Code.



DSC:517535.10/TEA002-143126                    - 20 -

# ARTICLE V

## PARTICIPANT CONTRIBUTIONS

5.1.    Participant Contributions.  No contributions shall be required of, nor shall any contributions be accepted from, any Participant.

# ARTICLE VI

## ALLOCATION OF CONTRIBUTIONS

6.1.    <u>Allocation of Employer Contributions</u>.  As of each Anniversary Date, the Employer's contribution for the Plan Year ending on that date shall be allocated among the Accounts of Active Participants entitled to share therein (as determined pursuant to subsection (b) hereof) as follows:

(a)    <u>Initial Allocation</u>.  Subject to the limitation of subsection (b) below, the amount to be allocated to the Account of each such Active Participant shall be determined by multiplying the total of the Employer's contribution for that computation period by a fraction, the numerator of which is the Participant's Compensation for such Plan Year and the denominator of which is the aggregate Compensation for such computation period of all such Active Participants.

(b)    <u>Entitlement to Share in Allocation</u>.  A Participant shall be an Active Participant for purposes of this Section and shall be entitled to share in the allocation of the Employer contribution for a particular Plan Year pursuant to this Section only if

(1)    Such Participant completed at least 1,000 Hours of Service during the Plan Year and was an Employee or on Excused Absence at the end of the Plan Year; or

(2)    Retired (at or after Normal Retirement Date) or died during the Plan Year.

Solely for purposes of determining whether a Participant has completed 1,000 Hours of Service for the Plan Year ending December 31, 1998, the entire 1998 calendar year shall be treated as the Plan Year.

(c)    <u>Effect of Status Change</u>.  Any Participant who remained in the employ of the Employer through the end of the Plan Year, but who changed from an eligible to an ineligible classification (or vice-versa) during the Plan Year shall be eligible to share in the allocation of the Employer's contribution pursuant to this Section only with respect to his Compensation paid for Hours of Service completed in an eligible status during such Plan Year.

(d)    <u>Allocation of Released Employer Securities</u>.  Employer Securities released from the Suspense Account as of the end of a Plan Year by reason of payments on any Exempt Loan shall be allocated among the Accounts of Active Participants for such computation period (determined pursuant to subsection (c) hereof) in accordance with the allocation method set forth in subsections (a) and (b) above of the Employer's contribution made pursuant to Section 4.1, except to the extent that Section 7.7 may provide for a different method of allocating a portion of the Employer Securities released from the Suspense Account as of the end of a particular Plan Year.  Upon crediting the allocation of such released Employer Securities to a

Participant's Account pursuant to this subsection for a Plan Year, the Plan Administrator shall debit the Account to reverse the crediting of the allocation of the Employer's contribution made pursuant to Section 4.1 for that computation period. Such "reverse debit" shall be made only against such Employer contributions and not against the allocation of forfeitures or any other Employer contributions for that computation period.

(e)     Notwithstanding anything herein to the contrary, the allocations to be made under this Section 6.1 shall only be made after the allocation of Employer Securities required to be made under Section 7.4(b) have been made.

6.2.     Allocation of Forfeitures. Forfeitures which become available for allocation during a Plan Year, shall be allocated among the Accounts of Participants entitled to share in the allocation of the Employer's contribution, if any, for that computation period pursuant to Section 6.1. No portion of a Participant's Account shall be deemed forfeited and available for allocation until such time as that Participant has experienced a five-year Period of Severance; provided, however, that, the non-vested portion of the Account of a Participant whose termination occurs on account of such Participant's death, may be forfeited and available for allocation immediately. If a Participant returns to employment with the Employer or any Affiliated Company prior to his having experienced a five-year Period of Severance, his Account shall be reinstated pending his completion of one (1) year of Service following such reemployment. If any Participant forfeits a portion of his Account under the Plan, but not all of such Account, Employer Securities shall be deemed forfeited only after all other assets held in such Participant's Account have been forfeited. If Employer Securities allocated to the Account of such Participant consist of more than one class of such securities, and if any portion of such Employer Securities are forfeited, the Participant shall be treated as forfeiting the same proportion of each such class.

6.3.     Special Rules for Top-Heavy Plans.

(a)     General Rule. Notwithstanding any provision of Section 6.1 of the Plan to the contrary, and except as provided in Section 6.3(b), any person who was eligible to be an Active Participant at any time during a Plan Year during which the Plan was a Top-Heavy Plan shall share in the allocation provided for in Section 6.1 of the Plan for the Plan Year ending in such Plan Year if he or she remained in the employ of the Employer or an Affiliated Company through the end of the Plan Year with respect to which such allocation applies.

(b)     Exceptions to the General Rule. The provisions of Section 6.3(a) shall not apply to any Participant for a Plan Year if, with respect to that Plan Year:

(1)     such Participant was an active Participant in a qualified defined benefit pension plan sponsored by the Employer or by an Affiliated Company under which plan the Participant's accrued benefit is not less than the minimum accrued pension benefit that would be required under section 416(c)(1) of the Code, treating such defined benefit pension plan as a Top-Heavy plan and treating all such defined benefit pension plans as constituting an Aggregation Group as a single plan; or

DSC:517535.10/TEA002-143126                          - 23 -

(2)     such Participant was an active Participant in a qualified defined contribution plan sponsored by the Employer or by an Affiliated Company under which plan the amount of the employer contribution allocable to the account of the Participant for the accrual computation period of such plan ending with or within the Plan Year is not less than the contribution allocation that would be required under section 416(c)(2) of the Code under the plan, or

(3)     the requirements of section 416(c) of the Code are otherwise satisfied by a combination of benefit accruals under plans of the types described in subparagraphs (b)(1) and (b)(2) hereof.

6.4.    <u>Top-Heavy Plan Minimum Allocation</u>.  The allocation made under Section 6.1 of the Plan to the Account of each Active Participant who is a Non-key Employee for any Plan Year in which the Plan is a Top-Heavy Plan or a Super Top-Heavy Plan shall be not less than the least of:

(a)     Three percent (3%) of the Statutory Compensation (but limited to the extent required under section 416(d) of the Code) of each such Participant for such Plan Year; or

(b)     The percentage of Compensation so allocated under said Section 6.1 to the Account of the Key Employee for whom such percentage is the highest for such Plan Year; or

(c)     The amount which, when added to benefits accrued under other qualified plans sponsored by the Employer or by an Affiliated Company, satisfies the lesser of the amounts described in subsections (a) and (b) hereof.

For the purposes of determining whether or not the provisions of this Section have been satisfied, (i) contributions or benefits under chapter 2 of the Code (relating to tax on self-employment income), chapter 21 of the Code (relating to Federal Insurance Contributions Act), title 11 of the Social Security Act, or any other federal or state law shall be disregarded; and (ii) all defined contribution plans in the Aggregation Group shall be treated as a single plan. For the purposes of determining whether or not the requirements of this Section have been satisfied, contributions allocable to the account of the Participant under any other qualified defined contribution plan that is part of the Aggregation Group shall be deemed to be contributions made under the Plan, and, to the extent thereof, no duplication of such contributions shall be required hereunder solely by reason of this Section.  This Section shall not apply in any Plan Year in which the Plan is part of an Aggregation Group containing a defined benefit pension plan (or a combination of such defined benefit pension plans) if the Plan enables a defined benefit pension plan required to be included in such Aggregation Group to satisfy the requirements of either section 401(a)(4) or section 410 of the Code.

6.5.  Annual Additions Limitations.

(a)  Primary Limitation.  In no event shall the Annual Addition to a Participant's Account for any Limitation Year exceed the lesser of:

(1)  $30,000 (or such other limit as may be the maximum permissible pursuant to the provisions of section 415(c)(1)(A) of the Code and the rulings, announcements and regulations issued thereunder, after giving full effect to the provisions of section 415(c)(6) of the Code), or

(2)  twenty-five percent (25%) of such Participant's Statutory Compensation for the Limitation Year.

(b)  Secondary Limitation.  For Limitation Years beginning before January 1, 2000, no amount shall be allocated to the Account of any Participant for any Limitation Year to the extent such allocation would cause the sum of the Defined Contribution Fraction and the Defined Benefit Fraction to exceed 1.0, or such other limitation as may be applicable under section 415 of the Code with respect to any combination of qualified plans without disqualification of any such plan.

