# EXHIBIT C

Westlaw.

Page 1

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

United States Court of Appeals,
Seventh Circuit.
Jonathan F. PEABODY, Plaintiff–Appellee,
Cross–Appellant,
v.
Andrew A. DAVIS, et al., Defendants–Appellants,
Cross–Appellees.

Nos. 09–3428, 09–3452, 09–3497, 10–1851,
10–2079, 10–2091.
Argued Nov. 2, 2010.
Decided April 12, 2011.

**Background:** Plan participant brought action under Employee Retirement Income Security Act (ERISA) against plan sponsor and its corporate parent, ERISA plan, plan's trustees and insurers for breach of their fiduciary duties in managing the plan. The United States District Court for the Northern District of Illinois, David H. Coar, J., 2009 WL 2916824, entered judgment in favor of participant on his claims against all defendants except for insurers, and participant and non-insurance defendants cross-appealed.

**Holdings:** The Court of Appeals, Cudahy, Circuit Judge, held that:
(1) plan trustees breached their duty of prudence with respect to plan participant;
(2) loan-for-stock transaction was a prohibited transaction; and
(3) participant lacked standing under ERISA to sue non-fiduciary insurance defendants.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Labor and Employment 231H ⚷647**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
            231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
                231Hk647 k. Action on behalf of plan or as individual. Most Cited Cases

ERISA authorizes recovery for breach of fiduciary duty only on behalf of an entire plan, and not in favor of an individual participant; however, a participant in a defined contribution plan may bring an action as to an individual account. Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[2] Labor and Employment 231H ⚷659**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
            231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
                231Hk658 Judgment and Relief
                    231Hk659 k. In general. Most Cited Cases

Remedy in an action under ERISA for breach of fiduciary duty is for the fiduciary to "make good" the loss to the plan. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[3] Federal Courts 170B ⚷776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial de novo. Most Cited Cases

**Federal Courts 170B ⚷871**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts and Findings
                170Bk870 Particular Issues and Questions
                    170Bk871 k. Damages and extent of relief. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

Method of calculating damages under ERISA for breach of fiduciary duty is reviewed de novo; calculations pursuant to the method are reviewed for clear error. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[4]** Labor and Employment 231H ⟳699

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
            231HVII(K)5 Actions to Recover Benefits
                231Hk698 Judgment and Relief
                    231Hk699 k. In general. Most Cited Cases

Remedy in a successful action by plan participant for ERISA plan benefits is to receive the accrued benefits. Employee Retirement Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B).

**[5]** Labor and Employment 231H ⟳491(1)

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
            231Hk487 Investments and Expenditures
                231Hk491 Investments in Securities or Property of Sponsor
                    231Hk491(1) k. In general. Most Cited Cases

Eligible individual account plan (EIAP) is exempted from ERISA's diversification duty with respect to employer securities; however, the full ERISA duty of prudence nevertheless applies. Employee Retirement Income Security Act of 1974, § 404(a)(1)(C), 29 U.S.C.A. § 1104(a)(1)(C).

**[6]** Labor and Employment 231H ⟳491(1)

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
            231Hk487 Investments and Expenditures
                231Hk491 Investments in Securities or Property of Sponsor
                    231Hk491(1) k. In general. Most Cited Cases

Under ERISA, eligible individual account plan (EIAP) plan trustees breached their duty of prudence with respect to plan participant's account; a prudent investor would not have remained so heavily invested in non-diversified employer's stock as the company's fortunes declined precipitously over a five-year period for reasons that foretold further and continuing declines. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[7]** Labor and Employment 231H ⟳491(1)

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
            231Hk487 Investments and Expenditures
                231Hk491 Investments in Securities or Property of Sponsor
                    231Hk491(1) k. In general. Most Cited Cases

Severe decline in company stock value does not, without considerably more, create a duty under ERISA to divest from company stock. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[8]** Labor and Employment 231H ⟳488

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
            231Hk487 Investments and Expenditures
                231Hk488 k. In general. Most Cited Cases

Whether a participant exercises control, under statutory safe harbor freeing fiduciaries from responsibility for plan losses attributable to the participant's investment decisions, stems from a plan's specific provisions, not from elements which may arguably amount to control in connection with a single transaction. Employee Retirement Income Security Act of 1974, § 404(c), 29 U.S.C.A. § 1104(c); 29 C.F.R. § 2550.404c–1.

**[9]** Labor and Employment 231H ⟳491(1)

231H Labor and Employment
    231HVII Pension and Benefit Plans

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

        231HVII(C) Fiduciaries and Trustees
           231Hk487 Investments and Expenditures
              231Hk491 Investments in Securities or Property of Sponsor
                231Hk491(1) k. In general. Most Cited Cases

    Eligible individual account plan (EIAP) plan trustees' carrying out of loan-for-stock transaction with plan participant and subsequently allowing participant to remain invested exclusively in employer stock during the company's decline was not consistent with trustees' duty of prudence under ERISA, and fact that participant agreed to the investment of employer stock at the outset did not free the trustees from the exercise of their fiduciary duty where plan did not comply with statutory safe harbor freeing fiduciaries from responsibility for plan losses attributable to the participant's investment decisions. Employee Retirement Income Security Act of 1974, § 404(c), 29 U.S.C.A. § 1104(c); 29 C.F.R. § 2550.404c–1.