In the event that the amount tentatively available for allocation to the Account of any Participant in any Limitation Year exceeds the maximum permissible hereunder, the Participant's share of Employer contributions and reallocable forfeitures shall be reduced to the extent necessary to result in conformity to the limitations expressed herein, provided that for any Limitation Year in which the Plan meets the requirements of section 415(c)(6) of the Code, the limitations described in this Section shall not apply to any portion of a Participant's Annual Additions representing either forfeitures of any Employer Securities which were acquired with the proceeds of an Exempt Loan or Employer contributions made pursuant to Section 4.1(b) to enable the Trustee to make interest payments on Exempt Loans.  Amounts released pursuant to the preceding sentence shall then be reallocated among the Accounts of the remaining Active Participants as though an additional Employer contribution for allocation for the Plan Year ending with or within said Limitation Year, provided, however, that such amounts shall be credited to the Accounts of Participants only to the extent that is permissible without causing any such Accounts to experience Annual Additions in excess of the maximum allowable hereunder, and without causing a violation of the applicable limitations, if any, of the Social Security integration rules.  If, after all such reallocations have been completed, there remains a reallocable amount which cannot be reallocated to the Accounts of any of the Active Participants (because all such Accounts have been credited with the maximum allowable Annual Addition for the Limitation Year in issue, or because further allocation would cause applicable Social Security integration limits to be exceeded), such remaining reallocable amount shall be placed in a suspense account, to be held and applied as an additional Employer contribution in the next succeeding Limitation Year(s) until exhausted.

6.6    Special First Year Allocation. Notwithstanding anything set forth herein to the contrary, the Employer may make a special contribution (the "Special Contribution") during the first Plan Year either in cash or in the form of Employer Securities.  If the Special Contribution is made in cash, the cash shall be used as soon as practicable to repay a portion of the Exempt Loans.  Any Employer Securities contributed and/or any Employer Securities which are released from encumbrance as a result of the repayment of a portion of the Exempt Loans in connection with the Special Contribution shall be allocated as soon as practicable following the date of the Special Contribution to the accounts of all Participants in the Plan.  The allocation made under this Section 6.6 shall be made on the same basis as the allocations made under Section 6.1 except that the allocation need not be made as of an Anniversary Date, and the eligibility of Participants to share in such allocation shall not be limited by the provisions of Section 6.1(b).

## ARTICLE VII

## ADMINISTRATIVE PROVISIONS

7.1.     Application of Employer Contributions.  All contributions made by the Employer shall be paid over to the Trustee and shall first be applied by the Trustee, as soon as practicable, to the principal and interest payments on Exempt Loans, and thereafter allocated pursuant to Section 4.2 and Article VI of the Plan.

7.2.     Valuations.  The Fund (and each of its Subfunds) shall be valued by the Trustee at fair market value annually as of the close of business on the Annual Valuation Date.  A similar valuation (or the partial valuation of one or more Subfunds, if appropriate) may occur at the end of any calendar month or on any other date upon the direction of the Plan Administrator.

7.3.     Crediting of Contributions.  Any contribution made in respect of any Plan Year by the Employer shall be deemed to have been made, for purposes of allocating the contribution among eligible Participant's Accounts pursuant to Article VI, immediately after the valuation occurring at the end of the Plan Year in which ends the Plan Year with respect to which such contribution was made.

7.4.     Crediting of Investment Results.

(a)     Within each Participant's Account, the Trustee shall identify on behalf of the Participant two separate parts.  One such part shall consist of the Participant's interest in the Employer Securities held for the credit of that Account, and shall be called the Participant's "Stock Interest."  The other part shall consist of the Participant's interest in the remaining assets, if any, of that Account and shall be called the Participant's "Ancillary Interest."

( b)     There shall be credited to the Participant's Stock Interest in his Account his interest in the Employer Securities held by the Fund for that Account (which shall be so credited in full and fractional shares to the third decimal place) together with all distributions (whether in the form of Employer Securities (as, for example, stock dividends and shares issued pursuant to "stock splits") or in the form of other assets (as, for example, cash dividends)) attributable to the Employer Securities so credited.  Cash dividends with respect to Employer Securities held in the Account of a Participant shall be used to pay principal and interest on the Exempt Loan the proceeds of which were used to acquire such Employer Securities, if such Exempt Loan is still outstanding; provided, however, that if such dividends are used for such payments, an allocation of Employer Securities shall be made to each such Account, before any other allocation of Employer Securities under any other provisions of the Plan, having a fair market value as of the date of such payment equal to the amount of the cash dividends so used.  Any expenses attributable to the Stock Interests of the Participants shall, unless such expenses are paid by the Employer, be allocated specifically to the Account or Accounts in respect of which incurred (to the extent that such specific identification is possible), and shall otherwise be allocated to all of the Stock Interests held in the Plan on the basis of the



ratio determined by comparing the Employer Securities held in each such Stock Interest to the aggregate of Employer Securities held in all such Stock Interests as of the first day of the Plan Year in which such expenses were incurred.

   (c) There shall be credited to the Participant's Ancillary Interest in his Account his interest in the assets held by the Fund other than in the form of Employer Securities (excluding cash dividends and other distributions in respect of the Employer Securities).

   (d) As of any Valuation Date, the earnings and accretions of the Fund attributable to investment of Fund assets other than Employer Securities, reduced by losses experienced (whether or not realized) and expenses incurred since the preceding Valuation Date shall be credited to the Ancillary Interests of the Participants and Beneficiaries who had unpaid balances in their Ancillary Interest parts of their respective Accounts as of such Valuation Date in proportion to the balances in such Ancillary Interest parts as of the prior Valuation Date, after reducing such prior Valuation Date balances by the amounts withdrawn or distributed to or on account of the Participant or Beneficiary since such immediately past Valuation Date, if any. For the purposes of this subsection, the balance in any Participant's or Beneficiary's Ancillary Interest shall not include values contained in the contracts of life insurance, if any, held as a general asset of the Fund.

   (e) As promptly as practicable following the initial crediting to the Stock Interest part of a Participant's Account of distributions received on account of assets held in such Stock Interest part, all such assets so credited that do not consist of Employer Securities shall be transferred to the Participant's Ancillary Interest part of the same Account.

  7.5. Exercise of Shareholder Rights.

   (a) The Trustee shall deliver or cause to be delivered to each Participant (or Beneficiary of any Participant in the event the Participant dies prior to complete distribution of such Stock Interest) all notices, prospectuses and financial statements relating to Employer Securities allocated to such Participant's Stock Interest in his Account. Each Participant or Beneficiary, as the case may be, shall have the right to direct the Trustee as to the exercise of voting rights with respect to such Employer Securities as are represented by their respective interests. The Trustee shall exercise the voting rights of each Participant or Beneficiary, as the case may be, as directed by the Participant or Beneficiary. The Trustee shall abstain from voting with respect to any Employer Securities for which no instructions are received. With respect to those Employer Securities which are held in the Suspense Account described in Section 7.7, the Trustee shall exercise voting rights in a manner that reflects, on a proportionate basis, the instructions received from Participants with respect to Employer Securities allocated to Participant's or Beneficiary's Accounts.

   (b) In the event there is a tender offer with respect to Employer Securities held by the Trustee, the Trustee shall cause to be tendered those shares which are allocated to Accounts of Participants or Beneficiaries to the extent the Participant or Beneficiary,



as the case may be, provides instructions requesting that such Employer Securities be tendered. The Trustee shall not tender any Employer Securities for which no instructions to tender are received. With respect to those Employer Securities which are held in the Suspense Account described in Section 7.7, the Trustee shall only tender a portion of each class of such Employer Securities equal to A divided by B, where A equals the number of shares of a class of Employer Securities allocated to Participant's or Beneficiary's Accounts that the Trustee is to tender pursuant to instructions received from Participants and Beneficiaries, and where B is equal to the total number of shares of that class of Employer Securities allocated to all Accounts of Participants and Beneficiaries.

(c)      In the event the Trustee tenders Employer Securities pursuant to a tender offer, the proceeds of such tender shall be allocated to the Accounts of those Participants from which the Employer Securities tendered were taken, and, with respect to the tender of Employer Securities held in the Suspense Account described in Section 7.7, any proceeds realized shall first be used to pay principal and interest with respect to the Exempt Loan, the proceeds of which were used to acquire such Employer Securities, and thereafter shall be allocated in the same manner as an Employer Contribution under Section 4.2 and Article VI of the Plan.

(d)      The Trustee shall take all appropriate steps in order to ensure that all information relating to Participant exercise of voting and tender rights with respect to Employer Securities is maintained in accordance with procedures which are designed to safeguard the confidentiality of such information, except to the extent necessary to comply with Federal laws or state laws not preempted by ERISA.