**[10] Labor and Employment 231H ⟳488**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
           231Hk487 Investments and Expenditures
              231Hk488 k. In general. Most Cited Cases

    Actions of ERISA plan trustee, when delegating decision-making authority to plan participants, must be evaluated to see if such delegations violate the trustee's fiduciary duty; where statutory safe harbor freeing fiduciaries from responsibility for plan losses attributable to the participant's investment decisions does not apply, ERISA fiduciaries can be liable for allowing participants to select company stock as an investment if it is manifestly imprudent to allow them to do so. Employee Retirement Income Security Act of 1974, § 404(c), 29 U.S.C.A. § 1104(c); 29 C.F.R. § 2550.404c–1.

**[11] Labor and Employment 231H ⟳493**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
           231Hk487 Investments and Expenditures
              231Hk493 k. Prohibited transactions; parties in interest. Most Cited Cases

    Eligible individual account plan's (EIAP's) transaction with plan participant, who was given sponsor company's in return for loan, was a prohibited transaction within meaning of ERISA since sponsor was a "party in interest" within meaning of the statutory prohibition. Employee Retirement Income Security Act of 1974, § 406(a)(1)(B), 29 U.S.C.A. § 1106(a)(1)(B).

**[12] Labor and Employment 231H ⟳662**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
           231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
              231Hk658 Judgment and Relief
                231Hk662 k. Damages. Most Cited Cases

    Damages for ERISA plan trustees' breach of their duty of prudence by failing to reduce plan participant's investment in sponsor's company stock as the company's fortunes declined precipitously over a five-year period for reasons that foretold further and continuing declines would be calculated on basis on premise that there was a prudential duty to reduce exposure to company stock in an orderly way, as company profitability abruptly and openly dropped; because of the uncertainties involved, prudence did not require that the account be totally drained of the arguably imprudent stock investment immediately, even though that investment eventually became worthless. Employee Retirement Income Security Act of 1974, § 502(a)(2), 29 U.S.C.A. § 1132(a)(2).

**[13] Labor and Employment 231H ⟳659**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
           231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
              231Hk658 Judgment and Relief
                231Hk659 k. In general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

District court did not abuse its discretion by declining to remove ERISA trustees, who breached their duty of prudence by failing to reduce plan participant's investment in sponsor's company stock as the company's fortunes declined precipitously over a five-year period for reasons that foretold further and continuing declines. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[14]** Labor and Employment 231H ⚷646

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
            231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
                231Hk646 k. Parties in general; standing. Most Cited Cases

Plan participant lacked standing under ERISA to sue non-fiduciary insurance defendants, which issued dishonesty bonds ERISA plan, whose trustees' breached their fiduciary duty to participant; adverse domination theory did not apply so as to transform participant's claim for money damages under the plan's insurance policy into claim for equitable relief available under ERISA. Employee Retirement Income Security Act of 1974, § 502(a)(3), 29 U.S.C.A. § 1132(a)(3).

**[15]** Limitation of Actions 241 ⚷58(4)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k58 Liabilities Created by Statute
                241k58(4) k. Liability of corporate officers or stockholders. Most Cited Cases

Adverse domination tolls the running of the statute of limitations period where the entity is dominated by wrongdoers.

Lee T. Polk, Barnes & Thornburg, Chicago, IL, for Plaintiff–Appellee, Cross–Appellant.

George N. Vurdelja, Jr., Harrison & Held, LLP, Chicago, IL, for Defendants–Appellants, Cross–Appellees.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.
*1 In this case, the Rock Island Corporation, its subsidiary, its Employee Retirement Income Security Act (ERISA) plan and the plan's trustees, Andrew Davis and Robyn Kole, all defendants, appeal from the district court's judgment that they breached their fiduciary duty in managing the Plan. Plaintiff John F. Peabody cross-appeals from the finding that he lacked standing to recover from the Plan's insurers. For the reasons that follow, we affirm the finding of liability, affirm the court's finding that Peabody lacks standing to sue the insurance defendants and remand for reconsideration of damages.

I. Facts and Procedural History
A. Background
This case arises from Peabody's employment with Rock Island Corporation (RIC), through which he became a participant in the company's ERISA Plan.[FN1] RIC was a securities firm based in Chicago, and had a subsidiary, Rock Island Securities (RIS). RIC was a closely-held corporation with several dozen shareholders, and RIS, its subsidiary, was the sponsor of the corporation's ERISA Plan. Defendants Davis and Kole were the corporation's co-founders. They served as corporate officers of RIC and as trustees and fiduciaries of RIS's ERISA Plan.