7.6.    Purchase of Employer Securities.  The Trustee shall have the right to purchase Employer Securities on behalf of Participants.  Such purchases shall be made with assets of the Fund, if any, held from time to time in the Ancillary Interest portions of Participant's Accounts. Any such purchase shall be accomplished in such a manner as to give each Participant an interest in the Employer Securities so purchased (which shall then be credited to a separate Subaccount (and respective Stock Interest parts thereof) of each such Participant's Account so that the stock interest part of a Participant's Account can reflect separately his share of Employer Securities purchased with the proceeds of Exempt Loans and his share of Employer Securities, if any, purchased from time to time with the Ancillary Interest portion of his Account and Subaccount. The Employer Securities purchased in each such transaction shall be allocated among Participant's Subaccounts in the same ratio of all Employer Securities purchased in that transaction as the value of the Participant's Ancillary Interest part of his Account as of the Valuation Date coincident with or last preceding such purchase bore to the aggregate values of the Ancillary Interests of all similar Accounts of the Participants as of that Valuation Date. Notwithstanding anything herein to the contrary, no purchases of Employer securities shall be made from the Ancillary Interests portion of a Participant's Accounts if payments on an outstanding Exempt Loan are not current unless the lender consents to such purchases.

7.7.   Suspense Account.  In the event that an Exempt Loan is made to the Trust for the purpose of purchasing Employer Securities, all assets acquired with the proceeds of the Exempt Loan shall be added to and maintained in a Suspense Account established by the Trustee for such purpose.  For each Plan Year during the duration of an Exempt Loan, the securities released from encumbrance, or, if there be no such encumbrance, the securities becoming available for allocation with respect to such Plan Year shall be allocated in nonmonetary units (in full and fractional shares to the fifth decimal place) to the Stock Interests of the Accounts of Participants as of the end of such Plan Year in accordance with Section 6.1(d) of the Plan.  If the Employer's contribution made pursuant to Section 4.1 for a Plan Year and/or the income, if any, generated by the Employer Securities held in the Suspense Account for that Plan Year are not sufficient to make all principal and interest payments on Exempt Loans coming due in that Plan Year, however, so that the investment assets of the Plan not held in the Suspense Account are applied to repayment of Exempt Loans for that Plan Year, then notwithstanding the foregoing provisions of this Section, that portion of the released Employer Securities for that Plan Year attributable to the payments made on Exempt Loans from such non-Suspense Account investment assets shall be allocated among the Stock Interest parts of Participants' Accounts in the same ratio as the assets otherwise allocated to the respective Accounts of such Participants were applied to the repayment of the Exempt Loan.

Employer Securities held in the Suspense Account on account of any Exempt Loan shall be released from the Suspense Account for allocation to Participants' Accounts as of the end of each Plan Year by multiplying the number of Employer Securities held in the Suspense Account as of the end of that Plan Year with respect to that Exempt Loan by a fraction: the numerator of which is the amount of the principal and interest paid on that Exempt Loan for that Year, and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future years on that Exempt Loan.  The number of future years under the Loan must be definitely ascertainable and must be determined without taking into account any possible extensions or renewal periods.  If the interest rate under any Exempt Loan is variable, the interest to be paid in future years shall be computed by using the interest rate applicable as of the end of the Plan Year.  If the Employer Securities held in the Suspense Account with respect to a particular Exempt Loan includes more than one class of such securities, the number of such securities of each class to be released for a Plan Year shall be determined by applying the same fraction to each class.  This paragraph shall be applied in accordance with the principles of section 4975 of the Code and the regulations thereunder.

Any dividends or other income received by the Plan in connection with Employer Securities held in the Suspense Account shall be applied to the repayment of principal and interest on the Exempt Loan with respect to which such Employer Securities are held (or if such income exceeds the principal and interest payments due in the Plan Year in which an Exempt Loan is repaid in its entirety, then such excess shall be allocated to Participants pursuant to Section 6.1(a) of the Plan).

7.8.   Investments in Life Insurance.  The Trustee, upon direction of the Plan Administrator, may apply any cash assets of the Plan (other than dividends received on



Employer Securities which are subject to distribution to Participants) to the purchase of life insurance on the life of any person who owns Employer Securities. Each such insurance contract shall be a general investment of the Fund, shall not be held for the Account of any individual Participant or for the purpose of providing a death benefit under the Plan to any insured, and shall be intended to provide the Fund with resources that may, but need not, be applied by the Trustee to the purchase of shares of Employer Securities from the insured or the estate of a deceased insured.

7.9.    Domestic Relations Orders.

(a)    Determination of QDRO Status.  Upon receipt of notification of any judgment, decree or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony payments, or marital property rights of a spouse, former spouse, child, or other dependent of a Participant and which is made pursuant to a state domestic relations law (including a community property law) (herein referred to as a "domestic relations order"), the Plan Administrator shall (a) notify the Participant and any prospective Alternate Payee named in the order of the receipt and date of receipt of such domestic relations order and of the Plan's procedures for determining the status of the domestic relations order as a QDRO, and (b) within a reasonable period after receipt of such order, determine whether it constitutes a QDRO.   The Plan's procedures for the determination of QDRO status of a domestic relations order shall be set forth by the Plan Administrator in writing, shall provide for the notification of each person specified in that order as entitled to payment of benefits under the Plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the Plan Administrator of such domestic relations order, and shall permit the prospective Alternate Payee to designate a representative for receipt of copies of notices that are sent to the prospective Alternate Payee with respect to a domestic relations order.  A domestic relations order shall be determined to be a QDRO only if such order (i) does not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan, (ii) does not require the Plan to commence payment of benefits any earlier than they would otherwise be payable to the Participant with respect to whom the QDRO is issued, (iii) does not require the Plan to provide increased benefits, and (iv) does not require the payment of benefits to an Alternate Payee which are required to be paid to another Alternate Payee under another order previously determined to be a QDRO.

(b)    Determination Period.  During any period in which the issue of whether a domestic relations order is a QDRO is being determined (by the Plan Administrator, by a court of competent jurisdiction, or otherwise), including the period beginning on the date of the Plan Administrator's receipt of the order, the Plan Administrator shall segregate in a separate account in the Plan or in an escrow account held by a Trustee the amounts, if any, which would have been payable to the Alternate Payee during such period if the order had been determined to constitute a QDRO, provided that, if no payments would otherwise be made under the Plan to the Alternate Payee or to the Participant or a Beneficiary of the Participant while the status of the order as a QDRO is being determined, no segregation into a separate or escrow account shall be required.  If a domestic relations order is determined to be a QDRO within eighteen (18) months

of the date of its receipt by the Plan Administrator (or from the beginning of any other period during which the issue of its being a QDRO is being determined by the Plan Administrator, the Plan Administrator shall cause to be paid to the persons entitled thereto the amounts, if any held in the separate or escrow account referred to above. If a domestic relations order is determined not to be a QDRO, or if the status of the domestic relations order as a QDRO is not finally resolved within such eighteen month period, the Plan Administrator shall cause the separate account or escrow account balance, as determined after the next following Valuation Date, to be returned to the Participant's Account or to be paid to the person or persons to whom such amount would have been paid if there had been no such domestic relations order, whichever shall apply. Any subsequent determination that such domestic relations order is a QDRO shall be prospective in effect only.

  (c)  <u>Provisions Relating to Alternate Payees.</u>

    (1)  Benefits payable to an Alternate Payee shall not continue beyond the lifetime of the Alternate Payee. In particular, no Alternate Payee shall have the right with respect to any benefit payable by reason of a QDRO to (A) designate a beneficiary with respect to amounts becoming payable under the Plan, (B) elect a method of benefit distribution providing for benefits continuing beyond the Alternate Payee's lifetime, (C) provide survivorship benefits to a spouse or dependent of such Alternate Payee or to any other person, spouse, dependent or other person, or (D) transfer rights under the QDRO by will or by state law of intestacy.

    (2)  None of the payments, benefits or rights of any Alternate Payee shall be subject to any claim of any creditor, and, in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Alternate Payee. No Alternate Payee shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingently or otherwise, under the Plan.

    (3)  Alternate Payees shall not have any right to (A) borrow money under any Participant loan provisions under the Plan, (B) exercise any other election, privilege, option or direction rights of the Participant under the Plan except as specifically provided in the QDRO, or (C) receive communications with respect to the Plan except as specifically provided by law, regulation or the QDRO.

    (4)  Each Alternate Payee shall advise the Plan Administrator in writing of each change of his name, address or marital status, and of each change in the provisions of the QDRO or of any circumstance set forth therein which may be material to the Alternate Payee's entitlement to benefits thereunder or the amount thereof. Until such written notice has been provided to the Plan Administrator, the Plan Administrator shall be (i) fully protected in not complying with, and in conducting the affairs of the Plan in a manner inconsistent with, the information set forth in notice, and (ii) required to act with respect to such

DSC:517535.10/TEA002-143126       - 32 -

notice prospectively only, and then only to the extent provided for in the QDRO. The Plan Administrator shall not be required to modify or reverse any payment, transaction or application of funds occurring before the receipt of any notice that would have affected such payment, transaction or application of funds, nor shall the Plan Administrator or any other party be liable for any such payment, transaction or application of funds.