Peabody joined RIC in 1998 as a vice president for "strategic technology and arbitrage." In 1999, Peabody first invested in the ERISA Plan. He did so because making the investment allowed him to receive his 1999 bonus, as he desired, in cash instead of stock. Specifically, Peabody and the RIC management agreed that if he rolled over his external IRA into RIC's Plan, he could receive a cash bonus instead of receiving RIC stock consistent with the company's ordinary practice. Therefore, Peabody rolled over outside investments totaling $167,819, of which $166,000 was used to purchase shares of RIC stock. In return, he received a 1999 cash bonus of more than $212,000. This left Peabody's account 98% invested in RIC stock, while the next greatest concentration in any other employee's account was approximately 5%.

Because RIC was a closely-held corporation, there was no market to indicate the value of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

company's stock; instead, valuation of the RIC stock required an analysis of the company's financial data. Davis and Kole issued valuation statements for the stock periodically. When Peabody initially purchased company stock in the 1999 rollover transaction, it was priced at $2,000 per share. In April of 2000, there was a ten-to-one stock split. In December of 2000, the RIC stock was valued at $757 per share by an outside financial analyst. In 2001 Peabody purchased five additional RIC shares at a value of $500 per share. A benefit statement in December of 2001 valued the stock at $625 per share. A 2004 statement valued it at $550 per share.

Peabody's employment with RIC ended in January of 2004. When he requested his benefits under the Plan, the company responded by giving him several choices: he could redeem his 835 RIC shares immediately for $215 per share, redeem them in 2005 for $300 per share or redeem them in 2007 for $400 per share. Not satisfied with any of these options, in April of 2004, Peabody entered into a loan agreement with RIC. Specifically, RIC agreed to purchase all of his RIC stock, in consideration of RIC's agreeing to pay Peabody $350 per share in one year. The total amount of the loan was $292,250 plus interest. This transaction was in effect the transformation of Peabody's equity interest in RIC, provided by the stock, into a creditor's interest, provided by the loan. When the time came for payment on the loan, RIC informed Peabody that it would be unable to pay. On March 18, 2005 Peabody formally demanded the distribution to him of his Plan benefit and was told that the loan proceeds could not be repaid. Sometime in 2005, RIC went out of business.[FN2]

**\*2** From 1997 to 2003, the Plan maintained a commercial crime policy for which insurance defendant Liberty Mutual is now responsible.[FN3] From February 22, 2003 to 2006, the Plan held commercial crime coverage provided by insurance defendant Hanover Insurance Company. Both these policies insured the Plan against employee dishonesty.

On August 31, 2005, Peabody filed a 27–count complaint. He alleged multiple theories of fiduciary breach against the Plan defendants, and also argued that he was entitled to recover damages from the insurance defendants. In September 2006, he notified the insurance defendants of a potential claim against them under the dishonesty bonds. In October, he named them as defendants in an amended complaint.

### B. Procedural History

The district court conducted a bench trial in July 2007 and in September 2009 issued a memorandum opinion holding Davis, Kole and RIS liable to Peabody. Initially, the court rejected Peabody's argument that the defendants violated the Plan terms or breached their fiduciary duties by allowing the initial rollover transaction—Peabody had "arguably" waived any such argument by agreeing to the transaction. Along the same lines, the court held that the defendants had not violated their duty to diversify the Plan assets, reasoning that Peabody had "knowing[ly] and voluntar[ily]" waived this claim at the time of the rollover transaction. But the court held that the defendants violated their fiduciary duty of prudence by maintaining the investment in RIC stock throughout RIC's decline, and also by failing to distribute Peabody's Plan benefit. The court found fiduciary breaches under several additional theories not material here.

As to the loan-for-stock transaction, the district court ruled that Davis (but not Kole) had breached his fiduciary duty by offering only a loan in payment for the RIC stock and further, that this exchange constituted a "prohibited transaction" under ERISA § 406(a)(1)(B).

The district court rejected Peabody's argument that the parent company, RIC, was liable, stating: "RIC is not a fiduciary of the Plan and all claims against it in the instant action are disregarded."

As to the insurance defendants, the district court concluded that Peabody lacked standing to press a claim on behalf of the Plan. The court reasoned that Peabody could not sustain his claim under § 502(a)(1)(B) or § 502(a)(2) because the insurers were not proper defendants. The court rejected Peabody's argument that he could recover in equity under § 502(a)(3) because he sought money damages, not equitable relief.

The district court struck Peabody's expert witness on RIC stock valuation because of Peabody's non-compliance with discovery rules. But the court nevertheless awarded damages. Although Peabody had not offered evidence of damages as to each theory of liability, the court determined that there was evidence with respect to the breach of the duty of prudence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

between 2001 and 2003, based on the relatively rapid decline in profitability of RIC in that period. Therefore, the court calculated damages on the basis of that breach. The court accepted that the value of Peabody's shares was at least $500 in 2001, because this was the price at which the Plan purchased five RIC shares for Peabody's account in 2001. Consequently, the court calculated Peabody's damages based on his ownership of 835 shares, arriving at a figure of $417,500. The court added prejudgment interest to arrive at a total figure of $506,601.82.