    (5) Except as specifically provided for in the QDRO, an Alternate Payee shall have no right to interfere with the exercise by the Participant or by any Beneficiary of their respective rights, privileges and obligations under the Plan.

   7.10. <u>Diversification of Investments</u>.  A Qualified Participant may elect within 90 days after each Annual Valuation Date in the Qualified Election Period to receive a distribution of up to the number of shares of Employer Securities which may be distributed to him as of that Annual Valuation Date.  Upon receipt of such an election by a Qualified Participant, the Plan Administrator shall direct the Trustee to distribute to the Qualified Participant, within 90 days after the end of the Participant's Election Period, the number of shares of Employer Securities elected by the Participant in accordance with this Section.  The maximum number of shares of Employer Securities which a Qualified Participant may elect to receive as of any Annual Valuation Date during his Qualified Election Period shall be that number of such shares which is equal to twenty-five percent (25%) of A, then reduced by B, where A is the sum of the shares of Employer Securities purchased by the Plan which are allocated to his Account as of that Annual Valuation Date plus the shares of Employer Securities, if any, previously distributed to him pursuant to this Section, and where B is the shares of Employer Securities, if any, previously distributed to him pursuant to this Section provided that for purposes of determining such maximum number of shares for the last Annual Valuation Date in a Qualified Election Period, fifty percent (50%) shall be substituted for twenty-five percent (25%).  For purposes of this Section, the following terms shall have the following meanings:

    (a) "Qualified Election Period" shall mean the six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a Qualified Participant.

    (b) "Qualified Participant" shall mean any Participant who has completed ten (10) Years of Participation in the Plan and has attained age 55.

   7.11 <u>Requirements and Limitations on Holdings of Voting Securities</u>.

    (a) The Trustee shall only acquire Employer Securities which have voting rights unless the acquisition occurs at a time when an acquisition of voting Employer securities is likely to cause the Plan to violate the limitations set forth in Section 7.11(b), in which event the Trustee shall be permitted to acquire Employer Securities which do not have voting rights.

    (b) Notwithstanding anything contained in the Plan to the contrary, the Trustee shall not permit or cause the Plan to acquire or hold Employer Securities which have

voting rights representing more than 9.9% of the voting power of all outstanding shares of the Company's stock. The Trustee shall take all appropriate steps, subject to any specific requirements of the Plan or applicable law, to dispose of any voting Employer Securities to the extent needed in order to ensure that the Plan does not hold more than 9.9% of the voting power of all outstanding shares of the Company's stock. To the extent permitted under the terms of the Exempt Loans, the Trustee may, on the sale of voting Employer Securities under this Section 7.11(b), use the proceeds of such sale to acquire nonvoting Employer Securities, to be held under the terms of the Plan on the same terms as were applicable to the voting Employer Securities which were sold.

If any Employer Securities are purchased at a time when the Plan already has 9.9% or more of the voting power of all outstanding shares of the Company's stock, the Trustee will only acquire Employer Securities that have no voting rights.



## ARTICLE VIII

## RETIREMENT AND TERMINATION OF EMPLOYMENT BENEFITS

8.1.    Normal Retirement Benefit.  The normal retirement benefit payable with respect to any Participant retiring at or after his Normal Retirement Date shall be equal to one hundred percent (100%) of his Account as of the Valuation Date coincident with or immediately preceding the date such Participant's benefit is distributed.

8.2.    Termination of Employment Benefit.  The benefit payable with respect to any Participant who terminates employment with the Employer prior to his Normal Retirement Date shall be equal to the vested percentage of his Account as of the Valuation Date coincident with or immediately preceding the date such Participant's benefit is distributed.

8.3.    Effect of QDRO.  All benefits provided under this Article are subject to the provisions of any QDRO in effect with respect to the Participant at the Participant's Benefit Commencement Date, and are subject to diminution thereby.





# ARTICLE IX

## DEATH BENEFITS AND SURVIVING SPOUSE'S BENEFITS

9.1.   <u>Death Benefit</u>.  If the death of the Participant occurs while such Participant has an Account under the Plan, there shall be paid a benefit equal to his vested interest in his Account, determined as of the Valuation Date of the Plan coincident with or immediately preceding the date such death benefit is distributed.  The person or persons to whom such benefit shall be payable shall be determined as follows:

(a)   <u>Surviving Spouse's Benefit</u>.  If the Participant is survived by his Spouse, the benefit hereunder shall be paid to such surviving Spouse except (1) to the extent that the Spouse has consented, in a written instrument complying with all of the provisions of Section 9.2 hereof, to the payment of such benefit to another Beneficiary (or Beneficiaries) designated by the Participant, and (2) to the extent that there is a QDRO applicable to such benefit.

(b)   <u>Benefit Payable to Others</u>.  If the Participant (1) is not survived by a Spouse, (2) is survived by a Spouse who has consented, in accordance with the provisions of Section 9.2 hereof, to the designation of a Beneficiary or Beneficiaries other than such Spouse (but only to the extent of the portion of the Participant's Account subject to such consent), or (3) is subject to a QDRO at the time of his death (but only to the extent of the QDRO), the benefit hereunder shall be paid to the Participant's Beneficiary determined in accordance with the provisions of Section 9.3 hereof, subject, however, to the provisions of any QDRO then in force.

(c)   <u>Coincidental Death of Participant and Spouse</u>.  If the spouse of a Participant dies at the same time as the Participant, or if the Participant and his spouse die under circumstances such that it is difficult to determine the order of their deaths, the Participant shall be deemed to have survived his spouse for the purposes of the Plan.

9.2.   <u>Spousal Consent to Designation of Alternative Beneficiary</u>.  A spouse may consent to the designation by the Participant of one or more Beneficiaries other than such spouse to receive benefits in the event of the death of the Participant.  Any such consent shall be in writing, and shall:

(a)   acknowledge the effect of such consent;

(b)   be witnessed by a representative of the Plan or by a notary public;

(c)   be subject to any QDRO applicable to the Participant at the time of his death or at the Benefit Commencement Date;

(d)   be subject to limitations expressed therein by the Spouse as to the portion of the Participant's Account (expressed as a percentage or in dollar terms) to which it applies;

(e)    acknowledge the specific non-spouse Beneficiary, including any class of Beneficiaries or any contingent Beneficiaries to which it applies;

(f)    be subject to revocation in writing by such Spouse if the revocation is delivered to the Plan Administrator not later than (1) the Participant's Benefit Commencement Date, or (2) in the case of a Participant who had not reached the earlier of (A) his Benefit Commencement Date or (B) his Normal Retirement Age, the date of the Participant's death; and

(g)    become null and void upon the termination of the marriage between the Participant and such spouse.

9.3.    Beneficiary Designation.

(a)    Spouse as Beneficiary.  The primary Beneficiary of each married Participant shall be his Spouse except to the extent that there is in force a consent, executed by such Spouse and complying with the provisions of Section 9.3 hereof, to the designation of one or more Beneficiaries other than such Spouse.

(b)    Beneficiary Designation Right.  Each unmarried Participant and each married Participant whose spouse has consented to designation of persons or entities other than such spouse as Beneficiaries in accordance with the provisions of Section 9.3 hereof, shall have the right to designate one or more primary and one or more contingent Beneficiaries to receive any benefit becoming payable pursuant to this Article IX.  All Beneficiary designations shall be in writing, in form satisfactory to the Plan Administrator.  Each Participant shall be entitled to change his Beneficiaries at any time and from time to time, subject to such spousal consent requirements as may then be applicable.

In the event that the Participant fails to designate a Beneficiary to receive a benefit that becomes payable pursuant to the provisions of this Article, or in the event that the Participant is predeceased by all designated primary and secondary Beneficiaries, the death benefit shall be payable to the following classes of takers, each class to take to the exclusion of all subsequent classes, with all members of each class sharing equally:

(1)    Spouse;

(2)    lineal descendants (including adopted and step-children), per stirpes;

(3)    surviving parents (equally); and

(4)    the Participant's estate.

9.5.    Effect of QDRO.  Notwithstanding any other provision of this Article, the Plan Administrator and the Trustee shall give full effect to any QDRO applicable at the time of the

death of the Participant, even to the extent that giving effect to such QDRO defeats or diminishes the interest of any Spouse or other Beneficiary hereunder.