*3 Peabody filed a post-judgment motion under Fed.R.Civ.P. 59(e), requesting that the court reconsider its denial of Peabody's claim for distribution of his benefits, under ERISA § 502(a)(1)(B) (count XXII), and also that the district court retain jurisdiction of the case. Beyond the Rule 59(e) motion, Peabody requested two additional forms of post-judgment relief significant here. First, he asked that the trustees be removed, and second, he requested that the court order the defendants to disclose certain historical Plan information. The court denied each of these requests. Peabody and the defendants both timely appealed.

II. Applicable Law

Three distinct causes of action are central to the present case: an action on behalf of the Plan against Plan fiduciaries for breach of fiduciary duty under § 502(a)(2); an action by a Plan participant against the Plan to receive his or her benefits under § 502(a)(1)(B); and an action for other equitable relief under § 502(a)(3).

The action for fiduciary breach occupies the bulk of our attention. Section 502(a)(2) of ERISA allows an action against a fiduciary for a breach of the fiduciary duties set forth in § 404. Those duties include managing investments "with the care, skill, prudence, and diligence under the circumstances then prevailing," § 404(a)(1)(B), and "diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so," § 404(a)(1)(C). However, certain plans termed "eligible individual account plans" are exempted from the diversification requirement by § 404(a)(2).

[1] The default rule has long been that § 502(a)(2) authorizes recovery only on behalf of an entire plan, and not in favor of an individual participant. *See, e.g.* Plumb v. Fluid Pump Serv., 124 F.3d 849, 863 (7th Cir.1997). However, a participant in a defined contribution plan may bring a § 502(a)(2) action for breach of fiduciary duty as to an individual account. LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 256, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) ("Whether a fiduciary breach diminishes plan assets payable to all participants ... or only to persons tied to particular individual accounts, it creates the kind of harms that concerned the draftsmen of [ERISA]."). To prevail under § 502(a)(2), the plaintiff must show a breach of fiduciary duty, and its causation of an injury. *See* Kamler v. H/N Telecomm. Servs., 305 F.3d 672, 681 (7th Cir.2002).

[2][3] The remedy in an action for breach of fiduciary duty is for the fiduciary to "make good" the loss to the plan. ERISA § 409; *see* Plumb, 124 F.3d at 863 n. 13; Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir.1985) (holding that "the measure of loss applicable under ERISA ... requires a comparison of what the Plan actually earned ... with what the Plan would have earned [but for the fiduciary breach]."). The method of calculating damages is reviewed de novo; the calculations pursuant to the method are reviewed for clear error. *See* Rexam Beverage Can Co. v. Bolger, 620 F.3d 718, 727 (7th Cir.2010).

*4 [4] In contrast to § 502(a)(2), § 502(a)(1)(B) expressly provides for an individual to have standing to recover benefits under the terms of an ERISA plan. Unsurprisingly, the remedy in a successful action for plan benefits is to receive the accrued benefits. § 502(a)(1)(B); *see* Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146–47, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

The third cause of action is § 502(a)(3), which is the mechanism through which Peabody attempts to recover from the third-party insurance defendants. That section allows for the recovery of "other appropriate equitable relief," including potentially recovery from non-fiduciaries, *see* Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 246–49, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000), but only to the extent that such relief is not available under the two sections discussed earlier, *see* Varity Corp. v. Howe, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Additional law is reviewed below, as needed.

III. Main Defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

We first address issues relating to defendants other than the insurers. The first issue is liability.

### A. Liability

[5] It has escaped attention thus far in this litigation that the RIC Savings Plan was an Eligible Individual Account Plan (EIAP) within the meaning of ERISA § 407(d)(3),[FN4] and consequently exempted by statute from the § 404(a)(1)(C) diversification duty with respect to employer securities. *See* § 404(a)(2); *Kirschbaum v. Reliant Energy,* 526 F.3d 243, 249 (5th Cir.2008) (applying the EIAP exemption to savings plan similar to the one at issue, and rejecting a diversification-based claim).[FN5] The exemption from the duty to diversify reflects a congressional judgment that the benefits of broadening employee ownership outweigh the greatly increased risks of an undiversified investment. *See Summers v. State St. Bank & Trust Co.,* 453 F.3d 404, 409–10 (7th Cir.2006). That calculation may have been more plausible at the time ERISA was enacted than it is today, because in 1974 the prevailing form of retirement plan was the defined benefit pension for which the duty to diversify is fully applicable, while today defined contribution plans (which enjoy the employer stock exemption from the duty to diversify) predominate. *See* Susan Stabile, *Paternalism Isn't Always a Dirty Word: Can the Law Better Protect Defined Contribution Plan Participants?,* 5 Empl. Rts. & Employ. Pol'y J. 491, 492 (2001).