## ARTICLE X

## NONFORFEITURE PROVISIONS (VESTING)

10.1.   Deferred Vested Interests.  The Participant's vested interest in his Account shall be determined from the following table:

| Participant's Period of Service | Participant's Vested Percentage |
|---|---|
| Fewer than 5 years | None |
| 5 years or more | 100% |
| Attainment of Normal Retirement Age while in the employ of the Employer | 100% |

10.2.   Disregarded Service for Vesting Purposes.  The following Service shall be disregarded in computing a Participant's vested (nonforfeitable) interest in his Account pursuant to the provisions of this Article:

(a)   Service prior to the Restatement Effective Date of the Plan;

(b)   Service prior to the Plan Year in which the Participant attained Age 18; and

(c)   Service disregarded pursuant to the provisions of Section 10.3 hereof.

10.3.   Effect of Periods of Severance.  Service after a period of Disregarded Prior Service shall not increase the Participant's vested interest in so much of his Account as was accrued with respect to the period of Disregarded Prior Service.  Otherwise, Service subsequent to one or more Periods of Severance shall be aggregated with Service prior to such Periods of Severance in determining the Participant's vested interest in accruals to his Account attributable to Service both before and after such Periods of Severance.

10.4.   Amendments to the Vesting Schedule.

(a)   Automatic Amendment.  In the event that the Plan is or becomes a Top-Heavy Plan, the table set forth below shall be substituted for that portion of the table set forth in Section 10.1 that relates vesting solely to years of Service.

| Participant's Years of Service | Participant's Vested Percentage |
|---|---|
| Less 3 | 0% |
| 3 or more | 100% |

        (b)        Participant's Election.

        (1)        If the vesting schedule under the Plan is amended, each Participant who has completed at least three (3) years of Service with the Employer may elect, during the election period specified in this Section, to have the vested percentage of his Account derived from Employer contributions determined without regard to such amendment.

        (2)        For the purposes of this Section, the election period shall begin as of the date on which the amendment changing the vesting schedule is adopted, and shall end on the latest of the following dates:

        (A)        the date occurring sixty (60) days after the Plan amendment is adopted; or

        (B)        the date which is sixty (60) days after the day on which the Plan amendment becomes effective; or

        (C)        date which is sixty (60) days after the day the Participant is issued written notice of the Plan amendment by the Plan Administrator or by the Employer; or

        (D)        such later date as may be specified by the Plan Administrator.  The election provided for in this Section shall be made in writing and shall be irrevocable when made.

    10.5.   Effect of QDRO.  All benefits provided under this Article are subject to the provisions of any QDRO in effect with respect to the Participant at the Participant's Benefit Commencement Date, and are subject to diminution thereby.



## ARTICLE XI

## METHODS AND TIMING OF BENEFIT DISTRIBUTIONS

11.1.   Form of Benefit Payments.   All benefits payable under the Plan shall be paid in the form of a single distribution of Employer Securities; provided, however, that the portion of any Participant's Account that consists of assets other than Employer Securities or consists of a partial share of Common Stock shall be distributed in cash at the same time as the distribution of Employer Securities is made.   Notwithstanding the foregoing, if a Participant so elects, benefits payable under the Plan shall be distributed entirely in cash.

11.2.   Benefit Commencement Dates.   Distribution of a Participant's benefit under the Plan shall be made as follows:

(a)    Retirement or Termination of Employment.   Benefits payable by reason of a Participant's retirement or any other termination of employment shall, if the Participant so elects, commence as soon as practicable following the Participant's election.   If the Participant does not so elect, the Participant's benefit shall be distributed in the form of a lump sum as soon as practicable following the date the Participant reaches his or her Normal Retirement Age.

(b)    Death Benefits.   Benefits payable by reason of the death of the Participant shall be distributed to the Beneficiary or Beneficiaries of the Participant (as determined pursuant to Article IX hereto) as soon as practicable following the date of the Participant's death.

(c)    Benefits Having a Value not in Excess of $5,000.   If the value of the Participant's Account is $5,000 or less, the distribution of the Participant's benefit shall occur as soon as practicable following the Participant's Severance from Service Date.   If no portion of a Participant's Account is nonforfeitable, such Participant shall be deemed to have received a distribution of his entire nonforfeitable Account upon such Participant's termination of employment with the Employer.

11.3.   Post-Distribution Credits.   In the event that, after the payment of a single-sum distribution under this Plan, there shall remain in the Participant's Account any funds, such funds shall be subsequently credited to such Account, such additional funds, to the extent vested, shall be paid to the Participant or applied for the Participant's Account as promptly as practicable.

11.4.   Certain Securities Law Restrictions.   Any distribution of Employer Securities pursuant to this Article shall be subject to all applicable laws, rules and regulations and to such approvals by stock exchanges or governmental agencies as may be deemed necessary or appropriate by the Board of Directors.   Each distributee may be required to give the Employer a written representation that he or she will not involve a violation of state or federal securities laws, including the Securities Act of 1933, as amended; the form of such written representation will be prescribed by the Plan Administrator or by the Board of Directors or its delegatee.

DSC:517535.10/TEA002-143126                             - 41 -

11.5.   Share Certificates.  Share certificates representing Employer Securities distributed pursuant to this Article shall be embossed or inscribed with such legends as the Board of Directors deems necessary or appropriate in respect of the matters referred to in Sections 11.4 above, and stop transfer instructions may be issued in connection therewith.

11.6   Direct Rollovers.  Notwithstanding any provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Section, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover.

For purposes of this Section 11.6 the following definitions shall apply:

(a).   Eligible Rollover Distribution: An Eligible Rollover Distribution is any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Sec. 401(a)(9); and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(b)   Eligible Retirement Plan: An Eligible Retirement Plan is an individual retirement account described in Code Sec. 408(a), an individual retirement annuity described in Code Sec. 408(b), an annuity plan described in Code Sec. 403(a), or a qualified trust described in Code Sec. 401(a), that accepts the distributee's eligible rollover distribution. However, in the case of an Eligible Rollover Distribution to the surviving spouse, an Eligible Retirement Plan is an individual retirement account or individual retirement annuity.

(c)   Distributee: A Distributee includes a Participant or former Participant.   In addition, the Participant's or former Participant's surviving spouse and the Participant's or former Participant's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Sec. 414(p), are Distributees with regard to the interest of the spouse or former spouse.

(d)   Direct Rollover: A Direct Rollover is a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

11.7   Required Distributions.  Notwithstanding anything contained herein to the contrary, the Account of a Participant shall be distributed no later than such Participant's Required Beginning Date.

## ARTICLE XII

## PROVISIONS RELATING TO TOP-HEAVY PLANS

**12.1.   Determination of Top-Heavy Status.** The Plan shall be deemed "top-heavy" as to any Plan Year if, as of the Determination Date with respect to such Plan Year, any of the following conditions are met:

(a)     The Plan is not part of an Aggregation Group and the Key Employee Ratio under the Plan exceeds sixty percent (60%).

(b)     The Plan is part of an Aggregation Group, there is no permissive Aggregation Group of which the Plan is a part, and the Key Employee Ratio of the Mandatory Aggregation Group of which the Plan is a part exceeds sixty percent (60%).

(c)     The plan is part of an Aggregation Group, there is a Permissive Aggregation Group of which the Plan is a part, and the Key Employee Ratio of the permissive Aggregation Group of which the Plan is a part exceeds sixty percent (60%).

**12.2.   Determination of Super Top-Heavy Status.** The Plan shall be deemed "super top-heavy" as to any Plan Year if, as of the Determination Date with respect to such Plan Year, the conditions of subsections 12.1(a), (b) or (c) are met with "ninety percent (90%)" substituted for "sixty percent (60%)".

**12.3.   Safe Harbor Minimum Benefit Provisions.** If the Plan is top-heavy within the meaning of section 12.1 hereof, but not super top-heavy within the meaning of Section 12.2 hereof, and if "1.0" is not to be substituted for "1.25" in subsection (c) of the definitions of Defined Benefit Fraction and Defined Contribution Fraction in the Plan, one of the following safe harbor minima must be satisfied:

(a)     Accrual Freeze Option. There shall be no further benefit accruals under any qualified defined benefit pension plan sponsored by the Employer or an Affiliated Company and no further Annual Additions under any qualified defined contribution plan sponsored by the Employer or an Affiliated Company for any individual until the sum of the Defined Benefit Fraction and the Defined contribution Fraction for the individual equal 1.0 or less, substituting "1.0" for "1.25" in each of the said definitions, and thereafter there can be no incremental accrual or Annual Addition which would cause the combined fraction, so calculated, to exceed 1.0.

(b)     Benefit Enhancement Option.