In any event, while the express duty to diversify is inapplicable to EIAPs investing in employer securities, the full ERISA duty of prudence nevertheless applies. *See Armstrong v. LaSalle Bank Nat'l Ass'n,* 446 F.3d 728, 732 (7th Cir.2006) (stating that plans with no diversification duty "demand[ ] an even more watchful eye, diversification not being in the picture to buffer the risk to the beneficiaries should the company encounter adversity."). Some courts, beginning with the Third Circuit in *Moench v. Robertson,* 62 F.3d 553, 571 (3d Cir.1995), have reconciled the residual duty of prudence with the absence of an express diversification duty by providing that for an EIAP or ESOP, [FN6] there is a presumption that investing in employer stock is prudent. *See Quan v. Computer Sciences Corp.,* 623 F.3d 870, 881 (9th Cir.2010) (adopting *Moench* in the 9th Circuit); *see also Summers,* 453 F.3d at 410 (citing *Moench* with approval, although not expressly adopting it).

*5 [6] We need not grapple with the extent of *Moench*'s force as to EIAPs in this circuit, because even if the *Moench* presumption of prudence applied we would agree with the district court that Davis and Kole breached their duty of prudence as to Peabody. We note at the outset that the RIC Plan did not affirmatively require or encourage investment in employer securities—indeed, other than Peabody, apparently only Davis and Kole held RIC stock in their Plan accounts, and so far as the record indicates, they held RIC in their Plan accounts at a much lower concentration and absolute value than Peabody. In other words, divestment from RIC stock would not have required any deviation from the Plan terms nor would it have been unusual in the context of RIC, so the barriers to divestment were low compared to many other EIAP plans. *See Quan,* 623 F.3d at 883 ("A guiding principle ... is that the burden to rebut the [*Moench* ] presumption varies directly with the strength of a plan's requirement that fiduciaries invest in employer stock."); *Kirschbaum,* 526 F.3d at 255 ("[*Moench* ] clearly implies that a plan participant would bear an even heavier burden of showing a fiduciary duty breach where the plan utterly compelled investment in company stock."); *cf. In re Schering–Plough,* 420 F.3d at 238 ("Because the Savings Plan in this case was not an ESOP [and did not require, but merely allowed for, the provision of company stock as an investment option], the *Moench* decision does not [apply].").

[7] We agree with the district court that a prudent investor would not have remained so heavily invested in RIC's stock as the company's fortunes declined precipitously over a five-year period for reasons that foretold further and continuing declines. In particular, Davis testified that RIC income came from commissions, and that the SEC's decimalization rule "crushed" RIC's profit margins, such that by 2003 or 2004 profit margins had declined by 70–80%. He further testified that this effect was being felt, beginning in 2000, in commission-based firms like RIC across the country. Kole likewise acknowledged that by 2003 and 2004, RIC was "going downhill." Although these developments were public, no one was better positioned to know of RIC's prospects and the future of its stock value than Davis and Kole, who co-founded the company and set the share value. These facts are consistent with circumstances under which sister courts would find it imprudent to continue an investment in company stock. *See Quan,* 623 F.3d at 882 (explaining that to demonstrate impru-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

dence, a plaintiff must show circumstances that " 'clearly implicate [ ] the company's viability as an ongoing concern' or show 'a precipitous decline in the employer's stock ... combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement.' ") (citing *Wright,* 360 F.3d at 1099 n. 5). In short, a widely-known and permanent change in the regulatory environment had undermined RIC's core business model, and consequently the company stock became an imprudent investment.[FN7]

**\*6** [8][9] The issue of waiver or consent by Peabody with respect to the non-diversified RIC stock investment (another branch of the fiduciary duty question) is close. The district court held that Peabody had "arguably waived" his claim that the defendants had breached their fiduciary duty by agreeing to the RIC stock investment initially, and by *never* requesting that the fiduciaries reduce this investment. This arguable waiver is effectively the same as a defense that the fiduciary is not liable if a participant has exercised control over the account. This defense is available under limited circumstances which are not clearly applicable here. Specifically, ERISA § 404(c) frees fiduciaries from responsibility for Plan losses attributable to the participant's investment decisions,[FN8] but only for certain types of accounts prescribed by the statute and by Department of Labor regulations. *See* ERISA § 404(c); 29 C.F.R. § 2550.404c–1 [FN9]; *see also LaRue,* 552 U.S. at 256, 128 S.Ct. 1020 (stating that § 404(c) "would serve no real purpose if ... fiduciaries never had any liability for losses in an individual account."). Moreover, whether a participant exercises control under § 404(c) "stems from a plan's specific provisions, not from elements ... which may arguably amount to control in connection with a single transaction." *See Meinhardt,* 74 F.3d at 446. Fiduciaries bear the burden of the § 404(c) defense. *Id.*

[10] We have explained that when a plan is non-compliant with § 404(c), fiduciaries are denied the statutory safe harbor. However, it does not necessarily follow that any delegation of investment discretion to plan participants violates ERISA. Rather, "the plan trustee, when delegating decision-making authority to plan participants, must be evaluated to see if [such delegations] violate the trustee's fiduciary duty." *Jenkins v. Yager,* 444 F.3d 916, 924 (7th Cir.2006).[FN10] In other words, where § 404(c) does not apply, ERISA fiduciaries can be liable for allowing participants to select company stock as an investment if it is manifestly imprudent to allow them to do so. *See generally Rogers v. Baxter Int'l Inc.,* 521 F.3d 702, 705–06 (7th Cir.2008) (discussing the possibility that the plaintiffs could prevail on remand by showing that the artificially high price of the company's stock created a "duty under ERISA ... to prevent participants from investing" in it).