(1)     Each Non-key Employee who is a Participant, but who is not covered under a qualified defined benefit plan sponsored by the Employer or an Affiliated Company, is entitled to a minimum aggregate Employer contribution under an Employer



qualified defined contribution plan equal to the contribution described in section 416(c)(2)(A) of the Code, with "4 percent" substituted for "3 percent" therein (and with the term "Employer qualified defined contribution plan" meaning the aggregate of all qualified defined contribution plans sponsored by the Employer or an Affiliated Company); and

(2)     Each Non-key Employee who is a Participant and who is covered under a qualified defined benefit plan sponsored by the Employer or an Affiliated Company (treating all such plans as a single plan) is entitled to (A) a minimum benefit accrual under such plan satisfying the requirements of section 416(c)(1) of the Code, but with "3 percent" substituted for "2 percent" and "30 percent" substituted for "20 percent" at section 416(c)(1)(B) of the Code, or (B) a minimum share of the Employer contribution allocation (including forfeiture reallocations, if any) under the Plan of seven and one-half percent (7½%) of Statutory Compensation (treating the Participant's allocation under the Plan and all other defined contribution plans sponsored by the Employer or by an Affiliated Company as allocations under the Plan), or (C) any combination of defined benefit plan accruals as described in (A) hereof and defined contribution plan allocations as described in (B) hereof which, taken together, satisfy the requirements of this paragraph (2).



## ARTICLE XIII

## PLAN ADMINISTRATOR

13.1.  <u>Appointment and Tenure</u>.  The Plan Administrator shall be the Company's Plan Administrative Committee, which shall consist of a committee of one or more persons who shall serve at the pleasure of the Board of Directors; provided, however, that the Board of Directors may, at its discretion, appoint any other person or persons or any other committee to act as Plan Administrator.  Any committee member may resign by delivering his written resignation to the Employer.  Vacancies arising by the death, resignation or removal of a committee member shall be filled by the Board of Directors.  If the Board fails to act, and in any event, until the Board so acts, the remaining members of the committee may appoint an interim committee member to fill any vacancy occurring on the committee.  If no person has been appointed to the committee, or if no person remains on the committee, the Employer shall be deemed to be the Plan Administrator.

13.2.  <u>Meetings; Majority Rule</u>.  If the Plan Administrator is a committee of more than one person:  any and all acts of the Plan Administrator taken at a meeting shall be by a majority of all members of the committee;  the Plan Administrator may act by vote taken in a meeting (at which a majority of members shall constitute a quorum) if all members of the committee have been given at least ten (10) days' written notice of such meeting or have waived notice; and the Plan Administrator may also act by unanimous consent in writing without the formality of convening a meeting.

13.3.  <u>Delegation</u>.  The Plan Administrator may, by written majority decision, delegate to each or any one of its members, or to its secretary, authority to sign any documents on its behalf, or to perform ministerial acts, but no person to whom such authority is delegated shall perform any act involving the exercise of any discretion without first obtaining the concurrence of a majority of the members of the committee, even though he alone may sign any document required by third parties.

The Plan Administrator may elect one of its members to serve as chairperson.  The chairperson, if any, shall preside at all meetings of the committee or shall delegate such responsibility to another committee member.  The committee shall elect one person to serve as secretary to the committee.

13.4.  <u>Authority and Responsibility of the Plan Administrator</u>.  The Plan Administrator shall have the following duties and responsibilities:

(a)      to maintain and preserve records relating to Plan Participants, former Participants, and their Beneficiaries;

(b)      to prepare and furnish to Participants all information and notices required under Federal law or the provisions of this Plan;

DSC:517535.10/TEA002-143126                          - 45 -

(c)     to prepare and furnish to the Trustee sufficient employee data and the amount of contributions received from all sources so that the Trustee may maintain separate Accounts for Participants and make required payments of benefits;

(d)     to prepare and file or publish with the secretary of Labor, the secretary of the Treasury, their delegates and all other appropriate government officials all reports and other information required under law to be so filed or published;

(e)     to provide directions to the Trustee with respect to the purchase of life insurance, methods of benefit payment, valuations at dates other than Annual Valuation Dates and on all other matters where called for in the Plan or requested by the Trustee;

(f)     to construe the provisions of the Plan, to correct defects therein and to supply omissions thereto;

(g)     to engage assistants and professional advisers;

(h)     to arrange for bonding, if required by law;

(i)     to provide procedures for determination of claims for benefits;

(j)     to determine whether any domestic relations order constitutes a QDRO and to take such action as the Plan Administrator deems appropriate in light of such domestic relations order; and

(k)     to retain records on elections and waivers by Participants, their spouses and their Beneficiaries, all as further set forth herein.

13.5.   Reporting and Disclosure.  The Plan Administrator shall keep all individual and group records relating to Plan Participants, and Beneficiaries, and all other records necessary for the proper operation of the Plan.  Such records shall be made available to the Employer and to each Participant and Beneficiary for examination during business hours except that a Participant or Beneficiary shall examine only such records as pertain exclusively to the examining Participant or Beneficiary and those records and documents relating to all Participants generally. The Plan Administrator shall prepare and shall file as required by law or regulation all reports, forms, documents and other items required by ERISA, the Code and every other relevant statute, each as amended, and all regulations thereunder.  This provision shall not be construed as imposing upon the Plan Administrator the responsibility or authority for the preparation, preservation, publication or filing of any document required to be prepared, preserved or filed by the Trustee or by any other Named Fiduciary to whom such responsibilities are delegated by law or by this Plan.

13.6.   Construction of the Plan.  The Plan Administrator shall take such steps as are considered necessary and appropriate to remedy any inequity that results from incorrect information received or communicated in good faith or as the consequence of an administrative



error.  The Plan Administrator shall interpret the Plan and shall determine the questions arising in the administration, interpretation and application of the Plan.  It shall endeavor to act, whether by general rules or by particular decisions, so as not to discriminate in favor of, or against, any person and so as to treat all persons in similar circumstances uniformly.  The Plan Administrator shall correct any defect, reconcile any inconsistency, or supply any omission with respect to the Plan.  All such corrections, reconciliations, interpretations and completions of Plan provisions shall be final and binding upon the parties.

13.7.   Engagement of Assistants and Advisers.  The Plan Administrator shall have the right to hire such professional assistants and consultants as it, in its sole discretion, deems necessary or advisable, including, but not limited to:

      (a)    investment managers and/or advisers;

      (b)    accountants,

      (c)    actuaries;

      (d)    attorneys;

      (e)    consultants;

      (f)    clerical and office personnel;

      (g)    medical practitioners.

The expenses incurred by the Plan Administrator in connection with the operation of the Plan, including, but not limited to, the expenses incurred by reason of the engagement of professional assistants and consultants, shall be expenses of the Plan and shall be payable from the Fund at the direction of the Plan Administrator.  The Employer shall have the option, but not the obligation, to pay any such expenses, in whole or in part, and by so doing, to relieve the Fund from the obligation of bearing such expenses.  Payment of any such expenses by the Employer on any occasion shall not bind the Employer to thereafter pay any similar expenses.

13.8.   Bonding.  The Plan Administrator shall arrange for such bonding as is required by law, but no bonding in excess of the amount required by law shall be considered required by the Plan.

13.9.   Compensation of the Plan Administrator.  The Plan Administrator shall serve without compensation for its services as such, but all expenses of the Plan Administrator shall be paid or reimbursed by the Employer, and if not so paid or reimbursed, shall be proper charges to the Trust Fund and shall be paid therefrom.  Notwithstanding the foregoing, any person serving as a committee member of the Plan Administrator who is not a full-time employee of the Plan Sponsor may receive as compensation such amounts as the Board of Directors of the Plan Sponsor may from time to time approve.

DSC:517535.10/TEA002-143126

13.10.  <u>Indemnification of the Plan Administrator</u>.  Each member of the committee constituting the Plan Administrator shall be held harmless and indemnified by the Employer against costs, expenses and liabilities (other than amounts paid in settlement to which the Employer does not consent) incurred by him in connection with any action to which he may be a party by reason of his service as Plan Administrator and shall include advancement of legal and other costs incurred by each member of the committee.  The foregoing right to indemnification and right to be held harmless shall be in addition to such other rights as the committee member may enjoy as a matter of law or by reason of insurance coverage of any kind, but shall not extend to costs, expenses and/or liabilities otherwise covered by insurance or that would be so covered by any insurance then in force if such insurance contained a waiver of subrogation.  Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the committee member may be entitled pursuant to the by-laws of the Employer.  Service on the committee as a Plan Administrator shall be deemed in partial fulfillment of the committee member's function as an employee, officer and/or director of the Employer, if he serves in that capacity as well as in the role of committee member.