The defendants here have made no effort to show that the Plan complied with ERISA § 404(c), and consequently the question becomes whether carrying out the rollover transaction and subsequently allowing Peabody to remain invested exclusively in RIC stock during the company's decline was consistent with the defendants' fiduciary duty. As noted, the defendants have not justified their failure to divest from RIC stock. Therefore, the fact that Peabody agreed to the RIC investment at the outset did not free the defendants from the exercise of their fiduciary duty. Hence, we affirm the district court's finding of breach of the duty of prudence.

**\*7** [11] Finally, as an alternative theory of liability, Peabody has argued that the defendants and the sponsor company, RIC, violated ERISA with the loan-for-stock transaction. Peabody is technically correct in his argument, but his success is of no benefit to him. Under ERISA § 406(a)(1)(B), it is a "prohibited transaction" for fiduciaries to loan Plan money to a "party in interest." The company employing the Plan participant—here RIC—is a "party in interest" pursuant to ERISA § 3(14)(C). Thus, there has been a violation of § 406 even though there has been no injury to the plan. *See, e.g., Keach v. U.S. Trust Co.,* 419 F.3d 626, 635 (7th Cir.2005). ERISA provides EIAPs with certain exemptions from the prohibition on § 406 transactions, *see* § 408(e), but the defendants have not argued how they might apply here, and any such argument has been waived. *See Elmore v. Cone Mills Corp.,* 23 F.3d 855, 864 (4th Cir.1994) (en banc) (placing the burden of proof for the § 408(e) exemption on the defendant). Nevertheless, it seems clear that no losses were attributable directly to the loan-for-stock transaction; rather, it appears that this transaction consisted of the exchange of worthless stock for a worthless loan. Although there has been a violation of ERISA § 406(a)(1)(B), there are not damages to Peabody from a substitution of debt for equity.[FN11]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

B. Calculation of Damages Requires Remand

As previously indicated, the district court's method of calculating damages was erroneous. The remedy in an action for breach of fiduciary duties under § 502(a)(2) is for the fiduciary to make good the loss to the Plan. See Plumb, 124 F.3d at 863 n. 13. But here, the $500 per share basis on which damages were based was tied only to a single, plausible valuation somewhere in the period of imprudency. Neither the $500 per share figure nor the $417,500 pre-interest total are solidly tied to the breach of fiduciary duty.

We understand the district court's predicament: Peabody's account was arguably mismanaged in several overlapping ways during the five years when the assets in his account disappeared. And the value of the account representing RIC shares during this period was quite elusive. The key questions are when did the fiduciary breach occur, and what was the resultant loss. See Martin v. Feilen, 965 F.2d 660, 671–72 (8th Cir.1992).

[12] On remand, we believe the district court should proceed on the theory that the defendants were required to divest from RIC as the profitability of the company declined sharply. The value of Peabody's initial investment ($167,819) will play an obvious part in these calculations, and at a later date the use of average values may be appropriate.[FN12] We think that for purposes of calculating damages perhaps an assumption that at least a quarter to a third of the original RIC stock could be left in the account when it was converted to a loan, without an imprudence violation, is reasonable. In other words, because of the uncertainties involved, prudence did not require that the account be totally drained of the arguably imprudent RIC stock investment immediately, even though that investment eventually became worthless. This is not to say that there was a general duty to "diversify" Peabody's holdings, since that is foreclosed by the statute. Rather, there was a prudential duty to reduce exposure to company stock in an orderly way, as company profitability abruptly and openly dropped. Cf. Steinman v. Hicks, 352 F.3d 1101, 1106 (7th Cir.2003) (recognizing that under certain circumstances an ESOP trustee may have a duty to sell company stock, that might "become a duty to diversify, even though failure to diversify an ESOP's assets is not imprudence per se.").

*8 A final note on Peabody's remedy is in order.

On appeal Peabody has argued, as he did in the district court, that he should be entitled to "distribution of his Plan benefits," under § 502(a)(1)(B) and count XXII of his complaint. As discussed above, the district court formally denied this claim as duplicative of the court's award under § 502(a)(2). But in addressing Peabody's post-judgment motion to amend, the district court indicated that it *did* want to grant this relief, at least insofar as it intended that the damages would be paid into Peabody's ERISA account and then would be immediately available to him with the tax rollover benefits preserved. The court stated:

> Peabody requests that the Court rule explicitly on his benefit claim to ensure that all damages are transferred to him as distributable benefits in his Plan account, as soon as practicable. Peabody seeks to preserve rollover eligibility with the funds, with attendant tax benefits. In its original judgment, the Court ordered Davis and Kole to restore the damages amount to [Peabody's] account under 29 U.S.C. § 1109. An alteration of the court's decision ... is unnecessary to accomplish the ends sought by Peabody.