## ARTICLE XIV

## ALLOCATION AND DELEGATION OF AUTHORITY

14.1.   Authority and Responsibilities of Employer.  The Employer, as Plan sponsor, shall serve as a "Named Fiduciary" having the following (and only the following) authority and responsibility:

(a)   to establish and communicate to the Trustee a funding policy for the Plan;

(b)   to appoint the Trustee and the Plan Administrator and to monitor each of their performances;

(c)   to communicate such information to the Plan Administrator and to the Trustee as each needs for proper performance of its duties; and

(d)   to provide channels and mechanisms through which the Plan Administrator and/or the Trustee can communicate with Participants and their Beneficiaries.

In addition, the Employer shall perform such duties as are imposed by law or by regulation and shall serve as Plan Administrator in the absence of an appointed Plan Administrator.

14.2.   Authority and Responsibilities of the Plan Administrator.  The Plan Administrator shall have the Authority and responsibilities imposed by Article XIII hereof.  With respect to the said authority and responsibility, the Plan Administrator shall be a "Named Fiduciary," and as such, shall have no authority and responsibility other than as granted in the Plan, or as imposed by law.

14.3.   Authority and Responsibilities of the Trustee.  The Trustee shall have the powers, authorities and obligations as set forth in the Trust Agreement.

14.4.   Limitations on Obligations of Named Fiduciaries.  No Named Fiduciary shall have authority or responsibility to deal with matters other than as delegated to it under this Plan, under the Trust Agreement, or by operation of law.  A Named Fiduciary shall not in any event be liable for breach of fiduciary responsibility or obligation by another fiduciary (including named Fiduciaries) if the responsibility or authority of the act or omission deemed as set forth below as though an oral presentation of the contents of the claimant's written presentation had been made to be a breach as not within the scope of the said Named Fiduciary's authority or delegated responsibility.

## ARTICLE XV

## CLAIMS PROCEDURES

15.1.  <u>Application for Benefits</u>.  Each Participant and/or Beneficiary believing himself or herself eligible for benefits under the Plan shall apply for such benefits by completing and filing with the Plan Administrator an application for benefits on a form supplied by the Plan Administrator.  Before the date on which benefit payments commence, each such application must be supported by such information and data as the Plan Administrator deems relevant and appropriate.  Evidence of age, marital status (and, in the appropriate instances, health, death or disability), and location of residence shall be required of all applicants for benefits.

15.2.  <u>Appeals of Denied Claims for Benefits</u>.  In the event that any claim for benefits is denied in whole or in part, the Participant or Beneficiary whose claim has been so denied shall be notified of such denial in writing by the Plan Administrator.  The notice advising of the denial shall specify the reason or reasons for denial, make specific reference to pertinent Plan provisions, describe any additional material or information necessary for the claimant to perfect the claim (explaining why such material or information is needed), and shall advise the Participant or Beneficiary, as the case may be, of the procedure for the appeal of such denial.  All appeals shall be made by the following procedure:

(a)  The Participant or Beneficiary whose claim has been denied shall file with the Plan Administrator a notice of desire to appeal the denial.  Such notice shall be filed within sixty (60) days of notification by the Plan Administrator of claim denial, shall be made in writing, and shall set forth all of the facts upon which the appeal is based.  Appeals not timely filed shall be barred.

(b)  The Plan Administrator shall, within thirty (30) days of receipt of the Participant's or Beneficiary's notice of appeal, establish a hearing date on which the Participant or Beneficiary may make an oral presentation to the Named Appeals Fiduciary in support of his appeal.  The Participant or Beneficiary shall be given not less than ten (10) days' notice of the date set for the hearing.

(c)  The Named Appeals Fiduciary shall consider the merits of the claimant's written and oral presentations, the merits of any facts or evidence in support of the denial of benefits, and such other facts and circumstances as the Named Appeals Fiduciary shall deem relevant.  If the claimant elects not to make an oral presentation, such election shall not be deemed adverse to his interest, and the Named Appeals Fiduciary shall proceed as set forth below as though an oral presentation of the contents of the claimant's written presentation had been made.

(d)  The Named Appeals Fiduciary shall render a determination upon the appealed claim which determination shall be accompanied by a written statement as to the reasons therefor.  The determination so rendered shall be binding upon all parties.



15.3.   Appointment of the Named Appeals Fiduciary. The Named Appeals Fiduciary shall be the person or persons named as such by the Board of Directors, or, if no such person or persons be named, then the person or persons named by the Plan Administrator as the Named Appeals Fiduciary. Named Appeals Fiduciaries may at any time be removed by the Board of Directors, and any Named Appeals Fiduciary named by the Plan Administrator may be removed by the Plan committee. All such removals may be with or without cause and shall be effective on the date stated in the notice of removal. The Named Appeals Fiduciary shall be a "Named Fiduciary" within the meaning of ERISA, and, unless appointed to other fiduciary responsibilities, shall have no authority, responsibility, or liability with respect to any matter other than the proper discharge of the functions of the Named Appeals Fiduciary as set forth herein.





## ARTICLE XVI

## AMENDMENT AND TERMINATION - ADOPTION BY AFFILIATES

16.1.   Amendment.  The provisions of the Plan may be amended at any time and from time to time by the Board of Directors, or by its delegatee, provided, however, that:

(a)     No amendment shall deprive any Participant or Beneficiary of any of the benefits to which he is entitled under the Plan with respect to contributions previously made;

(b)     No amendment shall provide for the use of funds or assets held to provide benefits under the Plan other than for the benefit of Participants and their Beneficiaries or to meet the administrative expenses of the Plan, except as may be specifically authorized by statute or regulation.

Each amendment shall be approved by the Board of Directors by resolution. Notwithstanding the foregoing, any amendment necessary to initially qualify the Plan under section 401(a) of the Code may be made without the further approval of the Board of Directors if signed by the proper officers of the Employer.

16.2.   Plan Termination.

(a)     Right Reserved.  While it is the Employer's intention to continue the Plan indefinitely in operation, the right is, nevertheless, reserved to terminate the Plan in whole or in part.  Whole or partial termination of the Plan shall result in full and immediate vesting in each affected Participant whose Severance from Service Date has not occurred of the entire amount standing to his credit in his Account, and there shall not thereafter be any forfeitures with respect to any such affected Participant for any reason.  Plan termination shall be effective as of the date specified by resolution of the Board of Directors, subject, however, to the provisions of Section 16.4 hereof.

(b)     Effect on Retired Persons, Etc.  Termination of the Plan shall have no effect upon payment of benefits to former Participants, their Beneficiaries and their estates, where benefit payments commenced prior to Plan termination.

(c)     Effect on Remaining Participants.  The Employer shall instruct the Trustee either (1) to continue to manage and administer the assets of the Trust for the benefit of the Participants and their Beneficiaries pursuant to the terms and provisions of the Trust Agreement, or (2) to pay over to each Participant (and former Participant) the value of his interest, and to thereupon dissolve the Trust.

16.3.   Complete Discontinuance of Employer Contributions.  While it is the Employer's intention to make substantial and recurrent contributions to the Fund pursuant to the provisions of the Plan, the right is, nevertheless, reserved to at any time completely discontinue Employer

contributions. Such complete discontinuance shall be established by resolution of the Board of Directors and shall have the effect of a termination of the Plan, as set forth in section 16.2, except that the Trustee shall not have the authority to dissolve the Fund except upon adoption of a further resolution by the Board of Directors to the effect that the Plan is terminated and upon receipt from the Employer of instructions to dissolve the Fund pursuant to subsection 16.2(c).

16.4.   Suspension of Employer Contributions.  The Employer shall have the right at any time, and from time to time, to suspend Employer contributions to the Fund pursuant to the Plan. Such suspension shall have no effect on the operation of the Plan except as set forth below:

(a)   If the Board of Directors determines by resolution that such suspension shall be permanent, a permanent discontinuance of contributions will be deemed to have occurred as of the date of such resolution or such earlier date as is therein specified.

(b)   If such suspension becomes a Plan termination, a complete discontinuance of contributions will be imputed. In such case, the permanent discontinuance, with resultant full vesting for all affected Participants, shall be deemed to have occurred on the date specified by resolution of the Board of Directors or established as a matter of equity by the Plan Administrator.

16.5.   Mergers and Consolidations of Plans.  In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant shall have a benefit in the surviving or transferee plan (determined as if such plan were then terminated immediately after such merger, consolidation or transfer) that is equal to or greater than the benefit he would have been entitled to receive immediately before such merger, consolidation or transfer in the plan in which he was then a Participant (had such plan been terminated at that time). For the purposes hereof, former Participants and Beneficiaries shall be considered Participants.