> * * *

> If ... Peabody is primarily concerned that Davis and Kole will prevent him from timely accessing his Plan assets, the Court simply needs to clarify that upon prompt payment into Peabody's account, the damages shall be made available for immediate distribution[.]

We do not disturb the district court's ruling. Since the Supreme Court sanctioned individual claims under § 502(a)(2) in LaRue in 2008, the relationship between that subsection and the traditional mechanism of individual relief, § 502(a)(1)(B), has been muddied. See LaRue, 552 U.S. at 257–59, 128 S.Ct. 1020 (Roberts, C.J., concurring); Howell v. Motorola, Inc., 633 F.3d 552, 558–59 (7th Cir.2011). We see little benefit to exploring this legal frontier given that, when the defendants comply with the district court's order in the manner the court prescribed, all of Peabody's tax-related concerns should be allayed. Peabody is entitled to have his damages distributed with the tax features preserved, but this court need not credit multiple theories of relief to accomplish it. See Graden v. Conexant Sys. Inc., 496 F.3d 291, 301 (3d Cir.2007) (stating that an action under § 502(a)(2) is "the sensi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

ble route" for a benefits claim under the circumstances, because it would allow the plaintiffs "to get the money in the first instance from a solvent party liable to make good on the loss, not from the plan itself.").

C. Peabody's Additional Requests for Relief

As discussed above, Peabody is aggrieved by the district court's denial of his requests for the removal of Davis and Kole as trustees of the ERISA Plan; for the district court to compel Davis and Kole to make certain disclosures; and for the court to retain jurisdiction of the case to ensure that Peabody's judgment is satisfied.

**\*9** [13] The district court enjoyed discretion as to the removal of trustees, *see Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984); *Iron Workers Local # 272 v. Bowen,* 624 F.2d 1255, 1262 (5th Cir.1980), and did not abuse its discretion in declining to remove them. Peabody has been awarded an enforceable judgment and has not supplied persuasive reasons to believe that the defendants will dishonor it. Lengthy and contentious litigation precedes the issuance of many judgments, and does not, without more, deprive the district court of its discretion to retain or remove ERISA trustees. For much the same reasons, we affirm the court's denial of Peabody's request for an order that trustees make disclosures to effectuate the judgment.

We need not opine on the district court's decision to reject Peabody's request that the court retain jurisdiction. The district court was correct insofar as it observed that it was without jurisdiction of the case once it was appealed. *See Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 378, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Because the court's sole rationale for denying this request was its lack of jurisdiction while the case was on appeal, we do not know how it would have ruled under different circumstances. We express no opinion as to the proper outcome if the issue arises again on remand.

IV. The Liability of the Insurer Defendants

[14] We turn now to the matter of the liability of the insurance defendants under their dishonesty bonds issued to the RIC Plan. The district court ruled that the plaintiffs lacked standing under ERISA to sue the non-fiduciary insurance defendants, and we agree.

[15] Peabody concedes that the insurers are not proper defendants under § 502(a)(1)(B) or § 502(a)(2), but argues that his claim can prevail under § 502(a)(3), as "other appropriate equitable relief." Peabody's argument under § 502(a)(3) fails because the relief he seeks, money damages under the Plan's insurance policy, cannot be described as typically "equitable." *See Wal–Mart Stores, Inc. Associates' Health & Welfare Plan v. Wells,* 213 F.3d 398, 401 (7th Cir.2000) ("[T]he Supreme Court said ... that only typical equitable relief is available under [ERISA]."); *Novak v. Andersen Corp.,* 962 F.2d 757, 760 (8th Cir.1992) ("[W]e find nothing in the statutory language to persuade us to interpret 'other appropriate equitable relief' to mean anything other than what it usually means—declaratory or injunctive relief."). Peabody's attempt to circumvent this problem by relying on the equitable doctrine of adverse domination is unavailing. Adverse domination "tolls the running of the statute of limitations period where the entity is ... dominated by wrongdoers." *Resolution Trust Corp. v. Gallagher,* 800 F.Supp. 595, 600 (N.D.Ill.1992). Even assuming the application of this doctrine were indicated (an argument that the district court convincingly rejected), it would not change the nature of Peabody's claim against the insurers, or "cloak the litigant with standing" as Peabody urges. Crediting Peabody's theory would extend the doctrine far beyond its purpose relating to the timeliness of claims, and it would be particularly inappropriate to so contort the doctrine to create an ERISA remedy where none existed before. *See Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ("We have ... been especially reluctant to tamper with [the] enforcement scheme embodied in [ERISA] by extending remedies not specifically authorized by its text.") (internal quotation omitted).