16.6   Participation By Related Entities.

(a)   Commencement.  Any subsidiary of the Employer which is eligible to file a consolidated federal income tax return with Advanta shall be deemed to have adopted this Plan and the accompanying Trust Agreement, as of the first year in which the consolidated federal income tax return filing that includes the subsidiary may be made, unless Advanta, through its Board of Directors, provides otherwise. Any other subsidiary company of Advanta or affiliate of Advanta may, with the permission of the Board of Directors, elect to adopt this Plan and the accompanying Trust Agreement.

(b)   Termination.  Advanta may, by action of the Board of Directors, determine at any time that any such Employer shall withdraw and establish a separate plan and fund. The withdrawal shall be effected by a duly executed instrument delivered to the Trustee instructing the Trustee to segregate the assets allocable to the Employees of such Employer and pay them over to the separate fund.

(c)    Single Plan.  The Plan shall at all times be administered and interpreted as a single plan for the benefit of the Employees of entities treated hereunder as the Employer.

(d)    Delegation of Authority.  Each Employer, by adopting the Plan, acknowledges that Advanta has all the rights and duties thereof under the Plan and the Trust Agreement, including the right to amend the same.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

17.1.   Nonalienation of Benefits.   None of the payments, benefits or rights of any Participant, Beneficiary or Alternate payee shall be subject to any claim of any creditor, and in particular, to the fullest extent permitted by law, all such payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Participant, Beneficiary or Alternate payee.  No Participant, Beneficiary or Alternate Payee shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingently or otherwise, under the Plan, except the right reserved to Participants, and in certain circumstances to their surviving Spouse, to designate a Beneficiary or Beneficiaries as hereinabove provided.  Compliance with the provisions and conditions of any QDRO shall not be considered a violation of this provision.

17.2.   Action by Employer.   Any action permitted or required to be taken by the Employer hereunder may be taken by the Board of Directors, or by such committee or person as may be designated for this purpose by the Board of Directors.  Amendment or termination of the Plan, the permanent or complete discontinuance of contributions by the Employer, the determination of Employer contributions for any Plan Year and the removal or appointment of the Plan Administrator or the Trustee shall be by resolution of the Board of Directors or any committee thereof, or by any person or persons authorized to take such action (or whose action so taken is ratified) by resolution of the Board or such committee.  Notwithstanding the foregoing, any amendment necessary to initially qualify the plan under section 401(a) of the Code, or to maintain such qualification, may be made without the further approval of the Board of Directors if signed by the officers or other persons authorized pursuant to this Section.

Each entity constituting the Employer hereby delegates to the Board of Directors (and to the officers and other persons authorized to act on behalf of Advanta) the full authority to act in its stead and on its behalf on all matters with respect to the Plan and the Trust Agreement.

17.3.   No Contract of Employment.   Neither the establishment of the Plan, nor any modification thereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving any Participant or employee, or any person whomsoever, the right to be retained in the Service of the Employer, and all Participants and other employees shall remain subject to discharge to the same extent as if the Plan had never been adopted.

17.4.   Severability of Provisions.   If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and the Plan shall be construed and enforced as if such provision had not been included.

17.5.   Heirs, Assigns and Personal Representatives.   This Plan shall be binding upon the heirs, executors, administrators, successors and assigns of the parties, including each Participant

and Beneficiary, present and future and all persons for whose benefit there exists any QDRO with respect to any Participant (except that no successor to the Employer shall be considered a Plan sponsor unless that successor adopts the Plan).

17.6.   **Headings and Captions.**  The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

17.7.   **Gender and Number.**  Except where otherwise clearly indicated by context, the masculine and the neuter shall include the feminine and the neuter, the singular shall include the plural, and vice-versa.

17.8.   **Controlling Law.**  The Plan shall be construed and enforced according to the laws of the State of Delaware to the extent not preempted by federal law, which shall otherwise control.

17.9.   **Funding Policy.**  The Plan is designed to invest primarily in Employer Securities so as to give Participants an ownership interest in the Employer.

17.10.   **Title to Assets.**  No Participant, Beneficiary or Alternate Payee shall have any right to, or interest in, any assets of the Fund upon termination of his employment or otherwise, except as provided from time to time under the Plan, and then only to the extent of the benefits payable under the Plan to such Participant, Beneficiary or Alternate Payee out of the assets of the Fund. All payments of benefits as provided for in the Plan shall be made from the assets of the Fund, and neither the Employer nor any other person shall be liable therefor in any manner.

17.11.   **Payments to Minors, Etc.**  Any benefit payable to or for the benefit of a minor, an incompetent person or other person incapable of receipting therefor shall be deemed paid when paid to such person's guardian or to the party providing or reasonably appearing to provide for the care of such person, and such payment shall fully discharge the Trustee, the Plan Administrator, the Employer and all other parties with respect thereto.

17.12.   **Reliance on Data and Consents.**  The Employer, the Trustee, the Plan Administrator, all fiduciaries with respect to the Plan, and all other persons or entities associated with the operation of the Plan, the management of its assets, and the provision of benefits thereunder, may reasonably rely on the truth, accuracy and completeness of any representations or data provided by any Participant, any Beneficiary, any spouse of a Participant or any Alternate Payee, including, without limitation, representations or data as to age, health, marital status and any inability to locate a spouse. All such representations made and data submitted are binding on any party seeking to claim a benefit through a Participant, Beneficiary, spouse of a Participant, Alternate Payee or the representatives of any such persons. Similarly, the Employer, the Trustee, the Plan Administrator, all fiduciaries with respect to the Plan and all such other aforementioned persons or entities, each shall have the right to rely on consents, elections, designations and waivers received, and may treat any such consent, election, designation or

waiver as genuine and as having been executed with full comprehension of the significance thereof by the party purported to have signed the same.

17.13.  Lost Payees.  A benefit shall be deemed forfeited if the Plan Administrator is unable to locate the person to whom payment is due, provided, however, that subject to Section 17.14, such benefit shall be reinstated if a claim is made by the party to whom the forfeited benefit is properly payable.

17.14.  Missing Spouses.  If a Participant certifies in writing to the Plan Administrator that he or she is unable to locate his or her Spouse after diligent effort to determine his or her whereabouts, and if the Plan Administrator, having written to such Spouse at the address at which such Spouse was last known to the Participant or the Plan Administrator to reside (or to the said Spouse's legal representative if the Plan Administrator has been advised of the existence of such legal representative), receives no response that could reasonably be expected to result in the location of such Spouse, the Participant shall be treated as an unmarried person for purposes of the Plan until such time, if ever, as such Spouse is located and his or her whereabouts made known to the Plan Administrator.  If such a missing Spouse subsequently appears or is located, such Spouse's rights, if any, to future benefit payments shall be restored, but such Spouse shall have no claim against any party with respect to benefits already paid, regardless of to whom paid.

17.15.  Notices.  Each Participant, Beneficiary, Alternate Payee or other person entitled to benefits under the Plan shall be responsible for furnishing the Plan Administrator with the current and proper address for the mailing of notices, statements, reports, other communications from the Plan Administrator and benefit payments.  Any notice, statement, report or communication required or permitted to be given to any such person shall be deemed to have been duly given if delivered to, or if mailed by first-class mail, postage prepaid and addressed to, such person at the address so furnished to the Plan Administrator.  If any check or Employer Securities mailed to such address is returned as undeliverable to the addressee, mailing of checks or such Employer Securities shall be suspended until the person entitled to such payment furnishes, or the Plan Administrator is otherwise furnished, the proper address.  This Section shall not be construed as requiring the mailing of any notice or communication if the regulations issued under ERISA or the Code deem sufficient notice to be given by the posting of notice in appropriate places, or by any other publication method.  All elections, designations, requests, notices, instructions and other communications from a Participant, Beneficiary, Alternate Payee or other person to the Plan Administrator, required or permitted under the Plan, shall be in such form as prescribed by the Plan Administrator and shall be mailed by first-class mail or delivered to such location as prescribed by the Plan Administrator and shall be deemed to have been given and delivered only upon actual receipt thereof by the Plan Administrator at such location.

17.16.  Counterparts.  This Plan instrument and any amendments thereto may be executed in several counterparts, each of which shall be deemed an original.  As to the Plan instrument and as to the instruments of amendment thereto, the counterparts of the respective instruments shall be considered a single instrument, which may be sufficiently evidenced by one counterpart.



Further, each amendment to the Plan shall be deemed to have all counterpart Plan instruments, and, if applicable, all counterparts of prior amendments.



IN WITNESS WHEREOF, and as evidence of the adoption of this Plan effective _9/10/98_ the Employer has caused the same to be executed by its duly authorized officers and its corporate seal to be affixed, this _31st_ day of _October_, 2001.

Advanta Corp.

Attest:

_Susan Giusti_
Susan Giusti
Assistant Secretary
(Corporate Seal)

By: _____
Elizabeth H. Mai, Senior Vice President,
Secretary and General Counsel