**\*10** For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for proceedings consistent with this opinion.

> FN1. The Plan is an employee benefit plan within the meaning of ERISA § 3(3), and a defined contribution plan within the meaning of § 3(34).
>
> FN2. RIC's decline is apparently primarily attributable to a 2000 SEC rulemaking that required all U.S. public exchanges to allow stocks to be traded at values measured in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

terms of pennies instead of fractional dollars. The change, termed "decimalization," diminished the profit margins yielded by commissions on trades.

FN3. The policy was issued initially by Liberty's predecessor, Peerless Insurance Company.

FN4. This is so because the Plan is an individual account plan and specifically a savings plan, *see* § 407(d)(3)(A)(i), and the basic plan document explicitly provides for the Plan to hold qualifying employer securities, *see* § 407(d)(3)(B).

FN5. Although much of the precedent discussing the diversification exemption for EIAPs focuses on a particular type of EIAP called an Employee Stock Option Plan (ESOP) which is expressly designed to invest in employer securities, the statute unambiguously exempts *all* EIAPs from the duty to diversify, including savings plans like the one at issue. § 404(a)(2); *see* Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1094 (9th Cir.2004).

FN6. It is unclear whether this "*Moench*" presumption should apply to all EIAPs, or only to ESOPs (which exist for the express purpose of investing in company stock). *Compare* Wright, 360 F.3d at 1098 n. 3 (indicating that the *Moench* reasoning would apply equally to EIAPs and ESOPs) *with* In re Schering–Plough Corp. ERISA Litig., 420 F.3d 231, 238 (3d Cir.2005) (holding that the *Moench* presumption of prudence does not apply to EIAPs that are only permitted, but not required, to invest in employer securities).

FN7. We emphasize the narrowness of our reasoning in this respect. Most business failures are not so foreseeable, and a severe decline in company stock value does not, without considerably more, create a duty to divest from company stock. *See* Kirschbaum, 526 F.3d at 256 n. 12 (describing facts found insufficient to rebut the presumption of prudence of investments in company stock, including the "ill-fated merger, reverse stock split, and seventy-five percent drop in stock price" in *Wright;* the "company-wide financial woes and eighty percent drop in stock price" in Kuper v. Iovenko, 66 F.3d 1447, 1451, 1459 (6th Cir.1995); and the "accounting violations, restated revenues for three years, and seventy-five percent drop in stock price" in In re McKesson HBOC, Inc. ERISA Litig., 391 F.Supp.2d 812, 830–33 (N.D.Cal.2005)).

FN8. 29 U.S.C. § 1104 provides as follows:

(c) Control over assets by participant or beneficiary.

(1)(A) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)—

* * *

(ii) no person who is otherwise a fiduciary shall be liable ... for any loss[.]

FN9. Generally, the Plan must inform participants that it is a § 404(c) plan, and it must offer a certain array of investment options. *See* Meinhardt v. Unisys Corp., 74 F.3d 420, 444 n. 21 (3d Cir.1996).

FN10. *But see* In re Enron Corp. Sec. Derivative & ERISA Litigation, 284 F.Supp.2d 511, 578 (S.D.Tex.2003) ("If a plan does not qualify as a § 404(c), the fiduciaries retain liability for all investment decisions made, including decisions by the Plan participants.").

FN11. This loan-for-stock transaction is also of arguable significance in that it may affect the liability of RIC. As noted, RIC is the parent company of RIS, the Plan sponsor. The district court rejected summarily the no-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))
**(Cite as: 2011 WL 1364427 (C.A.7 (Ill.)))**

tion that RIC could be liable to Peabody, observing simply that RIC was not a Plan fiduciary. However, a non-fiduciary may become liable for restitution if it engages in a § 406 prohibited transaction with the Plan, under § 502(a)(3). See *Harris Trust & Sav. Bank,* 530 U.S. at 253, 120 S.Ct. 2180 ("[A]n action for restitution against a transferee of tainted plan assets satisfies the 'appropriateness' criterion in § 502(a)(3). Such relief is also 'equitable' in nature."). Peabody did not cite § 502(a)(3), but he did claim RIC was liable as the counter-party in a prohibited loan transaction under the theory of *Harris Trust.* See *id.* at 245 n. 2, 120 S.Ct. 2180. However, as we have indicated, there are no evident damages to Peabody flowing from the loan.

FN12. We do not require that the district court on remand may not use the RIC stock valuations in calculating damages, but we note that the use of these valuations resulted in a surprisingly large award in view of Peabody's original investment of $167,819. It is easy to see how this happened: Peabody purchased shares at $2,000 in February of 2000; in April, 2000, there was a ten-to-one stock split (producing, one would imagine, a share value of $200); but in April of 2001 Peabody purchased post-split stock for his account at $500 per share. In other words, within the fourteen months after Peabody first purchased RIC stock, the supposed value of RIC stock had increased by 250%. The district court implicitly accepted this extraordinary statistic, and indeed, based its award on the April, 2001 transaction valuing RIC stock at $500. Consequently, the district court's award boils down to a multiplication of Peabody's original investment by 2.5.

C.A.7 (Ill.),2011.
Peabody v. Davis
--- F.3d ----, 2011 WL 1364427 (C.A.7 (Ill.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.